**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

JENNIFER LYNN HARRINGTON,

*Plaintiff*,

v.

CITY OF NEW YORK, COMMISSIONER JESSICA TISCH, CAPTAIN JAMES WHITLOCK, LIEUTENANT MICHAEL KONTOROVICH, LIEUTENANT PHILIP HIRSCH, SERGEANT KATHLEEN AUSMAN, DETECTIVE CHAD MACK, DETECTIVE JUSTIN DOUGLAS, OFFICER ILYA DZEVIATKA, OFFICER CLAIRE QUINONES, OFFICER YAMNY CASTILLO, OFFICER CHRISTOPHER CAVALIERI, OFFICER DAVID PASTWA, OFFICER JAMYANG LOBSANG, DR. STACI J. RAMOS, and JOHN DOE NOs. 1–50,

*Defendants*.

Civil Action No. 1:26-cv-02919

**VERIFIED COMPLAINT**

(*Jury Trial Demanded*)

Plaintiff Jennifer Lynn Harrington ("Plaintiff" or "JLH") alleges, upon personal knowledge as to herself and upon information and belief as to all other matters, as follows:

## I. PRELIMINARY STATEMENT

1. This action arises from Defendants' retaliatory and discriminatory misuse of police and prosecutorial authority against Plaintiff, a documented stalking and assault victim who, over a period of years, repeatedly sought lawful protection from escalating violence and lodged public and official complaints regarding systemic failures within the NYPD's 28th Precinct.

2. On May 15, 2025, after Plaintiff was threatened and physically assaulted by known aggressors, NYPD officers arrested her for allegedly violating N.Y. Penal Law § 265.01(1) based on her possession of an electronic stun gun ("SG") carried for non-lethal self-defense. The arrest was made notwithstanding that a federal court had previously held that New York's

categorical prohibition on civilian SG possession violated the Second Amendment and entered a permanent injunction against enforcement. See *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019).

3. Plaintiff alleges that the arrest and subsequent prosecution were not the product of neutral law enforcement, but were instead undertaken in retaliation for Plaintiff's protected speech criticizing NYPD misconduct and demanding enforcement of her court-issued orders of protection. At the same time, similarly situated individuals possessing comparable devices were not arrested or prosecuted under the statute.

4. Plaintiff further alleges that Defendants relied on misleading and incomplete narratives, suppressed exculpatory evidence, and pursued baseless additional charges and a retaliatory order of protection against Plaintiff herself, effectively reversing the roles of victim and offender.

5. Through these actions, Defendants violated Plaintiff's rights under the First, Second, Fourth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of New York State and City law. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and seeks declaratory and injunctive relief, compensatory damages, and other appropriate remedies.

## II. JURISDICTION and VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. §§ 2201–2202 and attorneys' fees pursuant to 42 U.S.C. § 1988.

7. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's related state law, state constitutional, and city code claims, which form part of the same case or controversy.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(2) because at least one Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred here.

9. Assignment to the Manhattan Courthouse is proper per S.D.N.Y. Rules for the Div. of Bus. Among Dist. Judges R. 18(a)(3).

## III. CONDITIONS PRECEDENT

10. Plaintiff has satisfied all conditions precedent under the New York General Municipal Law, including timely service of a Notice of Claim pursuant to § 50-e, appearance for a § 50-h hearing, and commencement of this action within the time prescribed by § 50-i.

## IV. PARTIES

11. **Plaintiff**: Jennifer Lynn Harrington ("Plaintiff" or "JLH") is an adult citizen of the United States residing in the State of New York. She is a law-abiding individual entitled to the protections of the United States Constitution. She has no felony or assault convictions and has not been involuntarily committed for mental health treatment.

12. **Defendant**: The City of New York (the "City") is a municipal corporation organized under the laws of the State of New York. The City operates and controls the New York Police Department ("NYPD"), and is responsible for the hiring, training, supervision, discipline, and conduct of NYPD personnel, including the policies, practices, customs, and usages that caused the violations alleged herein. Claims against the City arising under 42 U.S.C. § 1983 are asserted pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

13. **Defendant:** The NYPD is an agency of the City of New York and is not a suable entity under N.Y.C. Charter § 396. The NYPD is referenced herein solely to identify the law enforcement agency whose personnel engaged in the conduct alleged.

14. **Defendant:** Jessica Tisch ("Commissioner") is Commissioner of the NYPD and is sued in her official capacity for declaratory and prospective injunctive relief. As Commissioner, she is responsible for the administration of the NYPD and for the policies, practices, and customs challenged herein.

15. **Defendants:** Captain James Whitlock ("Whitlock"), Lieutenant Michael Kontorovich ("Kontorovich"), Lieutenant Philip Hirsch ("Hirsch"), Sergeant Kathleen Ausman ("Ausman"), Detective Chad Mack ("Mack"), Detective Justin Douglas ("Douglas"), Officer Ilya Dzeviatka ("Dzeviatka"), Officer Claire Quinones ("Quinones"), Officer Yamny Castillo ("Castillo"), Officer Christopher Cavalieri ("Cavalieri"), Officer David Pastwa ("Pastwa"), and Officer Jamyang Lobsang ("Lobsang") were, at all relevant times, officers, detectives, or supervisors employed by the NYPD and acting under color of state law. Each personally participated in or directly caused the constitutional violations alleged herein. They are sued in their individual capacities.

16. **Defendant:** Dr. Staci J. Ramos ("Ramos") was, at all relevant times, the President and Clergy Liaison of the 28th Precinct Clergy Council and acted jointly with NYPD personnel in connection with the conduct alleged herein. Ramos is sued in her individual capacity as a willful joint participant in concert with City actors under the color of state law. Ramos is not alleged to have exercised arrest authority, custodial control, or prosecutorial discretion except as alleged through knowing joint action with state actors.

17. **Defendants:** John Doe Nos. 1-50 ("JD Nos. 1-50") are police officers, supervisors, and/or other employees of the New York City Police Department, and/or employees of the New York County District Attorney's Office, whose identities are presently unknown to Plaintiff. Each is sued in his or her individual capacity for actions taken under color of state law. Plaintiff will seek leave of Court to amend this Complaint to substitute their true names upon identification through discovery.

## V. STATEMENT OF FACTS

### a. *Background and Selective Enforcement*

18. Plaintiff moved to New York City in November 2019 when she began residing at 262 West 122nd Street, Apartment 4A, a residential building (the "Building") located approximately 325 feet from the NYPD's 28th Precinct. Adjacent Apartment 4B was occupied by non-party individuals Porscha Smith ("PS") and her aunt, Tonia Jenkins ("TJ").

19. Plaintiff and PS were neighbors in the Building from approximately November 2019 through October 10, 2023. They were not family members, did not share an intimate relationship, and did not reside in the same dwelling unit.

20. Plaintiff and TJ remain neighbors as of the filing of this Complaint and reside directly across the hall from one another. They were not family members, did not share an intimate relationship, and did not reside in the same dwelling unit.

21. Electronic SGs are handheld, non-lethal defensive devices marketed to and possessed by civilians across the United States for self-defense. They are also routinely issued to and used by law enforcement and security agencies nationwide, including within New York.

22. New York State maintains N.Y. Penal Law Article 265, including § 265.01(1), which criminalizes the possession of electronic dart guns and electronic SGs, and § 265.10(4),

which makes it a crime to "dispose of" - *i.e.*, sell, transfer, or provide - any weapon listed in § 265.01, including electronic dart guns and electronic SGs. See N.Y. Penal Law §§ 265.01(1), 265.10(4).

23. Notwithstanding N.Y. Penal Law § 265.10(4), electronic SGs are commercially marketed, advertised, sold, and shipped to New York and New York City consumers. Upon information and belief, online vendors sell, ship, and deliver such devices to New York and New York City residents. Further, New York retail outlets located outside New York County sell to New York and New York City residents, without consistent arrest, seizure, or prosecution by state or municipal authorities, including the NYPD and the New York State Police ("NYSP").

24. N.Y. Penal Law Article 265 also includes § 265.20 ("Exemptions"), which enumerates limited exemptions regarding specified categories of weapons and circumstances, but does *not* provide *any* general exemption permitting ordinary civilians to lawfully possess electronic SGs.

25. New York City independently maintains and enforces New York City Administrative Code § 10-135 ("Prohibition on sale and possession of electronic stun guns"), which prohibits the possession and sale of electronic SGs within the City.

26. Upon information and belief, Penal Law Article 265 reflects a comprehensive statewide scheme governing weapons possession and sale. Plaintiff alleges that, to the extent that Administrative Code § 10-135 imposes parallel or divergent prohibitions in a field that is occupied by the State, it is preempted under New York law.

27. The NYPD, under the authority of the Commissioner, enforces both N.Y. Penal Law § 265.01(1) and New York City Administrative Code § 10-135, and NYPD officers have authority to arrest for alleged violations thereof and to refer such cases for prosecution.

28. While N.Y. Penal Law § 265.20, introduced in ¶ 24 above, provides the statutory framework governing exemptions for certain weapons, including self defense spray devices – imposing age restrictions and purchaser eligibility requirements – Article 265 does not contain comparable regulatory provisions governing the sale of electronic SGs. The statute does not establish minimum age requirements for purchasers or impose eligibility restrictions based on felony or assault convictions or involuntary mental health commitments.

29. New York law separately codifies justification and self-defense in Article 35 of the Penal Law. Article 35 provides a justification defense that, when applicable, renders the conduct legally justified and not criminal and negates criminal liability. See N.Y. Penal Law §§ 35.05, 35.15.

30. Upon information and belief, during the same period as Plaintiff's arrest, NYPD officers responded to incidents involving other individuals who possessed weapons regulated under Article 265, including electronic SGs materially comparable to Plaintiff's, yet those individuals were not arrested, charged, or subjected to custodial seizure under comparable circumstances, reflecting differential enforcement of the same statutory provisions.

b. *Avitabile Injunction: Statewide Notice and Continued Enforcement (2019-2025)*

31. On March 22, 2019, the United States District Court for the Northern District of New York issued a permanent injunction in *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019), declaring New York's categorical ban on civilian possession of electronic SGs unconstitutional and enjoining enforcement of N.Y. Penal Law § 265.01(1) as applied to such devices (the "Injunction").

32. The *Avitabile* Injunction and the underlying decision were matters of public record and readily accessible to state and municipal officials responsible for enforcing New York's weapons laws, including NYPD personnel.

33. Upon information and belief, the *Avitabile* decision and Injunction, and their practical effect were disseminated through ordinary law enforcement legal update services, criminal justice reference systems, and supervisory or legal bulletins used by NYPD personnel and the New York County District Attorney's Office.

34. Defendants also had actual notice of the *Avitabile* decision and Injunction and its interplay with Plaintiff's arrest because Plaintiff expressly invoked the *Avitabile* holding and offered supporting information to responding officers at the scene of her May 15, 2025, arrest.

35. Despite the public availability of the *Avitabile* decision and the widespread commercial availability of electronic SGs, NYPD officers were not provided clear or consistent guidance concerning the constitutional limits on enforcement of the statute.

36. By contrast, other law enforcement agencies recognized the need to provide guidance. In a letter dated September 26, 2019, shortly after the *Avitabile* decision, the Nassau County Police Department informed federally licensed firearms dealers that its current policy was not to enforce New York Penal Law § 265.01 with respect to the mere possession of electronic dart guns and electronic SGs. A true and correct copy of this letter is attached as Exhibit 1.

37. Upon information and belief, the Suffolk County Police Department likewise ceased enforcement and incorporated instruction concerning the lawful use and safety of SGs and Tasers into its community outreach programs, such as the Suffolk County Police Department

Civilian Academy, reflecting a policy that acknowledges the legality of these devices for self-defense.

c. *Orders of Protection, Notice, Stalking Course of Conduct, and NYPD Non-Enforcement (2019-2026)*

38. Between 2019 and 2025, PS repeatedly stalked Plaintiff inside and outside the Building, threatened violence, attempted to force entry into Plaintiff's apartment, blocked Plaintiff's exit while brandishing four (4) kitchen knives, attempted to kick down Plaintiff's door, and engaged in escalating harassment that created a concrete and foreseeable risk of physical harm and caused Plaintiff reasonable fear for her safety.

39. During one such incident, PS initiated a 911 call, contemporaneously reporting an intent to stab Plaintiff while engaging in this menacing conduct.

40. PS's conduct was frequently captured on Plaintiff's Ring camera and phone recordings, including threats, vandalism, sexualized harassment, sexual exposure directed at Plaintiff and/or her security camera, and attempts to destroy security equipment.

41. During this period, TJ repeatedly acted jointly with PS, by participating in threats and confrontations, facilitating PS's access to the Building and Plaintiff, initiating or supporting false complaints, and reinforcing PS's targeting of Plaintiff.

42. Between June 2022 and June 2025, Plaintiff was the protected party in eight (8) POs issued under N.Y. Crim. Proc. Law § 530.13 based on repeated threats, harassment, and assaults by PS and related conduct involving TJ.

43. On or about October 10, 2023, TJ (the leaseholder of the adjacent apartment) entered into a housing court consent order requiring, among other things, that PS vacate the Building, and that TJ prevent PS's re-entry, based on PS's conduct and its impact on Building safety and habitability.

44. On or about July 24, 2024, Plaintiff obtained a final full stay-away PO against PS (the "July 2024 Permanent PO"), which prohibited PS from contacting Plaintiff or coming near Plaintiff or Plaintiff's home (including the Building), and which included a "no third-party contact" provision addressing conduct by TJ. The July 2024 Permanent PO remained in effect at all relevant times, including on May 15, 2025.

45. Copies of Plaintiff's active POs were conspicuously posted in the Building's vestibule and were repeatedly visible to responding NYPD personnel, including Defendant officers, providing continuous notice of Plaintiff's protected status and the scope of prohibited contact, including third-party contact.

46. PS continued to engage in a sustained course of stalking and harassment, including repeated threats, confrontations at Plaintiff's home and on the street, property damage, monitoring or lying in wait, false reports, and physical assaults, placing Plaintiff in reasonable apprehension of physical harm.

47. Plaintiff repeatedly reported PS's conduct and PO violations to Defendants and other NYPD personnel and provided documentation, including videos and witness information. Defendants were aware of the escalating risk posed by PS and TJ.

48. Despite repeated notice, Defendants failed to take reasonable protective steps and provided misleading or incorrect guidance about Plaintiff's protection options.

49. Plaintiff filed a complaint with the Civilian Complaint Review Board concerning an incident in December 2021, in which NYPD Officer Joseph Amato called Plaintiff "a pain in the ass" to a supervisor with the District Attorney's Witness Aid Services Unit. The Civilian Complaint Review Board substantiated the complaint on February 16, 2023.

50. Defendants repeatedly represented that PO violations would be enforced and that Plaintiff would receive notification regarding PS's custody status and releases. Plaintiff reasonably relied on those representations in planning her safety and seeking lawful protection.

51. Defendants minimized or misstated the scope and enforceability of Plaintiff's POs, including Defendant Mack's assertions that her full stay-away order was effectively limited to "***inside***" Plaintiff's apartment on December 17, 2024, and repeated suggestions that Plaintiff's POs were unreliable or altered, despite their issuance by courts and Plaintiff's repeated provision of documentation.

52. Plaintiff acquired and carried a SG solely as an emergency, non-lethal measure to protect herself from imminent harm while Defendants failed to provide meaningful protection despite active court orders.

d. *PS Mental Health and NYPD Involvement*

53. On or about December 16, 2021, following a call from another resident of the Building, PS was taken into custody by officers of the NYPD and transported for psychiatric evaluation. Plaintiff was present and personally observed PS's removal from the Building. Plaintiff asked responding NYPD officers to provide notice of PS's release due to concerns for her safety.

54. On or about December 1, 2022, Plaintiff contacted emergency services (911) due to the erratic and threatening behavior directed at her by PS. As a result of this conduct and Plaintiff's emergency call, PS was taken into custody and, upon information and belief, transported to a mental health facility for evaluation. Officers of the NYPD's 28th Precinct were present and actively involved in this incident.

55. On April 12, 2023, PS engaged in additional threatening and violent conduct toward Plaintiff. Specifically, PS physically blocked Plaintiff from exiting her apartment while threatening

her with four (4) kitchen knives. Plaintiff immediately contacted law enforcement. An officer from the NYPD responded and generated an NYPD OmniForm System - Complaints report (Complaint Report No. 2023-028-001811), which omitted any narrative description and failed to identify an investigating officer, notwithstanding that Plaintiff had been effectively held hostage in her apartment. An NYPD OmniForm System - Arrests form was subsequently prepared charging PS with Criminal Contempt in the First Degree (N.Y. Penal Law § 215.51(b)) and Menacing in the Second Degree (N.Y. Penal Law § 120.14(3)). The arrest paperwork listed PS's location as St. Luke's Hospital Emergency Room.

56. On or about July 15, 2023, after physically attacking Plaintiff in front of the 28th Precinct and in view of several NYPD officers, PS was found unfit to stand trial and remained in custody for approximately one (1) year, from July 2023 through July 2024, due to mental-health-related incompetence.

57. On June 21, 2025, NYPD officers again took PS into custody after family members reported an acute mental health crisis. That arrest resulted in PS's apprehension on previously indicted felony charges arising from conduct against Plaintiff, as well as on an outstanding bench warrant that had not been meaningfully pursued by the 28th Precinct.

58. In September 2025, while in custody on felony charges arising from violations of Plaintiff's POs, PS was transferred to a mental health facility for reevaluation of fitness to stand trial.

e. *Plaintiff's Arrest and Charges (May 2025)*

59. On the morning of May 15, 2025, Plaintiff exited the Building and immediately encountered PS, who began shouting hostile language and making threats toward her. Moments later, TJ approached Plaintiff from behind, loudly instructing PS to "go about your business" and stating that she would "take care of this," which Plaintiff understood as a threat directed at

her. TJ then followed Plaintiff for several blocks, including to and from a nearby UPS Store, while yelling slurs and hostile epithets, including calling Plaintiff a “tranny,” a “sex trafficker,” and similar demeaning terms. TJ lay in wait and, minutes later, confronted Plaintiff on her return and physically assaulted her, striking Plaintiff at close range while Plaintiff’s phone camera was recording. TJ moved within inches of Plaintiff’s face, repeatedly yelling, “what are you going to do?” Plaintiff did not initiate physical contact or issue threats at any point. Fearing further assault and attempting to create distance, Plaintiff activated only the SG’s audible alert function. Upon hearing the sound, TJ immediately retreated.

60. During and after the incident she initiated, TJ placed multiple 911 calls, making false and exaggerated claims about Plaintiff, including misrepresentations regarding Plaintiff’s identity and conduct. When Defendants Quinones and JD No. 3 responded, they initially advised Plaintiff to seek a non-familial PO against TJ. However, after the officers learned Plaintiff’s identity from her voluntarily-provided New York City Identification Card and observed the SG, they seized the device and, at Defendant Kontorovich's direction, arrested Plaintiff for an alleged violation of N.Y. Penal Law § 265.01(1).

61. On May 15, 2025, after Plaintiff was threatened and physically assaulted, and after TJ placed multiple calls to 911, Plaintiff remained on scene, cooperated, identified herself, and voluntarily surrendered the SG to responding officers.

62. Plaintiff informed responding officers, including Defendant Quinones, that she was the protected party under a full stay-away PO against PS; that TJ’s conduct constituted third-party violations; and that Plaintiff possessed recordings showing PS and TJ as aggressors.

Plaintiff offered, and, upon information and belief, officers reviewed and/or captured exculpatory footage on their body-worn camera ("bodycam").

63. Plaintiff informed Defendant Quinones that a federal court had held the categorical ban on civilian SG possession unconstitutional and had entered a permanent injunction, and that enforcement under § 265.01(1) in these circumstances was constitutionally infirm.

64. After a phone call to a superior officer at the 28th Precinct, responding officers' posture toward Plaintiff shifted, and Plaintiff was handcuffed and arrested.

65. Defendant Kontorovich, a Lieutenant, arrived shortly thereafter to direct and oversee Plaintiff's detention and transport.

66. Upon information and belief, arrest paperwork and related submissions omitted or minimized material exculpatory information, including Plaintiff's victim status, the existence and scope of active POs, officers' awareness of available recordings, and facts negating any reasonable fear by TJ. Upon information and belief, Defendants further failed to preserve, review, and/or transmit bodycam footage and other recordings to prosecutors.

f. *Early Notice, Legal Misinformation, and Custodial Releases*

67. Beginning in 2020, Plaintiff repeatedly sought police protection from the NYPD's 28th Precinct regarding PS's and TJ's escalating threats, harassment, and assaults. Numerous 911 calls, complaints, recordings, and court filings documented this conduct and repeatedly provided Defendants with notice of the escalating risk to Plaintiff.

68. The NYPD and 28th Precinct's enforcement was inconsistent and often resistant, even when violations were verifiable or occurred in officers' presence.

69. On December 11, 2024, while barred from the Building by the July 2024 Permanent PO and housing court order, Plaintiff found PS inside the Building propping open the front door to

jam the lock. Plaintiff called 911, and Defendants Castillo and Cavalieri responded. Plaintiff showed nine (9) Ring videos documenting PS's unlawful presence and an audible threat to Plaintiff ("stop playing with me before I hurt you"), yet Defendants Castillo and Cavalieri took no enforcement action.

70. On December 12, 2024, Plaintiff called 911 to again report that PS was unlawfully present in the Building, despite the July 2024 Permanent PO, the posted notice of that order, and the housing court order. During the call, TJ verbally harassed Plaintiff, including anti-trans slurs. Plaintiff advised Defendants that PS's presence posed an immediate threat. Ring video later revealed that two NYPD officers, Defendants JD Nos. 1 and 2, entered the Building, located PS on the floor above Plaintiff's apartment or on the roof, and escorted her past Plaintiff's apartment and out the Building's front door – all without arrest, despite clear PO violations. No NYPD personnel made any follow-up contact with Plaintiff to assess her well-being after this incident or her 911 call.

71. The following day, December 13, 2024, Plaintiff encountered PS on the street, and again, PS threatened Plaintiff's life. PS's shouted threats were captured on video and included "tell the government that shit, you bum bitch." When Defendant NYPD officers responded to Plaintiff's subsequent 911 call, Defendant Dzeviatka accused Plaintiff of doctoring the PO, while mistakenly searching for the order under Plaintiff's name instead of PS's. Plaintiff was forced to contact Assistant District Attorney Nikolai DeJesus to walk officers through verifying the PO.

72. Four (4) days later, another NYPD officer from the 28th Precinct noted that Defendant Dzeviatka had used the incorrect NYPD form (a "familial" or "domestic" form, rather than

a purely criminal or "non-familial" form) and left key fields requesting prior incidents blank, further obscuring the history of PS's conduct.

73. On December 17, 2024, PS once again accosted Plaintiff on the street. During this encounter, PS yelled, among other threats, "you gonna pay for that shit…you call who the fuck you want, call who the fuck you want, that shit don't fucking scare me, you think I'm scared, bitch?.." and gestured toward the 28th Precinct while claiming she "worked for the government." NYPD officers from the 28th Precinct responded. Plaintiff later received phone calls from Defendant Mack, during which she was incorrectly told that her July 2024 Permanent PO was "only enforceable ***inside*** [her] apartment".

74. Subsequent to December 17, 2024, Plaintiff spoke with Defendant Douglas, who called to inform Plaintiff he was the assigned detective for the single incident, and he would not discuss *anything* else. When Plaintiff followed up by email with video of the PO violation, she received only a brief response consisting of a "thumbs-up" emoji from Detective Douglas. Upon information and belief, no further investigation occurred.

75. During this period, NYPD personnel repeatedly provided incorrect or misleading guidance regarding PO enforcement and arrest authority, minimized available enforcement options, and discouraged action. Defendant NYPD and related Defendant City actors also took PS into custody, both for psychiatric evaluation and arrest on multiple occasions (as described above), yet failed to provide Plaintiff with meaningful notice of PS's custody status or releases, and released PS without taking reasonable measures to mitigate the foreseeable risk of renewed violations.

g. *Post-Release Escalation and Continued Non-Enforcement (July-December 2024)*

76. Following the July 15, 2023 assault, PS was found unfit to stand trial and remained in custody for approximately one (1) year. PS ultimately pleaded guilty to a felony offense – but not to the felony charge Plaintiff had been expressly assured would be pursued – and was released with time served, without adequate support or supervision, without meaningful notice to Plaintiff, and without provision of any forwarding address.

77. After periods in which PS was taken into custody and then released, including in or around July 2024, PS immediately returned to Plaintiff's Building and vicinity despite a full stay-away PO and a housing court stipulation barring PS from the premises, and PS's threats and harassment resumed.

78. Plaintiff documented multiple post-release incidents on video and repeatedly sought NYPD intervention; Defendants declined to enforce clear PO violations, minimized Plaintiff's reports, and continued to provide incorrect statements about the scope and enforceability of Plaintiff's POs.

79. Defendants' repeated inaction and misinformation emboldened PS and TJ, leaving Plaintiff without reliable police protection despite active POs.

h. *Protected Speech and Escalating Complaints (January-February 2025)*

80. By January 2025, after years of documented inaction and misinformation, Plaintiff escalated her complaints to oversight bodies, elected officials, and senior governmental offices to report the 28th Precinct's repeated failures and mistreatment.

81. On January 20, 2025, following Plaintiff's complaints regarding misconduct and non-enforcement by the NYPD's 28th Precinct, Defendant Hirsch emailed Plaintiff concerning "a complaint she had made against the 28th Precinct and the NYPD." Later that day,

Defendant Hirsch placed a telephone call to Plaintiff, which Plaintiff recorded after providing audible notice of the recording.

82. During the recorded call, Plaintiff asked Defendant Hirsch what the NYPD was going to do "to keep her safe" from PS, given the ongoing threats and active POs. Defendant Hirsch became agitated and responded that the NYPD's obligation was to "keep all citizens safe," but not to keep "individuals safe." In doing so, Defendant Hirsch expressly disavowed any obligation to provide individualized protection to Plaintiff or to enforce Plaintiff's POs, despite Plaintiff's documented victim status and the known, particularized risk posed by PS.

83. Plaintiff also spoke publicly, as a private citizen addressing matters of public concern, at community meetings regarding the 28th Precinct's pattern of misconduct and non-enforcement. Specifically, Plaintiff publicly addressed the Manhattan Community Board 10 at a meeting on January 21, 2025, and a Community Council Meeting on February 12, 2025.

84. Following the Manhattan Community Board 10 meeting, Defendant Ramos, identified as the 28th Precinct Clergy Council President/Liaison, contacted Plaintiff, represented that she was positioned to help secure precinct leadership involvement, and communicated with 28th Precinct leadership and/or other NYPD personnel, including Defendant Whitlock, about Plaintiff's complaints and requests for protection.

85. However, after Plaintiff's public criticism, specifically at the Community Council Meeting on February 12, 2025, in which Defendant Whitlock was in attendance, Defendant Ramos expressly told Plaintiff that, "***because***" of Plaintiff's public comments, promised assistance (including assistance and resources from Manhattan Community Board Director Minah White and welfare checks previously promised by Defendant Ramos) and a scheduled

meeting with Defendant Whitlock had been canceled, and Defendant Ramos withdrew support and ceased further communication with Plaintiff.

86. On February 20, 2025, Plaintiff again captured PS on camera approaching and threatening her, claiming "I work for the government," "I can never go to prison," and denying knowledge of any PO. Plaintiff reported this to Officer Peerzada of the 28th Precinct, but was told she would need to go to One Police Plaza, by appointment during business hours, to obtain her own police reports due to a purported policy change under Mayor Eric Adams.

87. Seeking clarification and guidance as to what lawful options remained available to her, Plaintiff went to the 28th Precinct and spoke with an officer or supervisory official, presently unidentified and referred to herein as Defendant JD No. 14. During this exchange, Plaintiff described her fear for her personal safety and expressed concern that the NYPD's repeated refusal to intervene appeared to leave her with no practical means of protection other than forms of self-defense that she found morally objectionable and wished to avoid.

88. In response to Plaintiff's questions, JD No. 14 reacted in an agitated manner, stating to Plaintiff, **"**You are lucky my bodycam is not on**,"** and asserting that Plaintiff would have been immediately arrested had her remark been recorded. JD No. 14 provided no explanation of any alleged offense, issued no warning, and offered no guidance regarding lawful self-protection or available police assistance. The statement was made despite Plaintiff's non-threatening request for clarification and Plaintiff understood this statement as a threat of arrest and as discouragement from further seeking police assistance or clarification regarding her safety.

i. *Continued Failure to Protect and Retaliatory Arrest (April-May 2025)*

89. On April 12, 2025, PS confronted Plaintiff on the street without warning and issued threats, including, "You not winning with this 911, you not winning girl." Plaintiff reported this as another PO violation.

90. On April 21, 2025, Plaintiff testified before a Grand Jury (for the second time) regarding PS's violations of her POs, including incidents on December 11, 12, 13, and 17, 2024, and February 20 and April 12, 2025. The Grand Jury returned a felony indictment as to all charges. Upon information and belief, PS failed to appear for the subsequent arraignment, and a bench warrant was issued.

91. On May 6, 2025, PS assaulted Plaintiff in public, while Plaintiff recorded the incident on her phone. Plaintiff reported the assault and active POs and provided video evidence, yet responding officers, Defendants Lobsang and Pastwa, minimized the incident and declined enforcement action.

92. Less than ten days later, Defendants arrested Plaintiff for possessing the SG she carried as a direct result of the ongoing danger.

j. *Retaliatory Prosecution and Dismissal (June 2025)*

93. On June 3, 2025, after rejecting the District Attorney's Office's proposed "adjournment in contemplation of dismissal," Plaintiff was arraigned on the May 15, 2025 charge under § 265.01(1), while additional counts of Menacing in the Second Degree (N.Y. Penal Law § 120.14) and Menacing in the Third Degree (N.Y. Penal Law § 120.15) (the "June 3 Menacing Charges") were added, and a PO pursuant to C.P.L. § 530.13 was issued against Plaintiff in favor of TJ, one of her known aggressors (the "June 3 PO").

94. Another arraignment date was set for July 21, 2025.

95. Upon information and belief, the added charges and the PO were based substantially on TJ's statements and were pursued without full consideration of Plaintiff's recordings, bodycam footage, PO history, and other exculpatory materials available to police and/or prosecutors.

96. Plaintiff incurred legal expenses and endured restrictions and stigma associated with the prosecution and the PO.

97. On June 21, 2025, Plaintiff was informed that PS had been arrested in the Bronx, following a family-reported acute mental health crisis. Upon information and belief, that arrest resulted in PS's apprehension on the previously indicted felony charges arising from the conduct about which Plaintiff testified before the Grand Jury on April 21, 2025, as well as on an outstanding bench warrant. Upon information and belief, PS was taken into custody and transported to a mental health facility.

98. On or about June 25, 2025, following significant disruption, legal fees, and angst, the charges against Plaintiff were dismissed in the interest of justice, and the PO against Plaintiff was dissolved.

99. After Plaintiff's arrest and during the pendency of the case, PS and TJ continued to harass Plaintiff, exacerbating Plaintiff's fear and insecurity, while Defendants did not take enforcement action in response to continued harassment.

k. *Ongoing Risk and Prospective Harm*

100. Upon information and belief, PS was released on April 6, 2026 on conditions including inpatient treatment and mandatory weekly court appearances pending trial. Plaintiff has been advised that PS may be released with credit for time served. PS's release increases the risk to Plaintiff's safety and underscores Plaintiff's need for lawful, non-lethal self-defense.

101. Defendants have not rescinded enforcement policies, issued corrective guidance, or disavowed enforcement of N.Y. Penal Law § 265.01(1) or New York City Administrative Code § 10-135 against civilian possession of electronic SGs.

102. Given Plaintiff's position as a documented victim of stalking, with a history of threats and violence directed toward her, she faces, absent judicial relief, a credible and imminent risk that exercising her constitutional right to possess such a device would again subject her to arrest and prosecution.

103. Plaintiff intends to acquire, possess, and carry a SG for lawful self-defense. But for Defendants' continued enforcement of N.Y. Penal Law § 265.01(1), Plaintiff would presently acquire, possess, and publicly carry such a device while in New York City. Plaintiff reasonably refrains from doing so because she has already been arrested and prosecuted for identical conduct by NYPD officers.

## VI. CAUSES OF ACTION

### a. *Individual Liability and Personal Involvement (Global Allegations Applicable to All § 1983 Claims)*

104. Each individual Defendant is liable in his or her individual capacity because he or she was personally involved in one or more of the constitutional violations alleged herein, through direct participation, direction, authorization, approval, ratification, deliberate indifference, or failure to intervene, including, *inter alia*:

a. directly participating in, effectuating, or carrying out Plaintiff's arrest, detention, seizure of property, charging, recharging, prosecution, or continued liberty restraints;

b. ordering, authorizing, approving, ratifying, or directing such actions, including enforcement under N.Y. Penal Law § 265.01(1) despite its constitutional infirmity and Plaintiff's protected conduct;

c. initiating or continuing criminal proceedings without probable cause and for retaliatory or improper purposes;

d. misusing or leveraging criminal process for collateral, retaliatory, or coercive objectives;

e. suppressing, concealing, failing to preserve, mischaracterizing, or approving the withholding of material exculpatory or impeachment evidence;

f. approving or transmitting materially false, incomplete, or misleading factual narratives to prosecutorial authorities or the court;

g. participating in coordinated decisions to withhold exculpatory evidence or sustain charges known to lack lawful foundation;

h. exercising enforcement discretion in a selective, irrational, or retaliatory manner;

i. affirmatively creating or increasing a foreseeable risk of harm to Plaintiff through misuse of official authority, withdrawal of protection, or legitimization of known aggressors; and/or

j. personally observing, knowing of, or having reason to know of ongoing constitutional violations and having a realistic opportunity to intervene to prevent or mitigate them, yet deliberately failing to do so.

105. Upon information and belief, certain supervisory defendants, including Defendants Whitlock, Kontorovich, and Ausman, affirmatively ordered, authorized, or knowingly approved Plaintiff's arrest and continued prosecution under § 265.01(1).

106. Each individual Defendant acted under color of state law and with at least deliberate indifference to Plaintiff's clearly established constitutional rights, and, where specifically alleged in the relevant counts, with retaliatory or malicious intent.

107. At all relevant times, Defendant Ramos, as a self-described community liaison, acted as an intermediary and agent of the NYPD and the 28th Precinct, conveying, implementing, and enforcing command-level decisions regarding police services, victim protection, and enforcement posture, and did so in coordination with and at the direction of NYPD supervisory personnel.

### b. *Global Municipal Liability* *(Applicable to All § 1983 Claims Against Defendant City)*

108. Defendant City is liable under 42 U.S.C. § 1983 pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), because Plaintiff's constitutional injuries were caused by municipal policies, customs, practices, decisions of final policymakers, and/or deliberate indifference to the need for proper training, supervision, and corrective action.

109. At all relevant times, final municipal policymakers, including the NYPD Commissioner and other command-level officials responsible for enforcement directives, officer training, supervisory review, and disciplinary oversight, possessed final policymaking authority with respect to the policies and practices challenged herein.

110. The constitutional violations alleged in this Complaint were caused by one or more of the following municipal policies, customs, or practices:

a. maintaining, ratifying, or failing to correct enforcement practices under N.Y. Penal Law § 265.01(1) after its application to civilian SG possession had been declared

unconstitutional in *Avitabile v. Beach*, 368 F. Supp. 3d 404, 421-22 (N.D.N.Y. 2019);

b. failing to issue corrective guidance, training bulletins, or enforcement directives to implement constitutional limitations on SG enforcement;

c. tolerating or ratifying retaliatory enforcement against individuals who criticize NYPD personnel or petition for redress;

d. maintaining customs or practices permitting the misuse of criminal process for collateral or retaliatory objectives;

e. failing to train, supervise, or discipline officers regarding their obligations to preserve, document, and disclose material exculpatory or impeachment evidence to prosecutorial authorities and the courts;

f. maintaining policies or customs that permit selective, irrational, or bad-faith enforcement of facially neutral laws;

g. maintaining practices that affirmatively increase danger to known victims through withdrawal of protection, misinformation regarding POs, or retaliatory non-enforcement; and/or

h. failing to intervene, correct, or discipline officers after actual or constructive notice of unconstitutional conduct.

111. Upon information and belief, no meaningful corrective action, retraining, disciplinary review, or supervisory intervention occurred after Plaintiff's arrest, prosecution, and documented complaints regarding the constitutional infirmity of N.Y. Penal Law § 265.01(1) enforcement and related misconduct.

112. The need for corrective training, guidance, supervision, and discipline was obvious in light of: (1) various courts' constitutional rulings governing SG possession; (2) Plaintiff's repeated written and verbal complaints; and (3) the foreseeable risk that continued enforcement practices would result in wrongful arrests, retaliatory prosecutions, suppression of exculpatory evidence, and exposure of crime victims to increased danger.

113. The foregoing municipal policies, customs, and deliberate indifference were the moving force behind Plaintiff's arrest, prosecution, deprivation of liberty, exposure to danger, and other constitutional injuries.

c. *Global Damages*

114. As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered and continues to suffer substantial injuries, including:

a. wrongful arrest, criminal charges and recharges, and prosecution;

b. loss of liberty, including post-arraignment restraints and other restrictions on Plaintiff's freedom of movement;

c. financial losses, including attorneys' fees, legal expenses, and diminished earning capacity;

d. collateral consequences affecting professional licensing, employment prospects, firearms eligibility, and other legal interests, including the risk that Plaintiff may be deemed to lack "good moral character," as a result of her arrest and prosecution for possessing a SG;

e. reputational harm and diminished standing within her professional and civic communities;

f. emotional distress, humiliation, anxiety, and psychological injury;

g. assaults, threats, loss of bodily integrity, and diminished personal security resulting from Defendants' affirmative acts increasing danger and withdrawing protection;

h. exposure to foreseeable harm due to the selective denial of police protection and victim notification;

i. loss of property;

j. a chilling of Plaintiff's First and Second Amendment rights, including her willingness to speak, petition, seek protection, or exercise lawful self-defense; and

k. ongoing fear of retaliatory targeting and future enforcement.

These injuries were foreseeable, were the natural and probable consequences of Defendants' conduct, and include continuing personal, professional, economic, and constitutional harms that persist to this day.

## FIRST CAUSE OF ACTION
## **Deprivation of Rights Secured by the Second and Fourteenth Amendments of the United States Constitution**
(42 U.S.C. §§ 1983 and 1988; U.S. Const. amends. II and XIV)

(*Against Defendants: City, under Monell; Commissioner, in her official capacity for declaratory and injunctive relief; Whitlock, Kontorovich, Ausman, Quinones, and JD Nos. 1–50, in their individual capacities)*

### a. *Incorporation and Statutory Basis*

115. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

116. This cause of action arises under 42 U.S.C. §§ 1983 and 1988, and the Second and Fourteenth Amendments to the United States Constitution, which prohibit state and municipal actors from infringing on the individual right to keep and bear arms for lawful self-defense.

117. Plaintiff seeks declaratory and prospective injunctive relief against Defendant Commissioner, in her official capacity, to prevent ongoing and threatened enforcement of

N.Y. Penal Law § 265.01(1) and New York City Administrative Code § 10-135 against Plaintiff and similarly situated civilians.

b. *Second Amendment Protection and "Common Use"*

118. The Second Amendment, as incorporated and applicable to the states through the Fourteenth Amendment, protects the right of ordinary, law-abiding citizens to possess arms "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 624–25 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

119. Courts have recognized that SGs constitute "arms" within the meaning of the Second Amendment. See *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam).

120. In *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019), the parties stipulated that, as of 2019, at least 300,000 Tasers and 4,478,330 SGs were owned by private citizens across the United States.

121. In *O'Neil v. Neronha*, 594 F. Supp. 3d 463, 472 (D.R.I. 2022), the court noted sworn declarations from national SG distributors establishing that approximately 6.5 million SGs were sold to consumers in the United States between 2008 and 2020 alone**.** Those figures reflect lawful civilian acquisition over more than a decade and demonstrate widespread ownership nationwide.

122. Even though numerous manufacturers decline to disclose detailed sales data absent subpoena, publicly available corporate disclosures further corroborate widespread distribution. According to publicly reported investor disclosures, Axon Enterprise, Inc. (formerly TASER International), reported that sales of stun devices increased by approximately 300% between 2019 and 2020.

123. SGs are widely owned and lawfully possessed by civilians nationwide, commercially distributed, and are routinely issued to and used by law enforcement. They are therefore arms "typically possessed by law-abiding citizens for lawful purposes," *i.e.*, in "common use," within the meaning of the Second Amendment. See *Heller*, 554 U.S. at 624–25; *McDonald*, 561 U.S. at 750–52; *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (per curiam); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17–20 (2022).

c. *Bruen Framework and Lack of Historical Analogue*

124. Under *Bruen*, once the Second Amendment's plain text applies to Plaintiff's conduct, the burden shifts to the State to demonstrate that its restriction is consistent with the Nation's historical tradition of arms regulation. *Id.* at 19–23.

125. Plaintiff alleges that there is no historical analogue supporting a categorical prohibition on civilian possession of non-lethal electronic defensive arms such as SGs, and that Defendants' enforcement of such a ban is inconsistent with the Nation's historical tradition of arms regulation.

d. *Pretext and Enforcement Disparities*

126. Even assuming *arguendo* that Defendants invoke public safety as the justification for enforcement of N.Y. Penal Law § 265.01(1), Defendants' own conduct undermines that claim. As alleged above, New York has tolerated open commercial marketing, sale, shipment, and delivery of SGs, while selectively prosecuting individual possessors. This inconsistent enforcement, together with the absence of any comparable statutory regulatory framework governing commercial sale, supports the inference that Defendants' enforcement was discretionary, selective, and pretextual rather than grounded in a historically supported public safety rationale.

127. The non-enforcement policies or practices adopted by neighboring jurisdictions further underscore the lack of uniform statewide enforcement and support the inference that Defendants' enforcement is discretionary, selective, and constitutionally suspect.

128. Accordingly, Plaintiff alleges that a categorical ban on ownership, possession, and public carry of SGs is unconstitutional.

e. *Avitabile Injunction; Fed. R. Civ. P. Rule 65(d)(2); Active Concert and Participation*

129. On March 22, 2019, the United States District Court for the Northern District of New York held that New York's categorical prohibition on civilian possession of SGs under § 265.01(1) violated the Second Amendment and permanently enjoined its enforcement. *Avitabile v. Beach*, 368 F. Supp. 3d 404, 421-22 (N.D.N.Y. 2019).

130. The *Avitabile* Injunction bound the named state defendants and those acting in active concert with them under Federal Rule of Civil Procedure 65(d)(2). At a minimum, the decision constituted a published federal constitutional ruling squarely addressing enforcement of N.Y. Penal Law § 265.01(1) and provided actual and constructive notice sufficient to inform reasonable law enforcement officers and prosecutors that categorical enforcement of the statute against civilian possession of SGs was constitutionally infirm.

131. Plaintiff does not allege that the NYSP formally commands or supervises NYPD officers. Rather, upon information and belief, the NYPD participates in shared statewide law-enforcement information systems administered through the New York State Division of Criminal Justice Services ("DCJS"), including eJusticeNY / the Integrated Justice Portal and the New York State Police Information Network ("NYSPIN"). These systems are routinely used by participating agencies, including NYSP and NYPD personnel, to access criminal justice information and to receive operational bulletins, legal updates, and other

enforcement-related communications relevant to Penal Law provisions, including weapons enforcement. Upon information and belief, through these shared statewide platforms and related communication channels, judicial decisions, legal developments, and enforcement-related guidance concerning Penal Law provisions, including those affecting enforcement of N.Y. Penal Law § 265.01(1), were available to NYPD supervisory and enforcement personnel.

f. *Unlawful Deprivation*

132. Despite actual and constructive notice of the *Avitabile* Injunction, on May 15, 2025, more than five (5) years after its issuance, Defendants Kontorovich, Ausman, Quinones, and JD No. 3 (the "Arresting Agents"), arrested Plaintiff and seized her SG pursuant to N.Y. Penal Law § 265.01(1).

133. By May 2025, it was clearly established that SGs constitute "arms" protected by the Second Amendment and that categorical prohibitions on their civilian possession were unconstitutional. See *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam); *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019). In light of these authorities, together with the public availability of *Avitabile* and its dissemination through ordinary law enforcement channels, a reasonable officer would have understood that arresting a law-abiding civilian for possession of a handheld SG for lawful self-defense violated Plaintiff's clearly established constitutional rights.

SECOND CAUSE OF ACTION
**False Arrest / False Imprisonment**
(42 U.S.C. § 1983; U.S. Const. amends. IV and XIV)

(*Against Defendants: City, under Monell; Kontorovich, Ausman, Quinones, and JD Nos. 1–50, in their individual capacities*)

a. *Incorporation and Legal Basis*

134. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

135. This cause of action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

136. The Fourth Amendment protects individuals from unreasonable seizures, including arrests unsupported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 213–16 (1979); *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

137. These protections apply to state and municipal officials through the Fourteenth Amendment. See *Albright v. Oliver*, 510 U.S. 266, 274 (1994).

138. Probable cause is lacking where, in light of the facts known to the officer and controlling constitutional precedent, no reasonable officer could believe that the plaintiff had committed an offense under the circumstances, including where controlling precedent would have made clear to a reasonable officer that enforcement of the statute was unconstitutional as applied. See, *e.g.*, *Amore v. Novarro*, 624 F.3d 522, 533–36 (2d Cir. 2010); *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007); *Cooper v. Aaron*, 358 U.S. 1, 18 (1958).

b. *Legal Elements of a § 1983 False Arrest Claim*

139. To state a claim for false arrest under § 1983, Plaintiff must allege that: (1) Defendants intended to confine her; (2) Plaintiff was conscious of the confinement; (3) Plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. See *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995); *Jenkins v. City of New York*, 478 F.3d 76, 84–85 (2d Cir. 2007).

c. *Lack of Probable Cause*

140. Defendants lacked probable cause to arrest Plaintiff under N.Y. Penal Law § 265.01(1), because at the time of the arrest, the facts known to the officers, including Plaintiff's lawful possession of a nonlethal defensive device and controlling constitutional precedent governing such possession, would not permit a reasonable officer to believe that Plaintiff had committed a criminal offense.

141. Those facts included, *inter alia*, Plaintiff's limited use of the audible alarm function of the SG; her status as the protected party under active POs; and contemporaneous exculpatory video evidence depicting Plaintiff as defensive rather than aggressive, negating any reasonable inference of unlawful use, intent, or criminal conduct under § 265.01(1).

142. As further detailed in Plaintiff's Sixth Cause of Action ("Fabrication and Suppression of Evidence Causing Deprivation of Liberty"), Defendants knowingly omitted and/or suppressed material exculpatory evidence bearing directly on probable cause, thereby tainting and vitiating any purported basis for Plaintiff's arrest and the initiation of criminal process.

d. *Retaliatory Arrest (Independent of Probable Cause)*

143. Even assuming *arguendo* that probable cause existed (which Plaintiff denies), Plaintiff's arrest independently violated the First Amendment under the exception recognized in *Nieves v. Bartlett*, 587 U.S. 391, 409–10 (2019), where objective evidence shows that similarly situated individuals not engaged in protected speech were not subject to arrest.

144. Plaintiff pleads objective evidence that similarly situated individuals, including civilian possessors of SGs who did not engage in protected speech, were not arrested or prosecuted

under N.Y. Penal Law Article 265, and that enforcement against Plaintiff represented a departure from ordinary arrest practices in comparable circumstances.

145. As further detailed and alleged in the Fifth Cause of Action ("First Amendment Retaliation"), Defendants' decision to arrest and initiate criminal process against Plaintiff was substantially motivated by Plaintiff's protected speech and petitioning activity.

e. *Warrantless Arrest and Unlawful Detention*

146. On May 15, 2025, Arresting Agents arrested and detained Plaintiff without a warrant and without probable cause for Criminal Possession of a Weapon in the Fourth Degree under N.Y. Penal Law § 265.01(1), based on alleged possession of a SG.

147. Defendants handcuffed Plaintiff, transported her to the 28th Precinct, subjected her to booking, fingerprinting, and photographing, and detained her for several hours without her consent. Plaintiff was aware of her confinement, expressly objected, and was released only upon completion of processing.

THIRD CAUSE OF ACTION
**Malicious Prosecution**
(42 U.S.C. § 1983; U.S. Const. amends. IV and XIV)

(*Against Defendants: City, under Monell; Kontorovich, Ausman, Quinones, and JD Nos. 1-50, in their individual capacities*)

a. *Incorporation and Legal Basis*

148. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

149. This cause of action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

150. The Fourth Amendment protects individuals from unreasonable seizures, including pretrial detention and post-arraignment restraints arising from criminal proceedings unsupported by probable cause. See *Manuel v. City of Joliet*, 580 U.S. 357, 367–70 (2017).

b. *Legal Elements of a § 1983 Malicious Prosecution Claim*

151. To establish malicious prosecution under § 1983 in the Second Circuit, a plaintiff must show that: (1) the defendant initiated or continued a criminal proceeding; (2) the proceeding terminated in the plaintiff's favor; (3) the proceeding was commenced or continued without probable cause; and (4) the proceeding was instituted with actual malice. See *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010); *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997).

152. As a result of the criminal proceedings initiated against Plaintiff, including her arraignment on June 3, 2025 and the subsequent prosecution of charges under N.Y. Penal Law § 265.01(1) and related offenses, Plaintiff was subjected to post-arraignment liberty restraints, including mandatory court appearances, the imposition of a June 3 PO, and ongoing legal obligations, all of which constituted a seizure within the meaning of the Fourth Amendment.

c. *Initiation and Continuation of Criminal Proceedings*

153. On or about May 15, 2025, Arresting Agents initiated and continued criminal proceedings against Plaintiff by preparing, approving, and forwarding accusatory instruments and factual narratives to prosecutors, thereby causing the initiation and continuation of prosecution against Plaintiff.

154. The prosecution initiated on May 15, 2025, resulted in the filing of *People v. Harrington*, Docket No. CR-010714-25NY, in New York County Criminal Court.

d. *Absence of Probable Cause and Actual Malice*

155. As further alleged in Plaintiff's Sixth Cause of Action ("Fabrication and Suppression of Evidence Causing Deprivation of Liberty"), Defendants knowingly fabricated, omitted,

and/or failed to transmit material exculpatory evidence, thereby causing and prolonging Plaintiff's seizure and the initiation and continuation of criminal proceedings against her.

156. The totality of the facts known to Defendants, including Plaintiff's limited use of the audible alarm function of the SG, her status as the protected party under active POs, and readily available exculpatory recordings, precluded any objectively reasonable belief that Plaintiff had committed a criminal offense or that prosecution was warranted.

157. Defendants' initiation and continuation of proceedings were unsupported by probable cause in light of the exculpatory evidence known to them.

e. *Favorable Termination of the Criminal Proceedings*

158. On or about June 25, 2025, all criminal charges against Plaintiff were dismissed "in the interest of justice," and the June 3 PO issued against her was vacated.

159. Under federal law, a criminal proceeding terminates favorably for purposes of a § 1983 malicious prosecution claim where it ends without a conviction. *Thompson v. Clark*, 596 U.S. 36, 43–44 (2022). The dismissal of all charges against Plaintiff "in the interest of justice," and the vacatur of the June 3 PO, constitute a favorable termination under this standard.

f. *Evidence of Malice and Improper Purpose*

160. Malice may be inferred from the absence of probable cause and is further evidenced by Defendants' retaliatory animus and improper purpose, including suppression of exculpatory evidence, escalation of charges, and continuation of prosecution despite known inconsistencies and exculpatory material.

FOURTH CAUSE OF ACTION
**Abuse of Process**
(42 U.S.C. § 1983; U.S. Const. amends. IV and XIV)

(*Against Defendants: City, under Monell; Kontorovich, Ausman, Quinones, and JD Nos. 1-50, in their individual capacities*)

a. *Incorporation and Legal Basis*

161. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

162. This cause of action arises under 42 U.S.C. § 1983 and challenges Defendants' misuse of judicial process after issuance to impose restraints and obtain collateral objectives unrelated to legitimate criminal adjudication.

163. The Fourth Amendment protects against unreasonable seizures, including post-arraignment restraints on liberty imposed through the use of criminal process, such as court appearances and court-ordered conditions. See *Manuel v. City of Joliet*, 580 U.S. 357, 367–70 (2017).

164. The Fourteenth Amendment prohibits the arbitrary and improper governmental use of legal process, including the misuse of judicial proceedings for collateral purposes, and protects against resulting deprivations of liberty.

b. *Abuse of Process Distinguished from False Arrest and Malicious Prosecution*

165. This claim does not turn on the validity of the initial issuance of the criminal process. Rather, it concerns Defendants' post-issuance use and maintenance of that process for collateral and retaliatory purposes.

c. *Legal Standard*

166. Under § 1983, an abuse of process claim lies where state actors: (1) employ regularly issued legal process; (2) intend to do harm without justification; and (3) use that process in a perverted manner to obtain a collateral objective outside the process's proper scope. See *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994); *Savino v. City of New York,* 331 F.3d 63, 76–77 (2d Cir. 2003).

d. *Protected Activity and Retaliatory Motive as Collateral Objective*

167. Plaintiff engaged in protected speech and petitioning activity, including public criticism of the 28th Precinct and complaints to oversight bodies and supervisors.

168. As alleged, Defendants' own statements and conduct, including Defendant Ramos's statement that assistance would be withheld "***because***" of Plaintiff's complaints, support a reasonable inference that Defendants used criminal process to punish and deter Plaintiff's protected activity.

e. *Use of Regularly Issued Legal Process*

169. Defendants employed, and thereafter used and maintained, regularly issued judicial process against Plaintiff, including accusatory instruments, criminal charges, and the June 3 PO imposing court-ordered restraints.

f. *Perverted Use of Process for Collateral and Retaliatory Objectives*

170. After issuance of that process, Defendants used and maintained it for collateral objectives unrelated to legitimate adjudication**,** including: (1) retaliating against Plaintiff for protected speech and petitioning; (2) discrediting Plaintiff as a complainant and undermining her ability to seek enforcement of existing POs; (3) shielding officers and the precinct from scrutiny; and (4) leveraging court-ordered restraints and criminal exposure to deter further complaints.

171. This perversion of process included obtaining and maintaining the June 3 PO and sustaining escalated charges and related restraints in order to restrict Plaintiff's movement and communications and impair her ability to pursue enforcement of her existing POs.

g. *Harm and Fourth Amendment Restraints*

172. As a result of Defendants' misuse of process, Plaintiff was subjected to post-arraignment restraints, including mandatory court appearances and the June 3 PO, constituting a deprivation of liberty and a seizure within the meaning of the Fourth Amendment.

h. *Independent of Probable Cause*

173. Even assuming *arguendo* that probable cause existed at any stage (which Plaintiff denies), Defendants' post-issuance use of criminal process for retaliatory and collateral purposes constituted abuse of process. See *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).

FIFTH CAUSE OF ACTION
**First Amendment Retaliation**
(42 U.S.C. § 1983; U.S. Const. amends. I and XIV)

(*Against Defendants: City, under Monell; Whitlock, Kontorovich, Hirsch, Ausman, Mack, Douglas, Dzeviatka, Quinones, Castillo, Cavalieri, Pastwa, Lobsang, Ramos, and JD Nos. 1-50, in their individual capacities*)

a. *Incorporation and Legal Basis*

174. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

175. This cause of action arises under 42 U.S.C. § 1983 and the First Amendment to the United States Constitution, as incorporated and applicable to the states through the Fourteenth Amendment.

176. The First Amendment protects the rights to speak freely, to criticize government officials, to petition for redress of grievances, and to be free from retaliation for exercising these rights. *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

b. *Legal Elements of a First Amendment Retaliation Claim*

177. A First Amendment retaliation claim requires a showing that: (1) Plaintiff engaged in protected speech or petitioning activity; (2) Defendants took adverse action that would deter a person of ordinary firmness from continuing that activity; and (3) Plaintiff's protected activity was a substantial or motivating factor in Defendants' adverse action. See *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013); *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004).

178. Where the alleged adverse action consists of an arrest or prosecution, the existence of probable cause does not bar a First Amendment retaliation claim where the circumstances fall within the exception recognized in *Nieves v. Bartlett*, 587 U.S. 391, 409–10 (2019).

c. *Plaintiff's Protected Speech and Petitioning Activity*

179. Plaintiff engaged in protected First Amendment activity, including complaints to oversight bodies, communications with supervisors of the NYPD and the New York County District Attorney's Office, and public criticism of NYPD conduct at community meetings, as detailed in the preceding Statement of Fact allegations.

d. *Adverse Actions Taken*

180. As alleged herein, Defendants took adverse actions against Plaintiff, including:

a. withholding and distorting police protection and enforcement of valid POs;

b. canceling promised safety measures expressly "***because***" of Plaintiff's public criticism;

c. arresting Plaintiff without probable cause on May 15, 2025;

d. initiating and escalating criminal charges, including the June 3 Menacing Charges;

e. procuring and leveraging the June 3 PO against Plaintiff; and

f. continuing to refuse enforcement protection while aggressively prosecuting Plaintiff.

181. These actions would deter a person of ordinary firmness from engaging in protected speech.

e. *Causation and Retaliatory Motive*

182. Plaintiff's protected speech was a substantial or motivating factor in Defendants' adverse actions. Evidence of retaliatory motive includes:

a. Express Admissions: Defendant Ramos explicitly stated that protections and services were canceled "***because***" of Plaintiff's public criticism.

b. Temporal Proximity: The May 15, 2025 arrest occurred shortly after Plaintiff's high-profile public criticism and formal complaints.

c. Command-Level Awareness: NYPD supervisors, including Defendants Whitlock and Hirsch, acknowledged Plaintiff's complaints and criticisms.

d. Pattern of Escalating Hostility: Defendants' behavior escalated from disparagement (Officer Amato's December 2021 remark that Plaintiff was a "pain in the ass") to selective non-enforcement to a retaliatory arrest and baseless prosecution.

183. The retaliatory conduct described herein constitutes a sustained campaign of reprisal designed to silence and punish Plaintiff for engaging in protected activity.

f. *Application of the Nieves Exception*

184. To the extent Defendants contend that probable cause defeats this claim, Plaintiff pleads objective evidence under *Nieves v. Bartlett*, 587 U.S. 391, 409–10 (2019), including differential enforcement practices and the absence of comparable arrests of similarly situated individuals who did not engage in protected speech, demonstrating that enforcement against Plaintiff departed from ordinary practice. This differential treatment, together with direct

evidence of retaliatory animus, supports the inference that Plaintiff's protected activity was a but-for cause of Defendants' enforcement decisions.

g. *No Probable Cause*

185. Plaintiff further alleges that Defendants' retaliatory arrest and prosecution were undertaken without probable cause. Defendants' material omissions, suppression of exculpatory evidence, and forwarding of misleading narratives to prosecutors vitiated any arguable basis for probable cause and render Defendants' actions objectively unreasonable. See *Hartman v. Moore*, 547 U.S. 250, 262–66 (2006); *Nieves v. Bartlett*, 587 U.S. 391, 399–410 (2019).

SIXTH CAUSE OF ACTION
**Fabrication and Suppression of Evidence Causing Deprivation of Liberty**
(42 U.S.C. § 1983; U.S. Const. amends. IV and XIV)

(*Against Defendants: City, under Monell; Whitlock, Kontorovich, Hirsch, Ausman, Quinones, and JD Nos. 1-50, in their individual capacities*)

a. *Incorporation, Legal Basis, and Element Summary*

186. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

187. This cause of action arises under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution and challenges Defendants' fabrication of evidence, material omissions, and suppression of exculpatory information that caused or prolonged Plaintiff's deprivation of liberty.

188. The Fourth Amendment prohibits unreasonable seizures, including post-legal process detentions and restraints caused or prolonged by the use of false or misleading information that undermines probable cause. *See Manuel v. City of Joliet*, 580 U.S. 357, 367–70 (2017).

189. State actors violate the Constitution when they knowingly create, forward, or maintain false or misleading evidence, including fabricated statements or material omissions, that are likely to influence prosecutorial decisions and cause or prolong a deprivation of liberty. See

*Manuel*, 580 U.S. at 367–70; *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130–31 (2d Cir. 1997).

b. *Material Exculpatory Evidence and Facts Known to Defendants*

190. Defendants possessed, controlled, or had ready access to plainly exculpatory evidence and material facts bearing directly on probable cause at the time of arrest and throughout the charging and recharging process, including, *inter alia*:

a. bodycam footage documenting the events preceding and following Plaintiff's arrest, including Plaintiff's cooperation, contemporaneous statements, and circumstances showing Plaintiff as defensive rather than aggressive;

b. Plaintiff's contemporaneous phone video recording of the May 15, 2025 incident, depicting harassment and physical assault by PS and TJ;

c. statements by responding officers and/or observations reflected on bodycam footage undermining any claim that TJ was placed in reasonable fear by Plaintiff;

d. NYPD records and prior incident documentation evidencing Plaintiff's protected status under active stay-away POs and PS's documented history of threats and violence;

e. 911 recordings and other materials reflecting contradictions, incoherence, or exaggerations in the complainants' accounts; and

f. material facts known to Defendants that bore directly on probable cause and the elements of the charged offenses but were not reflected in arrest paperwork, complaint reports, or accusatory narratives.

191. Plaintiff expressly identified and offered exculpatory recordings and information at the scene, and, upon information and belief, responding officers and/or supervisors viewed,

captured, or otherwise obtained such recordings and documentation. The exculpatory significance of this evidence was obvious on its face and material to any reasonable determination of probable cause or charging decisions.

c. *Fabrication, Material Omissions, and Suppression*

192. Despite possessing, or having ready access to, the foregoing exculpatory evidence, Defendants knowingly, and/or with reckless disregard for the truth, used, distorted, omitted, or failed to disclose such evidence in a manner that created or maintained a materially misleading narrative, including by:

a. omitting material exculpatory facts from arrest paperwork, complaint reports, and accusatory narratives;

b. forwarding incomplete or misleading factual narratives to prosecutors;

c. failing to transmit Plaintiff's contemporaneous recordings and witness information to prosecutorial authorities;

d. failing to preserve relevant bodycam footage and related recordings;

e. failing to correct known inaccuracies or material omissions once the criminal case was initiated;

f. maintaining a prosecutable narrative portraying Plaintiff as the aggressor, notwithstanding plainly contradictory evidence; and

g. including affirmative statements in accusatory narratives that were materially misleading in light of known contradictory evidence.

193. Defendants' fabrication and suppression were not inadvertent or negligent, but were undertaken deliberately or with reckless disregard for Plaintiff's rights and for the obvious exculpatory significance of the evidence.

d. *Causation: Seizure Caused or Prolonged by Fabrication/Suppression*

194. Defendants' fabrication and suppression of evidence caused and/or prolonged Plaintiff's seizure and deprivation of liberty by inducing and sustaining the decisions to arrest Plaintiff, initiate criminal charges, and maintain criminal process and related post-arraignment restraints.

195. Had the exculpatory evidence been disclosed and the fabricated or misleading information not been presented, no reasonable officer or prosecutor could have concluded that probable cause existed to arrest Plaintiff, initiate criminal proceedings, or maintain post-arraignment restraints, and criminal process would not have been initiated or continued.

196. Defendants cannot rely on probable cause, arguable probable cause, or good-faith reliance on the information presented, because any such reliance would be predicated on information that was itself the product of Defendants' own fabrication, material omissions, and suppression of material evidence.

## SEVENTH CAUSE OF ACTION
**Conspiracy to Violate Constitutional Rights**
(42 U.S.C. § 1983)

(*Against Defendants: City, under Monell; Whitlock, Kontorovich, Hirsch, Ausman, Quinones, and JD Nos. 1-50, in their individual capacities*)

a. *Incorporation and Derivative Conspiracy*

197. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

198. This cause of action arises under 42 U.S.C. § 1983.

199. This conspiracy claim is derivative of the constitutional violations alleged herein, including the Fourth and Fourteenth Amendment violations pleaded in the Sixth Cause of Action ("Fabrication and Suppression of Evidence Causing Deprivation of Liberty"), as well as related claims for false arrest, malicious prosecution, abuse of process, and First Amendment retaliation.

b. *Agreement and Meeting of the Minds*

200. Upon information and belief, the individual Defendants reached an agreement or tacit understanding to violate Plaintiff's constitutional rights by maintaining and advancing a prosecutable narrative despite the existence of plainly exculpatory evidence, as evidenced by their coordinated preparation and transmission of materially consistent but misleading accounts, shared omissions of exculpatory facts, and collective failure to disclose or correct known inaccuracies throughout the arrest and charging process.

201. The agreement need not have been express and may be inferred from coordinated conduct and interdependent actions undertaken to achieve a shared unlawful objective.

202. The shared objective of the conspiracy was to cause and/or prolong Plaintiff's seizure and related criminal restraints by suppressing, omitting, or mischaracterizing exculpatory evidence and by sustaining a narrative portraying Plaintiff as the aggressor notwithstanding contradictory recordings and documented history, thereby inducing and maintaining criminal process against Plaintiff.

c. *Circumstantial Evidence Supporting the Agreement*

203. In furtherance of this agreement, Defendants engaged in coordinated and mutually reinforcing acts from which the existence of a meeting of the minds is plausibly inferred, including, *inter alia:*

a. pre-arrest communications between responding officers and supervisory personnel followed by a marked change in enforcement posture;

b. the on-scene arrival and involvement of supervisory personnel in charging decisions;

c. the preparation, review, and approval of arrest paperwork and accusatory narratives across multiple actors**;**

d. the interdependent handling and selective treatment of evidentiary materials, including recordings identified by Plaintiff at the scene;

e. the continuation and escalation of criminal process across multiple decision makers; and

f. the maintenance of a consistent prosecutorial narrative across actors despite access to the same underlying evidence.

204. These actions were not isolated or discretionary decisions, but sequential and interdependent steps requiring communication, coordination, and shared intent among the involved Defendants.

d. *Overt Acts in Furtherance of the Conspiracy*

205. In furtherance of the conspiracy, Defendants committed overt acts, including, *inter alia*:

a. initiating and/or continuing criminal proceedings against Plaintiff based on materially incomplete and misleading narratives;

b. suppressing, failing to preserve, and/or failing to transmit plainly exculpatory recordings and witness information;

c. omitting material exculpatory facts from arrest paperwork and accusatory narratives;

d. approving and maintaining charging decisions and court imposed restraints notwithstanding known inconsistencies; and

e. leveraging judicial process and court-issued restraints to impose continuing liberty restrictions.

e. *Intracorporate Conspiracy Doctrine Does Not Bar the Claim*

206. Although certain Defendants were employed by the same municipal entity, the intracorporate conspiracy doctrine does not bar this claim because Defendants were not acting in furtherance of legitimate municipal objectives, but instead engaged in coordinated conduct to violate clearly established constitutional rights, including the fabrication and suppression of evidence and the retaliatory use of criminal process. Upon information and belief, Defendants acted outside the scope of their lawful duties and for personal or improper purposes, including retaliatory animus and the deliberate misuse of authority, thereby falling within recognized exceptions to the doctrine.

EIGHTH CAUSE OF ACTION
**Selective Enforcement - Equal Protection Violation**
(42 U.S.C. § 1983; U.S. Const. amend. XIV)

(*Against Defendants: City, under Monell; Kontorovich, Hirsch, Ausman, Mack, Douglas, Dzeviatka, Quinones, Castillo, Cavalieri, Pastwa, Lobsang, Ramos, and JD Nos. 1-50, in their individual capacities*)

a. *Incorporation and Legal Basis*

207. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

208. This claim arises under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment.

209. The Equal Protection Clause prohibits selective enforcement of facially neutral laws where: (1) the plaintiff was treated differently from others similarly situated, and (2) such differential treatment was based on impermissible considerations, including an intent to punish or inhibit

the exercise of constitutional rights, or was motivated by malicious or bad-faith intent to injure. See *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886); *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980); *Bizzarro v. Miranda*, 394 F.3d 82, 87–88 (2d Cir. 2005).

b. *Differential Treatment*

210. As detailed in prior Causes of Action, Defendants: (1) refused to enforce the valid POs issued in Plaintiff's favor; (2) withheld or distorted police services; (3) arrested and prosecuted Plaintiff under N.Y. Penal Law § 265.01(1); and (4) added charges and sought a PO against Plaintiff.

211. Upon information and belief, similarly situated complainants in New York City who are alike in all material respects relevant to enforcement decisions, including individuals who (1) were protected parties under valid stay-away POs, (2) reported violations supported by officer observation or video evidence, (3) were not identified as primary aggressors, and (4) did not engage in protected speech criticizing NYPD personnel, are ordinarily afforded enforcement measures, including arrest of the violator, documentation of violations, and follow-up protective procedures.

212. Plaintiff, despite comparable or stronger documentation and repeated notice to officers, was treated differently from such similarly situated individuals by being denied enforcement protection and instead subjected to arrest and prosecution.

c. *Additional Disparate Treatment*

213. Defendants obstructed or delayed Plaintiff's efforts to obtain POs; refused to enforce multiple valid POs, including when violations occurred in their presence or were captured on bodycam; and aggressively pursued criminal enforcement against Plaintiff despite known exculpatory evidence and circumstances undermining probable cause.

214. Further, Defendants enforced § 265.01(1) against Plaintiff while, upon information and belief, declining to pursue enforcement against widespread civilian possession and open commercial distribution of SG devices during the same period. This disparity is pleaded as evidence of arbitrary and selective enforcement priorities and bad faith, not as a claim that all such actors are identically situated in every respect.

d. *Selective Denial of Crime Victim Notification and Protection*

215. Defendants' refusal to provide Plaintiff with basic crime victim notification and participation protections, including timely notice of PS's releases and an opportunity to be heard regarding PO violations and threats to her safety, while simultaneously pursuing criminal process against her, further illustrates the selective nature of their enforcement.

216. Upon information and belief, crime victims in comparable circumstances are ordinarily notified, consulted, and afforded protective measures. Plaintiff, by contrast, was denied such protections despite her documented status as the protected party under active POs.

e. *Discriminatory or Bad Faith Intent*

217. Evidence of bad faith and discriminatory intent includes: (1) the express withdrawal of services "***because***" of Plaintiff's criticism; (2) escalation of enforcement following Plaintiff's public complaints; (3) pre-arrest supervisory communications reflecting hostility; and (4) continued non-enforcement of POs while aggressively prosecuting Plaintiff.

f. *Independence from First Amendment Claim*

218. This Equal Protection claim is distinct from Plaintiff's First Amendment retaliation claim. It rests on unequal enforcement and discriminatory treatment as compared to similarly situated individuals, not solely on retaliatory motive.

219. Even assuming *arguendo* that probable cause existed (which Plaintiff denies), selective enforcement motivated by bad faith or intent to injure violates the Equal Protection Clause independent of the First Amendment retaliation framework.

NINTH CAUSE OF ACTION
**State-Created-Danger (Substantive Due Process)**
(42 U.S.C. § 1983; U.S. Const. amend. XIV)

(*Against Defendants: City, under Monell; Whitlock, Kontorovich, Ausman, Mack, Douglas, Dzeviatka, Quinones, Castillo, Cavalieri, Pastwa, Lobsang, Ramos, and JD Nos.1-50, in their individual capacities*)

a. *Incorporation and Legal Basis*

220. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

221. This cause of action arises under 42 U.S.C. § 1983 and the substantive component of the Fourteenth Amendment's Due Process Clause, which protects individuals from affirmative government conduct that creates or increases the risk of private violence.

b. *Governing Legal Standard*

222. Although the Due Process Clause generally does not impose an affirmative duty to protect individuals from private harm, liability attaches where state actors, through affirmative conduct, use their authority in a manner that creates or increases the risk of private violence to a particular individual. See *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989); *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428–31 (2d Cir. 2009); *Pena v. DePrisco*, 432 F.3d 98, 108–10 (2d Cir. 2005).

223. Under Second Circuit precedent, a state actor violates substantive due process under the state created danger doctrine where:

a. the harm to the plaintiff was foreseeable and a fairly direct result of the defendant's conduct;

b. the state actor's conduct was so egregious, arbitrary, or deliberately indifferent as to "shock the conscience";

c. the plaintiff was a foreseeable and particularized victim of the defendant's actions, as opposed to a member of the general public; and

d. the state actor affirmatively used his or her authority in a manner that created or increased the danger to the plaintiff, rendering her more vulnerable to harm than had the state not acted at all.

c. *Plaintiff as a Foreseeable and Particularized Victim*

224. Plaintiff was a known and documented victim of PS and TJ, subject of and under the protection of multiple active stay-away POs.

225. Defendants had actual knowledge of: (1) repeated PO violations; (2) prior assaults and threats; (3) Plaintiff's repeated emergency calls and written complaints; and (4) documented prior enforcement history involving PS.

226. Plaintiff was therefore not a member of the general public, but a specifically identified and foreseeable victim.

d. *Particularized Foreseeability and Induced Reliance*

227. Plaintiff does not allege a custodial "special relationship" of the type rejected in *DeShaney*, 489 U.S. at 195-97. Rather, Plaintiff alleges that Defendants, through affirmative undertakings, representations, and interventions, created heightened foreseeability and induced reasonable reliance, thereby triggering a duty not to increase the danger to Plaintiff through the misuse of state authority. See *Matican v. City of New York*, 524 F.3d 151, 155–58 (2d Cir. 2008).

228. The referenced crime victim frameworks and PO regime are pleaded not as independent sources of constitutional duty, but as contextual evidence bearing on foreseeability, reliance, and Defendants' knowledge of the specific and escalating risk to Plaintiff.

229. Through their affirmative conduct, Defendants created a relationship characterized by particularized foreseeability and reliance beyond that owed to the general public, including, *inter alia*:

a. obtaining and assuming responsibility for the enforcement of multiple POs naming Plaintiff as the protected party;

b. providing specific assurances that the stay-away POs would be enforced, including that violations would trigger mandatory arrest under N.Y. C.P.L. § 140.10 and that Plaintiff would receive notice of custodial and release decisions;

c. repeatedly exercising control over PS through involuntary transport, confinement, and release decisions; and

d. expressly inviting Plaintiff to rely on Defendants for protection and notification in connection with those interventions.

230. Plaintiff reasonably relied on these affirmative undertakings in structuring her safety decisions and movements. Defendants knew that withdrawing, reversing, or misrepresenting those protections would foreseeably expose Plaintiff to serious harm.

231. Defendants' liability arises not from failure to protect, but from affirmative conduct that increased Plaintiff's vulnerability after inducing reliance, thereby worsening her position relative to the *status quo ante*.

e. *Affirmative Acts that Increased Plaintiff's Vulnerability*

232. Defendants' conduct was not passive or merely a failure to act, but constituted affirmative uses of state authority, including arrest decisions, charging determinations, custodial control over aggressors, and official representations, that actively altered the dynamics between Plaintiff and her aggressors and increased the risk of harm. These acts included, *inter alia*:

a. reversing victim/offender roles by arresting Plaintiff while declining to arrest known PO violators under circumstances captured on video or observed by officers, thereby communicating to PS and TJ that their conduct would not result in enforcement consequences;

b. signaling non-enforcement of court-issued POs despite known violations;

c. canceling previously promised protective measures after inducing reliance;

d. providing misleading legal information regarding the scope and enforceability of Plaintiff's POs;

e. suppressing exculpatory evidence while maintaining criminal process against Plaintiff, thereby diverting enforcement attention away from known aggressors and reinforcing Plaintiff's exposed status; and

f. maintaining charging decisions that undermined Plaintiff's protective posture.

233. These actions removed deterrent effects, emboldened private actors, and altered the *status quo ante* by signaling tolerance of continued violations and increasing the likelihood of further harm to Plaintiff.

f. *Conscience-Shocking Conduct*

234. Defendants had ample time to deliberate and repeatedly confronted a known and escalating risk to Plaintiff's safety, yet consciously disregarded that risk and affirmatively acted in ways

that increased Plaintiff's vulnerability, thereby exhibiting deliberate indifference to a foreseeable and particularized risk of harm.

235. By affirmatively signaling non-enforcement, legitimizing known aggressors, and reversing or undermining previously promised protections, Defendants' conduct was so egregious, arbitrary, and deliberately indifferent to a known and escalating risk of serious harm as to shock the conscience under settled Second Circuit precedent. See *Okin*, 577 F.3d at 430–31.

<u>TENTH CAUSE OF ACTION</u>
**Failure to Intervene**
(42 U.S.C. § 1983; U.S. Const. amends. IV and XIV)

(*Against Defendants: City, under Monell; Kontorovich, Ausman, Quinones, and JD Nos. 1–50, in their individual capacities)*

a. *<u>Incorporation and Legal Basis</u>*

236. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

237. This cause of action arises under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

238. This cause of action is limited to Defendants' failures to intervene in ongoing constitutional violations committed by others, despite having actual or constructive knowledge of such violations and a realistic opportunity to prevent or halt them. Any allegations of direct participation, direction, approval, or ratification are pleaded as personal involvement in the underlying substantive constitutional causes of action.

239. The Fourth Amendment prohibits unreasonable seizures, including arrests unsupported by probable cause, and is enforceable against state actors through the Fourteenth Amendment.

b. *<u>Legal Standard: Duty to Intervene</u>*

240. To establish liability for failure to intervene, a plaintiff must show that: (1) a constitutional violation occurred; (2) the defendant knew or had reason to know of the violation; (3) the

defendant had a realistic opportunity to intervene; and (4) the defendant consciously failed to act. See *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994); *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016).

241. An officer who has a realistic opportunity to prevent a constitutional violation but fails to do so may be held liable under 42 U.S.C. § 1983. See *Anderson*, 17 F.3d at 557; *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988).

c. *Defendants' Knowledge of the Underlying Constitutional Violations*

242. At the time of Plaintiff's arrest and during the preparation and approval of arrest paperwork, Arresting Agents were physically present and/or in contemporaneous communication with responding officers and were aware, based on Plaintiff's contemporaneous video, bodycam footage, Plaintiff's statements, and the observable circumstances, that there was no lawful basis for a custodial arrest. Certain Defendants were present as observing or supervising officers with knowledge of the ongoing constitutional violations, even if they did not themselves directly effectuate each aspect of the arrest.

243. Each of the Arresting Agents who did not personally effectuate every aspect of Plaintiff's arrest failed to intervene while Plaintiff's warrantless arrest and custodial seizure were unfolding, including before handcuffing, transporting, booking, and completing the arrest paperwork, and failed to take available steps to direct Plaintiff's release, halt the custodial arrest, or prevent the submission of materially incomplete or misleading arrest paperwork that would foreseeably drive continued restraints.

d. *Realistic Opportunities to Intervene*

244. Defendants had realistic opportunities to intervene, including, *inter alia*:

a. while physically present during the arrest and detention, before the seizure was complete;

b. while in contemporaneous supervisory communication prior to booking and formal charging; and

c. while reviewing bodycam footage and exculpatory evidence prior to finalization of arrest paperwork and while Plaintiff remained in police custody and before arraignment, when they had the ability to halt processing, correct the basis for arrest, and secure Plaintiff's prompt release.

245. Despite their knowledge of the ongoing constitutional violations and their realistic opportunities to act, Defendants consciously failed to intervene to prevent or halt Plaintiff's unlawful seizure, custodial arrest, and immediate deprivation of liberty, thereby causing and prolonging Plaintiff's detention and subsequent restraints.

## ELEVENTH CAUSE OF ACTION
**(*Pled in the Alternative*)**
**False Arrest / False Imprisonment**
(New York Common Law)

(*Against Defendants: City, under respondeat superior; Kontorovich, Ausman, Quinones, and JD Nos.1-50, in their individual capacities*)

a. *Incorporation and Legal Standard*

246. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein, including the factual allegations and probable cause analysis set forth above, particularly in the Second Cause of Action ("False Arrest / False Imprisonment").

247. This cause of action is pled in the alternative to Plaintiff's federal false arrest claim and seeks relief under New York common law.

248. Under New York law, false arrest and false imprisonment are identical torts, each requiring that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent; and (4) the confinement was not otherwise privileged. See *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975).

b. *Plaintiff's Arrest, Confinement, and Absence of Probable Cause*

249. On May 15, 2025, Arresting Agents intentionally arrested and confined Plaintiff, without a warrant, for alleged Criminal Possession of a Weapon in the Fourth Degree under N.Y. Penal Law § 265.01(1).

250. Plaintiff was handcuffed, transported to the precinct, processed, fingerprinted, photographed, and detained for several hours. Plaintiff was conscious of and did not consent to this confinement.

251. As set forth in the Second Cause of Action, Defendants lacked probable cause to arrest Plaintiff, and the arrest was therefore not privileged under New York law. The absence of probable cause is based on the same facts and omissions set forth in Plaintiff's federal claims, including Defendants' suppression of exculpatory evidence and reliance on materially incomplete and misleading information.

252. Under New York law, an arrest made without probable cause is *per se* unlawful and satisfies the absence of privilege element. See *Broughton*, 37 N.Y.2d at 456–57; *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

253. Accordingly, Plaintiff's arrest and detention were unlawful, unprivileged, and without justification under New York common law.

c. *Municipal Respondeat Superior Liability*

254. Defendant City is liable for the foregoing conduct under the doctrine of respondeat superior because the individual Defendants were acting within the scope of their employment and in furtherance of the City's business when arresting and detaining Plaintiff.

TWELFTH CAUSE OF ACTION
**(*Pled in the Alternative*)**
**Malicious Prosecution**
(New York Common Law)

(*Against Defendants: City, under respondeat superior; Kontorovich, Ausman, Quinones and JD Nos. 1-50, in their individual capacities*)

a. *Incorporation and Legal Standard*

255. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein, including the factual allegations and probable cause analysis set forth above, particularly in the Third Cause of Action ("Malicious Prosecution").

256. This cause of action is pled in the alternative to Plaintiff's federal malicious prosecution claim and seeks relief under New York common law.

257. Under New York law, a claim for malicious prosecution requires: (1) initiation or continuation of a criminal proceeding; (2) termination of that proceeding in plaintiff's favor; (3) lack of probable cause; and (4) actual malice. See *Broughton v. State of New York*, 37 N.Y.2d 451, 457 (1975); *Cantalino v. Danner*, 96 N.Y.2d 391, 394 (2001); *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997).

b. *Initiation and Continuation of Criminal Proceedings*

258. Defendants initiated and continued criminal proceedings against Plaintiff by preparing, filing, and forwarding accusatory instruments; supplying false, misleading, or incomplete information to prosecutors; and suppressing or withholding material exculpatory evidence.

259. Defendants' conduct went beyond the mere furnishing of information and played an active and proximate role in the initiation and continuation of the prosecution, including drafting, reviewing, and approving accusatory instruments and providing sworn or materially influential statements upon which prosecutors relied.

c. *Favorable Termination of the Proceedings*

260. On or about June 25, 2025, all charges against Plaintiff were dismissed in the interest of justice, and the June 3 PO issued against her was vacated.

261. The termination was not the product of a compromise, plea, or misconduct by Plaintiff and was not inconsistent with her innocence.

262. Under New York law, a dismissal in the interest of justice constitutes a favorable termination where, as here, the circumstances of the dismissal are not inconsistent with innocence. See *Cantalino v. Danner*, 96 N.Y.2d 391, 396-99 (2001).

d. *Lack of Probable Cause*

263. As alleged in the Third Cause of Action, Defendants lacked probable cause to initiate and continue criminal proceedings against Plaintiff, and therefore lacked any privilege or justification to do so under New York law.

e. *Actual Malice*

264. Defendants acted with malice, which may be inferred from the absence of probable cause and is further evidenced by retaliatory motive, the suppression of exculpatory evidence, the escalation of charges without factual basis, and Defendants' reckless or intentional disregard for Plaintiff's rights.

f. *Municipal Respondeat Superior Liability*

265. The acts complained of were undertaken in the course of police functions, including arrest processing, preparation of accusatory instruments, and communications with prosecutors.

266. Defendant City is vicariously liable under New York law because the individual Defendants acted within the scope of their employment in initiating and continuing Plaintiff's prosecution. See *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979).

THIRTEENTH CAUSE OF ACTION
**(*Pled in the Alternative*)**
**Abuse of Process**
(New York Common Law)

(*Against Defendants: City, under respondeat superior; Kontorovich, Ausman, Quinones, Ramos, and JD Nos. 1-50, in their individual capacities)*

a. *Incorporation*

267. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein, including the allegations set forth in the Fourth Cause of Action ("Abuse of Process").

268. This cause of action is pled in the alternative to Plaintiff's federal abuse of process claim and seeks relief under New York law.

b. *Use of Regularly Issued Legal Process*

269. Defendants employed and thereafter used regularly issued legal process against Plaintiff, including criminal court accusatory instruments, the June 3 PO, court-directed conditions and restraints, and related judicial enforcement mechanisms issued in the course of Plaintiff's criminal proceedings.

270. After such process was issued, Defendants used and maintained it with intent to do harm to Plaintiff without justification, including with retaliatory motive and with knowledge that the underlying proceedings lacked probable cause.

c. *Perverted Use of Process to Achieve Collateral Objectives*

271. After issuance of the June 3 PO and related restraints, Defendants used and maintained those judicial processes in a perverted manner to obtain collateral objectives unrelated to legitimate adjudication, including retaliating against Plaintiff for protected speech, discrediting her as a complainant, shielding officers from scrutiny, and leveraging continuing court-imposed restraints to coerce silence and deter further complaints.

272. These objectives were collateral to the lawful purpose of criminal process - namely, adjudicating guilt or innocence - and, therefore, satisfy New York's "perverted use" requirement. See *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n, Inc., Local 1889*, 38 N.Y.2d 397, 403–04 (1975).

273. This misuse occurred after the issuance of process and constituted the use of that process for ends outside its lawful purpose.

d. *Improper and Malicious Intent*

274. Defendants' improper motive is evidenced by retaliatory statements, suppression of exculpatory evidence, escalation of charges without factual basis, and procurement and maintenance of judicial restraints inconsistent with the known facts.

275. This claim is independent of the existence of probable cause and is based on Defendants' improper use of process after its issuance.

e. *Municipal Respondeat Superior Liability*

276. Defendant City is vicariously liable under New York law for the tortious conduct of individual Defendants committed within the scope of their employment. See *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979).

FOURTEENTH CAUSE OF ACTION

**(*Pled in the Alternative*)**

**Negligent Performance of an Assumed Duty; Special Relationship and Affirmative Conduct Increasing Risk**

(New York Common Law)

(*Against Defendants: City, under respondeat superior; Whitlock, Kontorovich, Hirsch, Ausman, Mack, Douglas, Dzeviatka, Quinones, Castillo, Cavalieri, Pastwa, Lobsang, Ramos, and JD Nos. 1-50, in their individual capacities*)

a. *Incorporation and Legal Framework Governing Municipal Negligence and Special Duty*

277. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

278. This cause of action is pled in the alternative to Plaintiff's federal state created danger claim and seeks relief under New York common law principles governing municipal negligence, special duty, and the negligent performance of voluntarily assumed obligations.

279. Under New York law, municipal liability may arise where a special relationship exists between the municipality and the plaintiff, including where the municipality affirmatively undertakes to act on the plaintiff's behalf and the plaintiff justifiably relies on that undertaking. See *Cuffy v. City of New York*, 69 N.Y.2d 255 (1987); *Sorichetti v. City of New York*, 65 N.Y.2d 461 (1985).

280. A special relationship is established where: (1) the municipality assumes an affirmative duty to act on behalf of the injured party beyond that owed to the public generally; (2) the municipality knows inaction could lead to harm; (3) there is direct contact between the municipal agents and the plaintiff; and (4) the injured party justifiably relies on the undertaking.

281. Defendants, through repeated direct interactions with Plaintiff, undertook specific and particularized obligations toward her and made express assurances, including, *inter alia*:

a. representing that they would enforce multiple court-issued POs naming Plaintiff as the protected party;

b. advising Plaintiff that violations of those POs would trigger enforcement, including arrest authority under N.Y. C.P.L. § 140.10;

c. representing that Plaintiff would receive notification regarding custodial status, release decisions, and enforcement actions; and

d. affirmatively engaging with Plaintiff through in-person meetings, telephone communications, and repeated responses to emergency calls.

282. These representations and interactions constituted direct contact and specific assurances sufficient to create a special relationship under New York law, as they went beyond general police obligations and involved particularized commitments directed specifically to Plaintiff.

283. In reliance on these undertakings, Plaintiff reasonably structured her safety decisions, movements, and reporting behavior based on Defendants' representations that enforcement and notification would occur, including remaining in circumstances where she would otherwise have sought alternative protection, and refrained from pursuing alternative protective measures that she otherwise would have undertaken.

b. *Negligent Performance of Assumed Duty and Affirmative Misconduct Increasing Risk*

284. After undertaking the foregoing obligations, Defendants negligently performed those duties and engaged in affirmative conduct that increased the risk of harm to Plaintiff, including, *inter alia:*

a. providing misleading or inaccurate legal guidance regarding the scope and enforceability of POs;

b. canceling or withdrawing previously promised protective measures after inducing reliance;

c. reversing enforcement posture by declining to enforce known violations while affirmatively arresting Plaintiff;

d. failing to provide promised notifications concerning custodial or release decisions; and

e. engaging in conduct that signaled non-enforcement and emboldened known aggressors.

285. Defendants' conduct constituted misfeasance, not mere nonfeasance, because they affirmatively exercised their authority in a manner that worsened Plaintiff's position and increased her vulnerability to harm beyond the *status quo ante*, rather than merely failing to act.

286. As a direct and foreseeable result of Defendants' negligent performance of assumed duties and affirmative misconduct, Plaintiff was placed at increased risk of harm from known private actors and suffered resulting injuries.

c. *Foreseeability of Harm*

287. The risk of harm to Plaintiff was foreseeable and well known to Defendants, who had actual knowledge of: (1) repeated violations of court-issued POs; (2) prior threats, assaults, and escalating conduct by identified aggressors; (3) Plaintiff's repeated reports, complaints, and requests for assistance; and (4) the increasing likelihood of further violence in the absence of enforcement.

288. In light of this knowledge, Defendants knew or should have known that their conduct would expose Plaintiff to a heightened risk of harm.

d. *Immunity and Municipal Respondeat Superior Liability*

289. Defendants' conduct involved the negligent performance of specific, voluntarily assumed protective undertakings and ministerial enforcement and notification functions, including enforcement of court-issued POs and provision of promised notifications, which are not shielded by discretionary immunity.

290. To the extent Defendants contend that their conduct was discretionary, such immunity does not apply where the actions were taken without a reasonable basis, involved inadequate investigation, or were undertaken in bad faith or with disregard for known risks.

291. At a minimum, whether Defendants' conduct was ministerial or discretionary, and whether it was undertaken with a reasonable basis, presents questions of fact not resolvable on a motion to dismiss.

292. Defendant City is vicariously liable under New York law for the negligent acts and omissions of NYPD agents committed within the scope of their employment. See *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979).

FIFTEENTH CAUSE OF ACTION
**Violation of the New York City Human Rights Law**
(N.Y.C. Admin. Code §§ 8-107, 8-502(a))

(*Against Defendants: City; Whitlock, Kontorovich, Hirsch, Ausman, Mack, Douglas, Dzeviatka, Quinones, Castillo, Cavalieri, Pastwa, Lobsang, Ramos, and JD Nos. 1-50, and additional yet-to-be-identified JDs, in their individual capacities*)

a. *Incorporation, Statutory Basis, and Independent Construction of the NYCHRL*

293. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

294. This claim is brought pursuant to N.Y.C. Admin. Code § 8-502(a). Under § 8-130, the NYCHRL must be construed independently from federal and state law and liberally in favor of discrimination plaintiffs to accomplish its uniquely broad and remedial purposes.

295. The NYCHRL prohibits discrimination and retaliation in the provision of public accommodations and services, including municipal services such as police protection, enforcement of court-issued POs, and victim related safety services. See N.Y.C. Admin. Code § 8-107. The provision of police protection and enforcement services constitutes a municipal service within the meaning of the NYCHRL.

296. This cause of action concerns Defendants' discriminatory and retaliatory denial of municipal services to Plaintiff, including police protection, enforcement of court-issued POs, victim notification, and related safety services.

297. Plaintiff was a documented victim of conduct that would constitute stalking under New York law, and Defendants were aware of that status.

b. *Discrimination in the Provision of Municipal Services*

298. At all relevant times, Plaintiff is a member of a protected class under the NYCHRL, including on the basis of her gender.

299. Defendants, acting under color of law and in the course of providing municipal services, treated Plaintiff less well than similarly situated individuals in connection with the provision of police protection and enforcement services.

300. As alleged herein, Defendants:

a. refused to enforce valid court-issued POs protecting Plaintiff;

b. failed to provide standard victim protections and notifications;

c. reversed victim/offender roles by arresting Plaintiff rather than known aggressors; and

d. denied Plaintiff equal access to police services routinely afforded to similarly situated complainants.

301. Upon information and belief, similarly situated complainants, including individuals reporting comparable threats or violations of court-issued POs within the same precinct, are ordinarily provided enforcement of POs, victim services, and police protection under comparable circumstances.

302. Defendants' conduct resulted in Plaintiff being treated "less well" than others in the provision of municipal services, at least in part because of her gender, including through the application of gender-based stereotypes concerning credibility, victimhood, and prioritization and enforcement of complaints involving stalking, harassment, and interpersonal violence.

c. *Protected Activity Under the NYCHRL*

303. The NYCHRL prohibits retaliation against any person because she has opposed practices forbidden under the statute or otherwise exercised rights protected thereunder. See N.Y.C. Admin. Code § 8-107(7).

304. Plaintiff engaged in protected activity by opposing and complaining about discriminatory and unequal treatment in the provision of police services, including:

a. reporting that NYPD officers failed to provide equal enforcement of court-issued POs afforded to similarly situated complainants, including those not sharing Plaintiff's protected characteristics;

b. filing complaints with the Civilian Complaint Review Board and other oversight bodies alleging discriminatory and unequal provision of police services;

c. publicly criticizing the 28th Precinct and its leadership for discriminatory and retaliatory practices; and

d. repeatedly requesting equal access to police protection, enforcement, and victim services.

305. Plaintiff's complaints constituted opposition to practices prohibited by the NYCHRL, including discriminatory and unequal denial of municipal services and retaliatory treatment in response to such opposition.

d. *Retaliatory Conduct*

306. Following Plaintiff's protected activity, Defendants engaged in conduct reasonably likely to deter a person from engaging in such activity, including: (1) escalating enforcement against Plaintiff; (2) initiating and maintaining criminal charges against her; (3) refusing to enforce protective orders in her favor; and (4) denying her access to standard victim protections and services.

307. There is a direct causal connection between Plaintiff's protected activity and Defendants' retaliatory conduct, as evidenced by temporal proximity, Defendants' statements, and the escalation of adverse actions following Plaintiff's complaints.

e. *Independent and Liberal Construction*

308. This claim is independent of Plaintiff's federal constitutional claims and must be analyzed separately under the broader and more plaintiff-protective standards of the NYCHRL.

309. Under the NYCHRL, Plaintiff need only show that she was treated less well, at least in part, because of a protected characteristic, and that Defendants' conduct was reasonably likely to deter protected activity. The facts alleged herein plausibly satisfied those standards.

f. *Liability*

310. The individual Defendants are liable under N.Y.C. Admin. Code § 8-107(6) for aiding, abetting, inciting, compelling, or coercing the discriminatory and retaliatory conduct described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against all Defendants, jointly and severally where permitted by law, and award the following relief:

1. Declaratory Relief: A declaration pursuant to 28 U.S.C. §§ 2201–2202 that:

   a. Defendants' arrest, detention, and prosecution of Plaintiff violated her rights under the First, Second, Fourth, and Fourteenth Amendments to the United States Constitution;

   b. A declaration that, at the time of Plaintiff's arrest, enforcement of N.Y. Penal Law § 265.01(1) and New York City Administrative Code § 10-135 against civilian possession of SGs is unconstitutional as applied to Plaintiff and inconsistent with the permanent injunction issued in *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019), thereby rendering such enforcement unlawful under the United States Constitution;

   c. Defendants' conduct violated Plaintiff's constitutional and statutory rights as alleged in this Complaint;

   d. To the extent no adequate alternative remedies exist, Defendants' conduct violated Article I, §§ 6, 8, 11, and 12 of the New York Constitution.

2. Injunctive Relief: Appropriate prospective injunctive relief, including:

   a. Enjoining Defendants from enforcing § 265.01(1) against Plaintiff and similarly situated individuals in a manner that violates the Second and Fourteenth Amendments;

b. Enjoining Defendants from retaliating against Plaintiff for protected speech or petitioning activity;

c. Requiring Defendants to comply with constitutional requirements governing arrests, prosecutions, and enforcement decisions; and

d. Such further equitable relief as the Court deems necessary to prevent ongoing or future violations of law.

3. Compensatory Damages: Compensatory damages against all Defendants to the fullest extent permitted by law for:

a. Loss of liberty, emotional distress, reputational injury, and other personal harms;

b. Financial losses, including lost income, out-of-pocket expenses, and litigation-related costs; and

c. All damages recoverable under 42 U.S.C. §§ 1983 and 1985 and New York law.

4. Punitive Damages: Punitive damages against all individual Defendants (but not against the City), for their intentional, reckless, retaliatory, and malicious conduct.

5. Attorneys' Fees and Costs: Reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; N.Y.C. Admin. Code § 8-502(g); 28 U.S.C. § 1920; and any other applicable authority.

6. Nominal Damages: Damages for the violation of Plaintiff's constitutional rights.

7. Interest: Prejudgment and post-judgment interest as permitted by law.

8. Jury Trial: Plaintiff demands a trial by jury on all issues so triable.

9. Further Relief: Such other and further relief as the Court deems just and proper.

Date: April 9, 2026
New York, NY

Respectfully submitted,

/s/ *Jennifer L. Harrington*

Jennifer L. Harrington, Esq.
*Plaintiff, Pro Se*
2214 Frederick Douglass Blvd, Ste. 243
New York, NY 10026
Tel: (917) 488-8414
harringtonlegalnyc@gmail.com