**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JENNIFER LYNN HARRINGTON, <br><br> *Plaintiff,* <br><br> v. <br><br> CITY OF NEW YORK, COMMISSIONER JESSICA TISCH, CAPTAIN JAMES WHITLOCK, LIEUTENANT MICHAEL KONTOROVICH, LIEUTENANT PHILIP HIRSCH, SERGEANT KATHLEEN AUSMAN, SERGEANT ALEX LUGO, DETECTIVE CHAD MACK, DETECTIVE JUSTIN DOUGLAS, OFFICER ILYA DZEVIATKA, OFFICER CLAIRE QUINONES, OFFICER YAMNY CASTILLO, OFFICER CHRISTOPHER CAVALIERI, OFFICER DAVID PASTWA, OFFICER JAMYANG LOBSANG, OFFICER CHRISTIAN LAYES, OFFICER MATTHEW RUSSO, OFFICER DANIEL SOTAMBA, OFFICER SCOTT DRAUGHON, OFFICER LUC PITRE, OFFICER MD UDDIN, DR. STACI J. RAMOS, and JOHN DOE NOS. 4–50, <br><br> *Defendants.* | Civil Action No. 1:26-cv-02919 (MMG)(VF) <br><br><br> **FIRST AMENDED COMPLAINT** <br><br><br> (*Jury Trial Demanded*) |

Plaintiff Jennifer Lynn Harrington ("Plaintiff" or "JLH") alleges, upon personal knowledge as to herself and upon information and belief as to all other matters, as follows:

## I.   <u>PRELIMINARY STATEMENT</u>

1.   This action arises from Defendants' retaliatory and discriminatory misuse of police and prosecutorial authority against Plaintiff, a documented stalking and assault victim who, over a period of years, repeatedly sought lawful protection from escalating violence and lodged public and official complaints regarding systemic failures within the NYPD's 28th Precinct.

2.   At its core, this case concerns the retaliatory arrest and prosecution of a repeatedly victimized complainant who publicly criticized NYPD failures to enforce her POs.

3. On May 15, 2025, after Plaintiff was threatened and physically assaulted by known aggressors, NYPD officers arrested her under N.Y. Penal Law § 265.01(1) based on her possession of an electronic stun gun ("SG") carried for non-lethal self-defense. The arrest occurred despite publicly available federal constitutional authority, including *Avitabile v. Beach*, 368 F. Supp. 3d 404, 421-22 (N.D.N.Y. 2019), which had held, on the record before it, that enforcement of New York's civilian SG prohibition violated the Second Amendment and entered permanent injunctive relief.

4. Plaintiff alleges that the arrest and subsequent prosecution were not the product of neutral law enforcement, but were instead undertaken in retaliation for Plaintiff's protected speech criticizing NYPD misconduct and demanding enforcement of her court-issued Orders of Protection. At the same time, similarly situated individuals possessing comparable devices were not arrested or prosecuted under the statute.

5. Plaintiff further alleges that Defendants relied on misleading and incomplete narratives, suppressed exculpatory evidence, and pursued baseless additional charges and a retaliatory PO against Plaintiff herself, effectively reversing the roles of victim and offender.

6. Through these actions, Defendants violated Plaintiff's rights under the First, Second, Fourth, and Fourteenth Amendments to the United States Constitution and related provisions of New York constitutional, statutory, common, and municipal law. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and seeks declaratory and injunctive relief, compensatory damages, and other appropriate remedies.

## II.   JURISDICTION and VENUE

7.   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201–2202 and attorneys' fees pursuant to 42 U.S.C. § 1988.

8.   The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's related state law, state constitutional, and municipal law claims, which form part of the same case or controversy.

9.   Venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(2) because at least one Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred here.

10.   Assignment to the Manhattan Courthouse is proper under Rule 18(a)(3) of the S.D.N.Y. Rules for the Division of Business Among District Judges.

## III.   CONDITIONS PRECEDENT

11.   Plaintiff has satisfied all conditions precedent under the New York General Municipal Law, including timely service of a Notice of Claim pursuant to § 50-e, appearance for a § 50-h hearing, and commencement of this action within the time prescribed by § 50-i.

## IV.   PARTIES

12.   **Plaintiff**: Jennifer Lynn Harrington ("Plaintiff" or "JLH") is an adult citizen of the United States residing in the State of New York. She is a law-abiding individual entitled to the protections of the United States Constitution. She has no felony or assault convictions and has not been involuntarily committed for mental health treatment.

13.   **Defendant**: The City of New York (the "City") is a municipal corporation organized under the laws of the State of New York. The City operates and controls the New York Police

Department ("NYPD"), and is responsible for the hiring, training, supervision, discipline, and conduct of NYPD personnel, including the policies, practices, customs, and usages that caused the violations alleged herein. Claims against the City arising under 42 U.S.C. § 1983 are asserted pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

14. **Defendant:** The NYPD is an agency of the City of New York and is not a suable entity under N.Y.C. Charter § 396. The NYPD is referenced herein solely to identify the law enforcement agency whose personnel engaged in the conduct alleged.

15. **Defendant:** Jessica Tisch ("Commissioner") is Commissioner of the NYPD and is sued in her official capacity for declaratory and prospective injunctive relief. As Commissioner, she is responsible for the administration, supervision, policies, practices, training, discipline, and enforcement priorities of the NYPD. Plaintiff seeks prospective relief against Commissioner Tisch only to the extent necessary to ensure effective implementation of any declaratory or injunctive relief concerning ongoing or future NYPD enforcement of the challenged restrictions.

16. **Defendants:** Captain James Whitlock ("Whitlock"), Lieutenant Michael Kontorovich ("Kontorovich"), Lieutenant Philip Hirsch ("Hirsch"), Sergeant Kathleen Ausman ("Ausman"), Sergeant Alex Lugo ("Lugo"), Detective Chad Mack ("Mack"), Detective Justin Douglas ("Douglas"), Officer Ilya Dzeviatka ("Dzeviatka"), Officer Claire Quinones ("Quinones"), Officer Yamny Castillo ("Castillo"), Officer Christopher Cavalieri ("Cavalieri"), Officer David Pastwa ("Pastwa"), Officer Jamyang Lobsang ("Lobsang"), Officer Christian Layes ("Layes"), Officer Matthew Russo ("Russo"), Officer Daniel Sotamba ("Sotamba"), Officer Scott Draughon ("Draughon"), Officer Luc Pitre ("Pitre"), and Officer Md Uddin ("Uddin") were, at all relevant times, officers, detectives, or

supervisors employed by the NYPD and acting under color of state law. Each is sued in his or her individual capacity for that Defendant's own conduct and personal involvement in the constitutional and state law violations alleged herein.

17. **Defendant:** Dr. Staci J. Ramos ("Ramos") was, at all relevant times, the President and Clergy Liaison of the 28th Precinct Clergy Council. As alleged herein, Defendant Ramos acted jointly with NYPD personnel and through precinct-linked community safety channels concerning Plaintiff's reports, requests for protective intervention, and communications involving the 28th Precinct. Plaintiff alleges that Defendant Ramos acted under color of state law to the extent she jointly participated with NYPD personnel in the conduct alleged herein, including the withdrawal or abandonment of contemplated protective intervention involving NYPD leadership after Plaintiff engaged in protected complaints and public criticism.

18. **Defendants:** John Doe Nos. 4-50 ("JD Nos. 4-50") are police officers, supervisors, and/or other employees of the New York City Police Department, and/or employees of the New York County District Attorney's Office, whose identities are presently unknown to Plaintiff. Each is sued in his or her individual capacity for actions taken under color of state law. Plaintiff will seek leave of Court, as necessary, to substitute their true names upon identification through discovery.

## V.   STATEMENT OF FACTS

### a.   *Background and Statutory Framework*

19. Electronic stun guns ("SGs") are handheld defensive devices marketed for personal self-defense. These devices are also used by law enforcement and security agencies across the United States, including agencies within New York.

20. At relevant times, New York State statutory provisions and New York City local provisions continued – and continue – to state, on their face, prohibitions concerning civilian possession, sale, transfer, or distribution of SGs, including N.Y. Penal Law §§ 265.01(1), 265.10(4), and N.Y.C. Administrative Code § 10-135.

21. Nevertheless, SGs remain openly commercially available to civilians in New York State, including through ordinary retail channels outside New York City and through online channels that ship or deliver to consumers throughout New York State, including into New York County.

22. This practical availability exists despite the absence of any statewide licensing, permitting, registration, or purchaser eligibility framework comparable to those applicable to other regulated weapons.

23. Upon information and belief, this gap between facial prohibition and practical commercial availability has produced materially inconsistent enforcement across New York State, with New York City maintaining a more restrictive enforcement posture than the practical treatment of SG possession and acquisition elsewhere in the State.

24. Plaintiff acquired her SG through ordinary commercial channels available to the general public, without concealment, special access, or any individualized exemption, and the device was directly mailed to her New York County address through ordinary package delivery channels.

25. The New York Police Department ("NYPD"), acting under the authority of the Police Commissioner, routinely enforces applicable statewide New York criminal law and New York City administrative law, including N.Y. Penal Law §§ 265.01(1), 265.10(4), and N.Y.C. Administrative Code § 10-135.

26.    NYPD officers possess authority under New York law to make warrantless arrests for crimes committed anywhere within New York State, not merely within New York County, including in circumstances described by N.Y. Crim. Proc. Law § 140.10(3).

27.    Upon information and belief, NYPD's enforcement of N.Y. Penal Law § 265.01(1) against civilian SG possession is not carried out through a purely local enforcement mechanism, but through statewide Penal Law enforcement structures, reporting systems, criminal process mechanisms, and law enforcement databases involving relevant state actors, including New York State Police ("NYSP") and/or state criminal justice agencies.

28.    Plaintiff was arrested and charged under N.Y. Penal Law § 265.01(1), the statewide Penal Law weapon possession offense, rather than under N.Y.C. Administrative Code § 10-135. Plaintiff alleges that NYPD's use of the statewide Penal Law charge materially connects her arrest and prosecution to the statewide enforcement framework governing Penal Law weapon offenses.

29.    New York law separately recognizes justification and lawful self-defense principles. See N.Y. Penal Law art. 35.

30.    Plaintiff submitted FOIL Request No. FOIL-2025-056-28029 to the NYPD on or about September 26, 2025, seeking records relevant to the events alleged herein. The NYPD acknowledged the request and advised Plaintiff that a response could be expected on or about February 10, 2026. As of the filing of this First Amended Complaint, no response – substantive or otherwise – has been provided. Plaintiff, therefore, pleads certain matters upon information and belief where the relevant records remain in Defendants' possession and control.

b.    *Avitabile Injunction and Continued Enforcement Practices*

31.    On March 22, 2019, the United States District Court for the Northern District of New York, in *Avitabile v. Beach*, 368 F. Supp. 3d 404, 421-22 (N.D.N.Y. 2019), held that enforcement of N.Y. Penal Law § 265.01(1) against civilian possession of SGs violated the Second Amendment under the circumstances presented there and entered permanent injunctive relief accordingly.

32.    The constitutional ruling and injunction entered in *Avitabile* were matters of public record and publicly accessible to law enforcement agencies, governmental actors, and the public.

33.    Following *Avitabile*, enforcement practices concerning New York's civilian SG prohibitions appeared to materially change in at least some New York jurisdictions, including through written non-enforcement guidance, open commercial availability of SGs to civilians, and materially different practical treatment of civilian possession and acquisition.

34.    For example, in a September 26, 2019 written communication, the Nassau County Police Department informed federally licensed firearms dealers that its then-current policy was not to enforce N.Y. Penal Law § 265.01 with respect to possession of SGs. A true and correct copy is attached as Exhibit 1.

35.    Publicly available materials also show that civilian TASER/stun-gun training is offered in New York. Identified examples include a Rochester-based Civilian TASER Certification course; Public Safety and Education's TASER Civilian Energy Weapons course; and S-K Prevention's Civilian Taser Training Course, a New York/Long Island-area course.

c.    *Escalating Threats, Harassment, and Orders of Protection*

36.    Plaintiff moved to New York City in or about November 2019 and began residing at 262 W. 122nd Street, Apartment 4A, a residential building (the "Building") located approximately 325 feet from the NYPD's 28th Precinct.

37.    The apartment directly adjacent to Plaintiff's, Apartment 4B, was occupied by non-party individuals Porscha Smith ("PS") and her aunt, Tonia Jenkins ("TJ").

38.    Plaintiff and PS were neighbors in the Building from approximately November 2019 through October 2023. Plaintiff and PS were not family members, did not share an intimate relationship, and did not reside in the same dwelling unit.

39.    Plaintiff and TJ remain neighbors as of the filing of this First Amended Complaint and reside directly across the hall from one another. Plaintiff and TJ were not family members, did not share an intimate relationship, and did not reside in the same dwelling unit.

40.    Beginning in or about early 2020, PS engaged in a repeated course of threatening, harassing, intimidating, and violent conduct directed toward Plaintiff, including stalking, verbal threats, physical intimidation, spitting on or at Plaintiff, repeated confrontations inside and outside the Building, interference with Plaintiff's use of the Building, and efforts to gain access to Plaintiff's residence.

41.    During one incident, PS physically prevented Plaintiff from leaving her apartment while threatening her with multiple kitchen knives.

42.    During that same incident, while the confrontation remained ongoing, PS placed a 911 call and stated to the operator, in substance, "I have the knife now" and "I am about to stab her." Upon information and belief, those statements were captured on the corresponding 911 call recording.

43. During another incident, PS attempted to set fire to Plaintiff's Ring camera doorbell while it was mounted to Plaintiff's door. The Ring video doorbell captured the incident.

44. Plaintiff documented numerous incidents involving PS through Ring camera footage, cellular recordings, and other documentary evidence. Those materials captured, among other things, threats, confrontations, harassment, repeated unwanted encounters, property interference, vandalism, sexualized harassment, sexual exposure directed at Plaintiff or her security equipment, and attempts to damage, disable, or steal Plaintiff's security devices.

45. TJ repeatedly participated in threats, harassment, false accusations, confrontational conduct, and efforts to facilitate continued prohibited contact between PS and Plaintiff despite court-ordered restrictions, while also independently engaging in direct confrontations with Plaintiff.

46. This conduct caused and continues to cause Plaintiff reasonable and ongoing fear for her safety.

47. Beginning in or about June 2022 and continuing through the filing of this First Amended Complaint, Plaintiff was the protected party under at least eight (8) criminal court protective orders ("POs") issued pursuant to N.Y. Crim. Proc. Law § 530.13 protecting Plaintiff from PS, including indirect or facilitated contact through TJ.

48. On or about October 10, 2023, TJ (the leaseholder of the adjacent Apartment 4B) entered into a housing court stipulation requiring, among other things, that PS vacate the Building and that TJ prevent PS's re-entry.

49. On or about July 24, 2024, Plaintiff obtained a final full stay-away PO against PS (the "July 2024 Permanent PO"), prohibiting PS from contacting Plaintiff or coming near Plaintiff or

Plaintiff's home (including the Building), and imposing restrictions intended to prevent indirect or third party contact by TJ.

50. The July 2024 Permanent PO remained in effect at all relevant times, including May 15, 2025.

51. Copies of Plaintiff's active POs were repeatedly provided to NYPD personnel and were visibly posted within the Building, including in locations accessible to responding NYPD officers.

d.    *Repeated NYPD Notice and Interventions*

52. For years before Plaintiff's May 15, 2025 arrest, members of the 28th Precinct were independently familiar with PS and TJ as recurring subjects of police response, including calls and cross-complaints between them, violent or threatening conduct, erratic behavior, disputes involving Apartment 4B, and incidents requiring removal, detention, arrest, transport, investigation, or other official police action at or near the Building.

53. Plaintiff also repeatedly reported threats, harassment, physical aggression, stalking, and related incidents involving PS and TJ to 28th Precinct personnel while providing recordings, documentary evidence, witness information, and other corroborating materials.

54. Those repeated requests for assistance were met with a recurring pattern of dismissive responses, misinformation concerning enforcement options, failures to provide meaningful follow-up, and other conduct that materially undermined Plaintiff's efforts to obtain protection.

55. For example, in or about December 2021, while Plaintiff was seeking assistance through the New York County District Attorney's Witness Aid Services Unit, a supervising official from that unit telephoned the 28th Precinct concerning Plaintiff. When 28th Precinct Officer Joseph

Amato answered the call and heard Plaintiff's name, he immediately referred to Plaintiff as "a pain in the ass," reflecting his familiarity with Plaintiff and his dismissive attitude toward her requests for assistance.

56. Plaintiff filed a complaint with the Civilian Complaint Review Board ("CCRB") arising from this incident.

57. On February 16, 2023, the CCRB substantiated Plaintiff's complaint concerning Officer Amato's conduct.

58. Officer Amato's comment and the subsequent CCRB substantiation are consistent with Plaintiff's allegation that members of the 28th Precinct treated Plaintiff as a nuisance or burdensome complainant rather than as a person seeking protection from repeated threats, harassment, and violence.

59. During her interactions with personnel from the New York County District Attorney's Witness Aid Services Unit, Plaintiff learned that NYPD personnel at the 28th Precinct had materially misinformed her over an extended period regarding the availability of criminal enforcement against PS. Plaintiff had repeatedly been told, in substance, that PS could not be arrested for threatening, harassing, or otherwise unlawful conduct unless a PO was already in place. Personnel from the District Attorney's Office informed Plaintiff that this was materially inaccurate.

60. As a practical matter, that misinformation created a circular barrier to protection by falsely suggesting that Plaintiff could not obtain criminal enforcement without first securing judicial protection that criminal enforcement itself could help trigger.

61. Plaintiff's reliance on this misinformation materially delayed her pursuit and receipt of criminal court protective relief by almost a year.

62. The same pattern of dismissive responses, misinformation, and failures continued even when NYPD personnel took affirmative action in response to escalating incidents involving PS: those interventions often ended without reliable protective measures, meaningful follow-up, or sustained protection for Plaintiff.

63. On or about December 16, 2021, following a call from another Building resident, NYPD officers took PS into custody and transported PS for psychiatric evaluation.

64. Plaintiff personally observed PS's removal by NYPD personnel and expressly requested notification upon PS's release because she feared further retaliation or confrontation.

65. NYPD personnel represented that such notification would be provided, but no such notification was provided.

66. On or about December 1, 2022, Plaintiff contacted 911 following threatening and erratic conduct by PS.

67. NYPD personnel responded, and upon information and belief, PS was again transported for psychiatric evaluation.

68. Plaintiff again expressly requested notification upon PS's release because of her safety concerns.

69. NYPD personnel represented that such notification would be provided, but no such notification was provided.

70. On or about April 12, 2023, NYPD personnel responded to a serious incident involving PS inside Plaintiff's Building, including the knife-related conduct described above.

71. Following that response, PS was taken into custody and arrested for Criminal Contempt in the First Degree under N.Y. Penal Law § 215.51(b), based on PS's violation of Plaintiff's PO.

72.    Plaintiff again expressly requested notification upon PS's release because of her safety concerns.

73.    NYPD personnel represented that such notification would be provided, but no such notification was provided.

74.    NYPD records were generated concerning PS's conduct on April 12, 2023, including Omniform complaint and arrest paperwork relating to PS's PO violations on that day.

75.    Upon information and belief, the resulting NYPD Omniform complaint records materially omitted significant aspects of the reported incident, including narrative details, threatening conduct reported by Plaintiff, and the identity of the investigating officer.

76.    Related NYPD Omniform arrest paperwork identified PS's location as St. Luke's Hospital Emergency Room.

77.    Related Omniform arrest paperwork identified Defendant Douglas as the arresting officer and Defendant Ausman as the supervisor who signed off on the paperwork, further reflecting that Defendants Douglas and Ausman had prior involvement with PS, Plaintiff's PO, and PS's PO-related criminal conduct before the December 17, 2024 incident described below and Plaintiff's May 15, 2025 arrest.

78.    On or about July 15, 2023, PS physically attacked Plaintiff in front of the 28th Precinct and in view of 28th Precinct personnel while Plaintiff was trying to reach the 28th Precinct for safety.

79.    Following that incident, PS was arrested, found to be unfit to proceed in the related criminal matter, and remained in custody for approximately one (1) year.

80.     These incidents, psychiatric transports, arrests, PO-related interactions, and direct officer observations, among many other events, further put NYPD personnel on actual notice of the persistent and escalating threats confronting Plaintiff.

e.      *Post-Release Return, Escalation, and Continued Non-Enforcement*

81.     Following PS's release from custody arising from the July 15, 2023 incident, PS returned to the Building and the surrounding vicinity in or about late July 2024, despite the July 2024 Permanent PO and the October 2023 housing court stipulation barring PS from the premises.

82.     Plaintiff documented subsequent encounters, threats, assaults, and apparent PO violations involving PS.

83.     Plaintiff repeatedly contacted the NYPD, seeking enforcement assistance.

84.     Although Plaintiff was continually assured by NYPD personnel and other governmental actors that violations of her valid POs would trigger immediate enforcement action, NYPD personnel consistently refused to take such action when actual violations were reported or emergent threats were actively unfolding.

85.     Because those assurances continued to be given, Plaintiff relied on governmental protection, rather than immediately abandoning reliance on law enforcement and pursuing alternative protective measures.

f.      *December 2024 Protective Order Violations and NYPD Non-Enforcement*

86.     On December 11, 2024, Plaintiff found PS inside the Building propping open the front door to jam the lock. Plaintiff called 911, and Defendants Castillo and Cavalieri responded. Plaintiff showed nine (9) Ring videos documenting PS's unlawful presence and an audible threat to Plaintiff ("stop playing with me before I hurt you").

87. Plaintiff informed Defendants Castillo and Cavalieri that PS's presence created an immediate threat to her safety, yet Defendants Castillo and Cavalieri affirmatively refused to take contemporaneous enforcement action.

88. On December 12, 2024, Plaintiff again called 911 after PS was confirmed to be unlawfully present in the Building.

89. During that 911 call, TJ, from adjacent Apartment 4B, continued to verbally harass Plaintiff, including by directing anti-trans slurs at Plaintiff. Upon information and belief, those statements were captured on the relevant 911 call recording.

90. Plaintiff informed emergency services (911) dispatch personnel that PS's presence posed an immediate safety threat.

91. Plaintiff remained confined inside her apartment for several hours awaiting NYPD intervention because she believed she could not safely leave her apartment or the Building.

92. Upon information and belief, the Building superintendent separately called 911 to report PS's unlawful presence in the Building.

93. Ring camera footage viewed later that day showed two NYPD officers entering the Building, locating PS inside despite the active PO and housing court stipulation, and escorting PS past Plaintiff's door, down the stairs, and out of the Building without arrest.

94. As those officers escorted PS past Plaintiff's door and down the stairs, they looked toward Plaintiff's door, as reflected in the Ring camera footage, but did not stop, knock, speak with Plaintiff, check on Plaintiff's safety, or interview Plaintiff concerning her contemporaneous emergency report.

95.    In its July 7, 2026 Valentin response, the City identified Defendants Lugo, Sotamba, Draughon, and Pitre as "four members of the NYPD who responded to Plaintiff's 911 call(s) on December 12, 2024."

96.    Upon information and belief, the two officers shown on the Ring camera footage responded to the superintendent's trespass report concerning PS's presence in the Building.

97.    However, none of the four Defendants identified by the City as "responding to" Plaintiff's December 12, 2024 912 call(s) provided a comparable response, welfare intervention, investigation, or follow-up concerning Plaintiff's contemporaneous emergency report, notwithstanding Plaintiff's status as the protected party and the ongoing hostility involving TJ during Plaintiff's 911 call.

98.    Had NYPD personnel responded to Plaintiff's emergency report, they would have encountered PS unlawfully present in the Building in violation of active court-issued POs and would have possessed grounds, at minimum, to investigate, document, and evaluate or initiate enforcement action concerning those violations.

99.    Further, Defendant Sotamba had prior involvement with the recurring situation involving Plaintiff and PS. Defendant Sotamba was involved in the July 15, 2023 incident in which PS attacked Plaintiff in front of the 28th Precinct, after which PS was taken into custody and later found unfit to stand trial. Defendant Sotamba, therefore, had prior notice of PS's violence toward Plaintiff, the history between Plaintiff and PS, and Plaintiff's status as a recurring complainant and protected party.

100.    The following day, December 13, 2024, Plaintiff again encountered PS, and PS threatened Plaintiff's life.

101. Video captured PS shouting threats and hostile remarks, including statements to the effect of "tell the government that shit, you bum bitch."

102. When Defendants Dzeviatka and Russo responded to Plaintiff's resulting 911 call, Defendant Dzeviatka accused Plaintiff of altering her valid PO while attempting to verify the order using incorrect identifying information.

103. Plaintiff had to contact Assistant District Attorney Nikolai DeJesus, who assisted Defendant Dzeviatka in verifying the validity of the PO.

104. Nevertheless, Defendants Dzeviatka and Russo affirmatively declined to take contemporaneous enforcement action concerning PS's threats and PO violation.

105. Approximately four (4) days later, another NYPD officer informed Plaintiff that Defendant Dzeviatka had used an incorrect NYPD incident classification, including an improper domestic or familial classification rather than the appropriate non-familial classification.

106. Plaintiff later learned that key incident history fields had been left blank on the accompanying Omniform reports, obscuring prior incident history involving PS.

107. On December 17, 2024, PS again accosted Plaintiff on the street near the Building.

108. During that encounter, PS shouted threats, including statements to the effect that Plaintiff would "pay," and that Plaintiff's attempts to seek help did not frighten PS.

109. Defendants Layes and Russo from the 28th Precinct responded and, again, affirmatively declined to take enforcement action.

110. This was Defendant Russo's second known encounter with the situation in five (5) days in which he took no enforcement action.

111. Following the December 17, 2024 incident, Defendant Mack justified the non-enforcement of Plaintiff's PO by telling Plaintiff that her full stay-away July 2024 Permanent PO was enforceable only "*inside*" Plaintiff's apartment.

112. Also following the December 17, 2024 incident, Defendant Douglas was assigned responsibility for review or follow-up regarding Plaintiff's evidence, but failed to correct known misinformation, initiate enforcement, or even conduct a meaningful investigation of these incidents.

g.    *Protected Speech and Escalating Complaints*

113. Before January 2025, Plaintiff had repeatedly complained to NYPD personnel, personnel from the New York County District Attorney's Office, victim services personnel, and others about the 28th Precinct's handling of her reports, including non-enforcement, misinformation, dismissive treatment, and failures to provide meaningful protective assistance.

114. By January 2025, after those complaints failed to produce meaningful protection or corrective action, Plaintiff escalated beyond ordinary precinct and victim assistance channels and began publicly criticizing the 28th Precinct's handling of her reports.

115. Plaintiff communicated complaints to oversight bodies, elected officials, and senior governmental offices concerning the 28th Precinct's repeated refusals to take enforcement action, misinformation concerning POs, and handling of Plaintiff's reports involving PS and TJ.

116. On January 20, 2025, Defendant Hirsch contacted Plaintiff regarding Plaintiff's "complaints concerning the 28th Precinct and the NYPD," via email and telephone. During the call, Plaintiff asked what the NYPD intended to do "to keep her safe," given the ongoing threats, repeated reported violations, and active POs in Plaintiff's favor. Defendant Hirsch responded,

in substance, that NYPD's role was to protect "all citizens," not any "particular individual," and refused to discuss or formulate any individualized safety response for Plaintiff, despite Plaintiff's status as the protected party under a full stay-away PO and her repeated reports of ongoing threats and violations.

117. On January 21, 2025, Plaintiff publicly addressed Manhattan Community Board 10 concerning the 28th Precinct's repeated refusals to take meaningful enforcement action, misinformation concerning POs, and handling of Plaintiff's reports involving PS and TJ.

118. Multiple community members and participants at the meeting and familiar with precinct-linked safety and victim support channels identified Defendant Ramos as someone capable of facilitating direct coordination with NYPD leadership and related community safety resources regarding Plaintiff's ongoing danger.

119. Plaintiff provided her contact information to a meeting participant, who then provided that information to Defendant Ramos. Defendant Ramos thereafter contacted Plaintiff.

120. Defendant Ramos affirmatively represented to Plaintiff that, through her role as President and Clergy Liaison of the 28th Precinct Clergy Council and her relationships with precinct leadership and community officials, she could facilitate coordinated protective intervention, command-level engagement, welfare monitoring, and access to community and governmental safety resources concerning Plaintiff's ongoing threats and safety concerns.

121. Defendant Ramos further represented that she would personally coordinate communications with NYPD supervisory personnel, facilitate Plaintiff's access to community resources, arrange command-level engagement concerning Plaintiff's safety concerns, and assist Plaintiff in obtaining additional protective intervention as a crime victim and protected party.

122. Consistent with those representations, Defendant Ramos arranged and scheduled an in-person meeting between Plaintiff and Defendant Whitlock, facilitated contact with Manhattan Community Board 10 personnel, discussed welfare check coordination, and undertook efforts to secure additional safety-related assistance for Plaintiff.

123. Plaintiff reasonably relied on Defendant Ramos's representations, actions, and coordination efforts as an available avenue for safety-related intervention.

124. On February 5, 2025, Defendant Hirsch then responded to Plaintiff's complaints in another email, acknowledging the incidents involving PS on December 12, 13, and 17, 2024, confirming that related reports existed and had been referred to the detective squad, but rejected Plaintiff's complaint as "Unsubstantiated." Defendant Hirsch identified the the December 12, 2024 complaint number as 2024-28-6343, and characterized that incident as a trespass matter.

125. Defendant Hirsch's response did not address the December 11, 2024 incident, and did not identify any corresponding NYPD complaint number, detective squad assignment, or follow-up documentation concerning Plaintiff's separate December 12, 2024 911 complaint relating to safety concerns and PO violations. As to December 12, 2024, Defendant Hirsch stated, "The incident regarding the trespassing on 12/12/24 does not require a complaint against [sic] you," and concluded, "The three incidents mentioned are being investigated by the detective squad. As such, the complaint is Unsubstantiated."

126. Defendant Hirsch's response appeared internally inconsistent with Plaintiff's reported facts and raised questions about the accuracy, completeness, and characterization of the associated NYPD records. Although Defendant Hirsch represented that the December 12, 13, and 17, 2024 incidents were being investigated by the detective squad, the City's July 7, 2026

*Valentin* response did not identify any detective squad personnel assigned to, reviewing, investigating, supervising, documenting, closing, or otherwise involved in those incidents, nor did it clarify whether any detective squad personnel were assigned to Plaintiff's separate December 12, 2024 911 complaint.

127.    On or about February 7, 2025, Plaintiff responded to Defendant Hirsch in writing, disputing his characterization of her complaints, identifying perceived deficiencies in NYPD's handling of the December 2024 incidents, and requesting a substantive response by February 10, 2025. Defendant Hirsch provided no response and identified no additional protective measures or follow-up intervention.

128.    On February 12, 2025, Plaintiff again spoke publicly, this time at a Community Council Meeting, concerning the 28th Precinct's handling of Plaintiff's safety concerns and complaints.

129.    Defendant Whitlock was present at the meeting and heard Plaintiff's statements. In response, Defendant Whitlock stated, in substance, "Let's do this offline," which Plaintiff understood to mean that the discussion should continue privately. After the meeting, Defendant Whitlock confirmed with Plaintiff the date and time of the meeting Defendant Ramos had arranged and stated that no additional information was needed from Plaintiff in preparation for that meeting.

130.    On February 20, 2025, while the coordinated safety meeting and related protective intervention remained pending, Plaintiff again captured PS on video approaching and threatening her. During that encounter, PS stated, in substance, "I work for the government," "I can never go to prison," and denied knowledge of any active PO.

131. On February 26, 2025, the night before Plaintiff's scheduled meeting with Defendant Whitlock, Defendant Ramos initiated a telephone call with Plaintiff and abruptly withdrew the coordinated protective intervention described above. Defendant Ramos also canceled Plaintiff's scheduled meeting with Defendant Whitlock and expressly told Plaintiff that she was doing so "*because*" of Plaintiff's public criticism of the 28th Precinct at the February 12, 2025 Community Council Meeting.

132. Plaintiff immediately contacted Shanny Herrera in the office of New York City Council Member Dr. Yusef Salaam, who represents District 9. Upon information and belief, Ms. Herrera contacted the 28th Precinct in an effort to have Plaintiff's canceled meeting with Defendant Whitlock restored as scheduled.

133. On February 27, 2025, at approximately 2:00 p.m., Plaintiff appeared at the 28th Precinct for the meeting with Defendant Whitlock that had been arranged through Defendant Ramos and confirmed by Defendant Whitlock at the February 12, 2025 Community Council Meeting. Plaintiff was informed, however, that Defendant Whitlock was unavailable because he was meeting with the NYPD Commissioner at One Police Plaza.

134. Defendant Ramos's retaliatory withdrawal of promised intervention materially reduced Plaintiff's access to anticipated protective resources, disrupted expected command-level engagement concerning Plaintiff's safety concerns, undermined Plaintiff's reliance on coordinated institutional protection mechanisms, and increased Plaintiff's vulnerability to continued threats, proximity, and confrontation.

135. Through these direct communications – including communications with Defendant Whitlock at the February 12, 2025 Community Council meeting, communications with Defendant Hirsch on January 20, 2025, February 5, 2025, and February 7, 2025, and communications

with other supervisory personnel – Defendants Whitlock, Hirsch, and other supervisory personnel became aware of Plaintiff's public complaints, criticism of the 28th Precinct, and allegations concerning precinct misconduct before Plaintiff's May 15, 2025 arrest.

136. Upon information and belief, Defendants Whitlock, Hirsch, and other supervisory personnel participated, directly or indirectly through subordinate personnel, in discussions concerning Plaintiff, her complaints against the 28th Precinct, and her continued requests for intervention.

137. Seeking guidance concerning lawful protective options for self-protection, Plaintiff went to the 28th Precinct and spoke with an officer or supervisory official whose identity is presently unknown and who is referred to herein as Defendant JD No. 14. During that exchange, Plaintiff described her fear for her personal safety, and expressed concern that repeated failures to intervene by the NYPD had left her without any reliable protection, forcing her to consider lawful personal defensive measures she had hoped to avoid.

138. In response to Plaintiff's questions, Defendant JD No. 14 stated, in substance, "You are lucky my body-cam is not on," and further indicated that Plaintiff would have been arrested had her remark been recorded. Defendant JD No. 14 identified no offense, provided no legal explanation, and offered no guidance concerning lawful self-protection or available police assistance.

139. In light of the NYPD's repeated refusals to take enforcement action, Plaintiff's January 20, 2025 conversation with Defendant Hirsch, and Defendant Ramos's withdrawal of promised assistance, Plaintiff reasonably came to believe that existing court-ordered interventions were not reliably preventing renewed proximity, escalation, or physical confrontation.

140. After attempting to determine whether civilian possession of SGs remained lawful, in light of publicly available information and the legal landscape following *Avitabile*, Plaintiff acquired a SG from an online retailer.

h. *Immediate Pre-Arrest Escalation (April–May 2025)*

141. On April 12, 2025, PS approached Plaintiff in public and threatened Plaintiff.

142. PS stated, "You not winning with this 911, you not winning girl."

143. Plaintiff reported the incident as another violation of active POs.

144. Despite the NYPD's repeated refusals to take contemporaneous enforcement action, Plaintiff's reports and supporting evidence concerning PS's repeated PO violations were ultimately presented to and reviewed by prosecutorial authorities, resulting in Plaintiff testifying in front of a Grand Jury on April 21, 2025 concerning incidents that occurred on December 11, 12, 13, and 17, 2024, February 20, 2025, and April 12, 2025.

145. The Grand Jury returned a felony indictment charging PS with Criminal Contempt in the First Degree, in violation of N.Y. Penal Law § 215.51(b)(ii), based on a course of conduct that encompassed all six (6) incidents, as well as six (6) misdemeanor counts, one arising from each incident.

146. Upon information and belief, PS thereafter failed to appear for arraignment, resulting in the issuance of a bench warrant.

147. On May 6, 2025, PS assaulted Plaintiff in public while Plaintiff recorded the incident on her phone, consistent with her practice of documenting encounters involving PS.

148. Plaintiff reported the assault to responding NYPD officers, Defendants Lobsang and Pastwa, and advised them of active POs while providing video evidence documenting the incident.

149.    Nevertheless, Defendants Lobsang and Pastwa affirmatively declined to take any enforcement action, with Defendant Pastwa expressly and incorrectly stating that absent ambulance transport, Plaintiff had not been assaulted per the Penal Code.

        i.    *Plaintiff's Arrest, Charging, and Related Events (May–June 2025)*

150.    Less than ten (10) days after the May 6, 2025 assault, on the morning of May 15, 2025, Plaintiff exited the Building and immediately encountered PS, who began shouting hostile language and threats toward Plaintiff.

151.    Moments later, TJ approached Plaintiff from behind, loudly instructing PS, in substance, to "go about your business" and stating that she would "take care of this."

152.    TJ then followed Plaintiff for several blocks, including to and from a nearby UPS Store, while yelling slurs and hostile epithets, including calling Plaintiff a "tranny," a "sex trafficker," and similar demeaning terms.

153.    Minutes later, upon Plaintiff's return toward the Building, TJ confronted Plaintiff and physically assaulted Plaintiff at close range while Plaintiff's phone camera was recording.

154.    During the assault, TJ moved within inches of Plaintiff's face while repeatedly yelling "What are you going to do?"

155.    Plaintiff did not initiate physical contact, threaten TJ, or otherwise act as the aggressor.

156.    Fearing further assault and attempting to create distance, Plaintiff activated only the SG's audible alert function.

157.    Plaintiff did not deploy the SG against TJ or otherwise physically use the device.

158.    Upon hearing the audible alert, TJ immediately retreated.

159.    During and after the confrontation initiated by TJ, TJ placed multiple 911 calls, making false, misleading, and/or materially exaggerated accusations concerning Plaintiff, including falsely

identifying Plaintiff to dispatch as a man despite TJ's familiarity with Plaintiff, as well as misrepresenting Plaintiff's conduct and the nature of the encounter. Upon information and belief, those statements were captured on the relevant 911 recordings.

160. NYPD personnel, including Defendants Quinones, Uddin, and Draughon responded to the scene.

161. According to the City's July 7, 2026 *Valentin* response, Defendant Draughon was also among the NYPD personnel identified as having responded to Plaintiff's December 12, 2024 911 call(s). Accordingly, the May 15, 2025 response was Defendant Draughon's second known contact with the recurring situation involving Plaintiff, Porscha Smith, and Tonia Jenkins, including Plaintiff's protected party status, PS's presence in the Building, and prior NYPD involvement concerning the same individuals.

162. Plaintiff remained at the scene, cooperated with responding officers, identified herself, and voluntarily surrendered the SG.

163. Plaintiff informed responding officers that she was the protected party under an active, full stay-away PO against PS, that TJ's conduct implicated ongoing safety concerns and third party contact issues, that Plaintiff possessed recordings reflecting the surrounding events, and that Plaintiff understood a federal court had held New York's civilian SG prohibition unconstitutional.

164. Plaintiff offered recordings documenting the events preceding the officers' arrival, including the conduct of PS and TJ, and, upon information and belief, responding officers reviewed or otherwise became aware of relevant portions of those recordings. Upon information and belief, portions of that review were contemporaneously captured on responding officers' body-cam footage.

165. Initially, responding officers discussed Plaintiff's eligibility for protective relief, including advising that Plaintiff should seek a non-familial PO against TJ.

166. Defendant Quinones advised Plaintiff that she was stepping away to contact the 28th Precinct regarding Plaintiff's SG. Based on the officers' statements and conduct at the scene, Plaintiff reasonably understood that Defendant Quinones was contacting her superiors at the 28th Precinct to determine whether the SG could be returned to Plaintiff.

167. After Plaintiff provided identification and responding officers consulted supervisory personnel at the 28th Precinct, the officers abandoned their initial victim-oriented approach and shifted toward treating Plaintiff as the subject of arrest.

168. Defendant Kontorovich, a Lieutenant, arrived on the scene shortly thereafter, assumed supervisory control over Plaintiff's detention, and, upon information and belief, approved, directed, or otherwise participated in the decision to arrest Plaintiff.

169. NYPD personnel arrested Plaintiff, handcuffed her, seized her property, and Defendant Kontorovich personally transported her to the 28th Precinct, where she was subjected to booking procedures, including fingerprinting and photographing, and held in custodial detention pending criminal processing.

170. Defendant Ausman was present during, consulted regarding, or otherwise participated in Plaintiff's custodial processing, charging determinations, or related supervisory review after Plaintiff's arrest.

171. Defendant Ausman was not encountering Plaintiff for the first time on May 15, 2025. Before that date, NYPD records reviewed or approved by Defendant Ausman identified Plaintiff as a crime victim and complainant in incidents involving PS and the same longstanding adversarial relationship. Defendant Ausman was involved in the response to or

documentation of the April 12, 2023 incident in which PS blocked Plaintiff's exit while possessing four (4) knives, and reviewed or approved NYPD records concerning the July 15, 2023 incident in which PS attacked Plaintiff in a crosswalk directly in front of the 28th Precinct, as described above.

172. Defendants treated the mere presence of the SG as dispositive and shifted to arrest and criminal processing without conducting any individualized assessment of Plaintiff's defensive purpose, protected party status, the absence of unlawful deployment, or the constitutional limits on *automatic* enforcement of N.Y. Penal Law § 265.01(1).

173. While Plaintiff was being processed in the precinct bullpen, she overheard NYPD personnel discussing whether TJ had stated that she was in fear.

174. Plaintiff overheard an officer, whom she believed to be Defendant Quinones, indicate, in substance, that TJ had *not* stated that she was in fear.

175. Plaintiff then heard Defendant Kontorovich, state, in substance, "Then the victim is the City of New York."

176. Plaintiff was then charged under N.Y. Penal Law § 265.01(1), a statewide criminal weapons offense carrying materially more serious criminal consequences than enforcement under N.Y.C. Admin. Code § 10-135, a local provision that remained available and was not the subject of an injunction.

177. Upon information and belief, NYPD personnel generated arrest paperwork and related incident documentation that materially omitted, minimized, mischaracterized, or failed to communicate exculpatory facts known to responding officers – including Plaintiff's victim status, active POs, prior incident history, available recordings, the identity of the initiating aggressor, and other circumstances materially bearing on probable cause – and

communicated materially incomplete, misleading, or otherwise distorted factual narratives, records, or related information to prosecutorial authorities, materially contributing to the continuation or escalation of criminal proceedings against Plaintiff.

178. On June 3, 2025, Plaintiff was arraigned on the May 15, 2025 charge under N.Y. Penal Law § 265.01(1). At or before that proceeding, additional counts of Menacing in the Second Degree (N.Y. Penal Law § 120.14) and Menacing in the Third Degree (N.Y. Penal Law § 120.15) (the "June 3 Menacing Charges") were added, and a PO pursuant to N.Y. Crim. Proc. Law § 530.13 was issued against Plaintiff in favor of TJ, whom Plaintiff had repeatedly identified as an aggressor (the "June 3 PO").

179. As a result of the June 3 PO, Plaintiff's ability to navigate the neighborhood, attend proceedings, and seek enforcement of her own existing POs was materially impaired.

180. Following the June 3, 2025 proceedings, Plaintiff remained subject to continued criminal prosecution and was directed to return to court on July 21, 2025.

181. During the pendency of Plaintiff's prosecution arising from the May 15, 2025 incident, including the additional charges added on June 3, 2025, PS remained the subject of active criminal proceedings arising from Plaintiff's April 21, 2025 Grand Jury testimony and resulting felony indictment, in which Plaintiff was the complaining witness and protected party.

182. Because those matters proceeded simultaneously, Plaintiff's status as a criminal defendant materially impaired her ability to function effectively as a victim complainant in the proceedings involving PS.

183. Consistent with that impairment, Assistant District Attorney Molly Stein ("ADA Stein") informed Plaintiff that communications concerning the pending criminal proceedings

involving PS would be routed through Plaintiff's counsel, rather than directly through Plaintiff, because Plaintiff herself was then under prosecution.

184. On or about June 21, 2025, Plaintiff was informed that PS had been taken into custody following a family-reported acute mental health crisis.

185. Upon information and belief, after PS was taken into custody, PS was held, at least in part, on the felony and misdemeanor indictments returned on April 21, 2025, and on the outstanding bench warrant.

186. On June 25, 2025, all criminal charges against Plaintiff were dismissed in the interest of justice, and the PO against her was dissolved.

187. After the charges against Plaintiff were dismissed, Plaintiff went to the 5th Precinct to report the May 15, 2025 incident, in which Plaintiff contends she had been the victim, intentionally avoiding the 28th Precinct because of her prior experiences there.

188. Upon information and belief, the matter was thereafter referred or routed to the 28th Precinct.

189. Plaintiff later received a telephone call from unidentified 28th Precinct personnel, referred to herein as Defendant JD No. 16, seeking additional information concerning Plaintiff's 5th Precinct report regarding the May 15, 2025 incident.

190. After learning that Plaintiff had been arrested in connection with the same incident, Defendant JD No. 16 abruptly terminated the conversation, stating in substance that the caller needed to consult with a supervisor and that someone would contact Plaintiff shortly. Plaintiff never received any further communication regarding the matter from Defendant JD No. 16 or anyone else.

191. On or about June 26, 2025, Plaintiff testified before a Grand Jury concerning PS's conduct on May 6, 2025. The Grand Jury thereafter returned a felony indictment charging PS with

Criminal Contempt in the First Degree, in violation of N.Y. Penal Law § 215.51(b)(v), arising from the May 6, 2025 incident.

192. Upon information and belief, in or about September 2025, PS was transferred to a mental health facility for competency evaluation.

### j.    *Renewed proximity and ongoing safety risk*

193. In or around April 2026, Plaintiff was informed by ADA Stein that PS had been found competent to stand trial and had been released pending further criminal proceedings, subject to court-imposed requirements and restrictions, including treatment-related supervision. Plaintiff was further informed that, as a condition of release, PS would remain in a secured treatment setting under court supervision and away from Plaintiff's vicinity.

194. As late as mid-May 2026, ADA Stein affirmatively represented to Plaintiff that her active POs and applicable release restrictions governing PS would be enforced. Those representations were later contradicted by subsequent events.

195. On or about April 27, 2026, and May 2, 2026, Plaintiff personally observed PS unescorted in public approximately one block from the Building.

196. Plaintiff therefore attended the May 11, 2026 status hearing in PS's criminal matter to raise concerns regarding PS's return to Plaintiff's neighborhood and to seek greater clarity concerning separation requirements and protective restrictions that ADA Stein had represented were in place.

197. At that proceeding, Plaintiff informed the appearing ADA that PS had returned to her immediate vicinity, a fact confirmed by PS through counsel. Upon information and belief, no meaningful consequence was imposed other than the court advising PS, in substance, to "meet others somewhere else."

198.    Plaintiff requested that the ADA seek stronger and more clearly defined protective measures, including a more specific geographic stay-away restriction, because NYPD personnel had previously cited the absence of clear geographic parameters as a reason not to enforce Plaintiff's existing POs and because PS had repeatedly resumed stalking, harassment, and proximity-based intimidation directed at Plaintiff.

199.    The ADA declined to make that request, and no specific geographic restriction or enhanced protective measure was implemented.

k.    *Confirmed neighborhood presence*

200.    Because of PS's renewed proximity and Plaintiff's continuing fear for her safety, Plaintiff has frequently stayed away from her residence on West 122nd Street, including by remaining outside New York City, rather than staying at home. This displacement continued during the period between PS's April 27, 2026 sighting and the filing of this First Amended Complaint and has been practically, financially, and emotionally unsustainable.

201.    Upon returning to the neighborhood on or about May 13, 2026, Plaintiff's building superintendent informed Plaintiff that he regularly observed PS sitting approximately 100 yards from the Building, within view of the Building entrance and directly across from the 28th Precinct.

202.    On May 14, 2026, upon exiting the Building, Plaintiff encountered TJ nearby, observed PS seated in the same location previously described by the superintendent, photographed PS there, and promptly reported the incident to ADA Stein by text message.

203.    On or about May 20, 2026, Plaintiff again personally observed PS approximately one block from the Building, confirming PS's continued presence in Plaintiff's immediate vicinity

despite prior representations concerning confinement, supervision, and separation from Plaintiff.

### l.    *Present constitutional injury / standing*

204.    As of the filing of this First Amended Complaint, Plaintiff has not received the promised meeting with Defendant Whitlock; substantive follow-up, response, or assistance from Defendants Hirsch, Douglas, or Ramos; assistance from Manhattan Community Board 10 or its Executive Director, Minah White; promised welfare checks; or any meaningful follow-up from Defendant JD No. 16 or anyone else concerning Plaintiff's report relating to the events of May 15, 2025.

205.    Plaintiff remains fearful for her personal safety and reasonably fears future confrontation, retaliation, or renewed adverse law enforcement treatment.

206.    Plaintiff reasonably believes that possession of a non-lethal defensive device for lawful self-defense remains important for her personal protection.

207.    But for Defendants' prior enforcement actions and continuing enforcement posture, Plaintiff would presently acquire, possess, and carry such a device for lawful self-defense in New York City.

## VI.    CAUSES OF ACTION

### a.    *Generally*

208.    Plaintiff pleads certain claims herein in the alternative and/or in the alternative to the extent required by applicable law, pursuant to Rule 8(d) of the Federal Rules of Civil Procedure. To the extent any causes of action arise from overlapping factual allegations, Plaintiff does not seek duplicative recovery for the same injury, but pleads alternative and parallel theories of liability as permitted by law, including punitive and other special damages.

b.  *Individual Liability and Personal Involvement*
*(Global Allegations Applicable to the § 1983 Claims)*

209.  Each individual Defendant is sued in his or her individual capacity based on that Defendant's own conduct and personal involvement in one or more of the constitutional violations alleged herein. The specific conduct attributable to each Defendant is set forth in the preceding factual allegations and in the causes of action asserted against that Defendant.

210.  As applicable to the particular Defendant and claim, such personal involvement included directly participating in, directing, authorizing, approving, prolonging, or causing Plaintiff's arrest, detention, or property seizure; initiating, procuring, or continuing Plaintiff's prosecution; engaging in retaliatory or selective enforcement; transmitting or adopting materially false or misleading information; withdrawing previously coordinated protective assistance; or failing to intervene despite knowledge of an ongoing constitutional violation and a realistic opportunity to prevent or mitigate it.

211.  The knowledge alleged as to particular Defendants arose from, among other things, their personal participation in prior responses; Plaintiff's direct reports and communications to them; POs, recordings, and documentation provided to or reviewed by them; supervisory discussions and reviews in which they participated; and communications among patrol officers, detectives, supervisors, and command personnel that they received, transmitted, reviewed, or joined. Such knowledge was further reflected and corroborated in records maintained by the 28th Precinct and NYPD, including CAD/Sprint histories, complaint reports, Omniform entries, DD5s, body-worn-camera records, memo book entries, command logs, PO records, arrest and incident histories, and internal communications.

212.  To the extent relevant information concerning Plaintiff's protected status, PS's prior conduct, or the history involving PS and TJ was specifically communicated to, reviewed by, generated

by, or otherwise known to a particular Defendant, that Defendant disregarded, omitted, mischaracterized, or failed to account for such information in the manner specifically alleged herein during the investigation, arrest, processing, charging, prosecution, or supervisory review of Plaintiff on May 15, 2025 and thereafter.

213. Each individual NYPD Defendant acted under color of state law and with the state of mind required for the particular constitutional violation alleged against that Defendant, as demonstrated by the defendant-specific facts and circumstances alleged herein.

214. Defendant Ramos presented herself as an intermediary between Plaintiff and precinct leadership concerning Plaintiff's safety; communicated with Plaintiff and NYPD personnel regarding contemplated safety measures, command-level engagement, and protective assistance; and served as a channel through which such assistance was to be coordinated. Ramos thereafter withdrew the previously discussed and coordinated assistance because of Plaintiff's public criticism of the 28th Precinct. Through the communications, coordination, and concerted conduct specifically alleged herein, Ramos acted jointly with NYPD personnel and as a willful participant in state action concerning the retaliatory withdrawal of protective assistance and the resulting constitutional deprivations.

c. *Global Municipal Liability*
*(Applicable to the § 1983 Claims Against Defendant City)*

215. Defendant City is liable under 42 U.S.C. § 1983 pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), because Plaintiff's constitutional injuries were caused by municipal policies, customs, practices, failures to train or supervise, decisions of policymakers, and/or deliberate indifference attributable to Defendant City.

216. At all relevant times, Defendant City, acting through the NYPD Commissioner, precinct supervisory personnel, and other officials responsible for training, enforcement policy,

supervisory review, and disciplinary oversight, maintained, enforced, tolerated, ratified, or failed to correct the unconstitutional practices alleged herein.

217. Plaintiff alleges that, despite repeated reports of threats, harassment, physical aggression, stalking, and PO violations, NYPD personnel failed, where required or appropriate, to generate, preserve, or properly classify Domestic Incident Reports ("DIRs"), PO-enforcement documentation, Omniform records, DD5s, complaint reports, or equivalent domestic/interpersonal-violence and protected party documentation. The absence of prior DIRs or equivalent documentation, if confirmed, is not evidence that Plaintiff failed to report danger; rather, it supports Plaintiff's allegations that NYPD personnel failed to document, classify, supervise, and train officers concerning repeated protected party complaints, recurring safety threats, and PO enforcement.

218. The constitutional violations alleged in this Complaint were caused by one or more municipal policies, customs, or practices, including:

    a. continued, inconsistent, or selectively applied enforcement of N.Y. Penal Law § 265.01(1) against civilian SG possession despite publicly available constitutional rulings limiting such enforcement;

    b. failure to adequately train, supervise, or guide officers concerning lawful SG enforcement and constitutional limitations following *Avitabile*;

    c. tolerance of retaliatory or materially disparate treatment toward individuals who criticize NYPD personnel or seek governmental redress;

    d. failure adequately to train, supervise, or discipline officers regarding accurate documentation, preservation, and communication of material exculpatory information;

e. tolerance of recurring failures to provide meaningful enforcement response, victim-directed intervention, or protective follow-up despite repeated notice of ongoing safety threats and active POs; and

f. failure adequately to train, supervise, or discipline officers concerning the generation, preservation, and classification of DIRs, PO enforcement documentation, Omniform records, DD5s, complaint reports, and equivalent records concerning repeated protected party complaints, recurring safety threats, and PO violations.

219. New York City's post-*Avitabile* enforcement posture was, at minimum, materially distinctive and potentially an outlier because NYPD continued to treat civilian SG possession as arrestable under N.Y. Penal Law § 265.01(1) while the City also maintained a separate local SG prohibition under N.Y.C. Admin. Code § 10-135. Discovery is expected to show the extent to which New York City's enforcement posture differed from other New York jurisdictions and reflected a municipal policy, practice, or custom.

220. These policies and practices caused Plaintiff's injuries in concrete ways: the City's failure to correct post-*Avitabile* SG guidance caused or materially contributed to Plaintiff's arrest under § 265.01(1); the City's tolerance of inaccurate or incomplete reporting caused exculpatory facts to be omitted or minimized in records transmitted through criminal process; the City's failure to supervise PO-related responses caused repeated non-enforcement despite active court orders and known safety risks; and the City's tolerance of retaliatory treatment toward complainants caused Plaintiff to be treated as an enforcement target after publicly criticizing the 28th Precinct.

221. As alleged throughout this Complaint, Plaintiff repeatedly notified NYPD personnel and supervisory officials of ongoing threats, PO violations, deficient enforcement responses, inaccurate reporting, and retaliatory treatment through emergency calls, in-person reports, recordings, written complaints, oversight complaints, public criticism, and direct communications with supervisory personnel.

222. Despite repeated notice of these issues, Defendant City failed to implement meaningful corrective action, retraining, supervision, discipline, or protective intervention.

223. Upon information and belief, the reporting deficiencies, inaccurate classifications, omitted incident history, materially incomplete documentation, and failures to provide meaningful protective intervention described herein were not isolated incidents but reflected broader recurring practices tolerated within the NYPD and the 28th Precinct.

224. The need for corrective training, supervision, and intervention was obvious in light of Plaintiff's repeated complaints, repeated officer-level and supervisory-level notice of ongoing safety risks, the constitutional issues publicly raised by *Avitabile*, and the foreseeable risk that continued deficient enforcement and reporting practices would result in wrongful arrest, retaliatory enforcement, distorted incident narratives, and continued danger to known victims and protected parties.

225. The foregoing municipal policies, customs, practices, failures to train or supervise, and deliberate indifference were moving forces behind Plaintiff's constitutional injuries, including her arrest, prosecution, deprivation of liberty, retaliatory treatment, and continuing constitutional harms.

d.    *Global Damages*

226.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered and continues to suffer injuries and damages, including:

   a.    wrongful arrest, detention, criminal charges, and continued prosecution;

   b.    loss of liberty, including post-arraignment restraints and other restrictions on Plaintiff's freedom of movement;

   c.    out-of-pocket legal expenses, economic losses, and diminished earning capacity;

   d.    collateral professional, licensing, firearm licensing, and legal consequences arising from Plaintiff's arrest and prosecution, including impairment of Plaintiff's ability to apply for, obtain, or maintain firearm licenses or permits;

   e.    material impairment of Plaintiff's ability to function as a complaining witness and protected party in simultaneously pending criminal proceedings involving PS, including restrictions requiring communications concerning those proceedings to be routed through counsel rather than directly to Plaintiff;

   f.    reputational harm and diminished standing within Plaintiff's professional and civic communities;

   g.    emotional distress, humiliation, anxiety, and fear;

   h.    diminished personal security, increased vulnerability to foreseeable harm, exposure to dangerous conditions, and impairment of Plaintiff's sense of safety foreseeably exacerbated by Defendants' conduct;

   i.    exposure to foreseeable harm arising from materially disparate enforcement treatment, failures to enforce POs, failures to communicate material safety information, and related acts or omissions alleged herein;

j.    loss of property;

k.    chilling of Plaintiff's First and Second Amendment rights, including Plaintiff's willingness to speak, petition, seek governmental redress, request law enforcement intervention, or exercise lawful self-defense rights; and

l.    ongoing fear of retaliatory targeting, renewed retaliatory enforcement, or future arrest and criminal charges.

227.    These injuries and damages were foreseeable and were the natural and probable consequences of Defendants' conduct and include continuing personal, professional, economic, personal security, and constitutional harms that persist to this day.

<u>FIRST CAUSE OF ACTION</u>
**Deprivation of Rights Secured by the**
**Second and Fourteenth Amendments of the United States Constitution**
(42 U.S.C. §§ 1983 and 1988; U.S. Const. amends. II and XIV)

(*Against Defendants: City, under Monell; and Commissioner, in her official capacity for declaratory and injunctive relief; and Kontorovich, Ausman, Quinones, Uddin, Draughon, and later-identified NYPD personnel who personally participated in, directed, approved, supervised, or enforced Plaintiff's arrest, detention, seizure of property, charging, or continued enforcement arising from Plaintiff's SG possession, in their individual capacities*)

a.    *Incorporation and Statutory Basis*

228.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

229.    This cause of action arises under 42 U.S.C. §§ 1983 and 1988, and the Second and Fourteenth Amendments to the United States Constitution, which secure the individual right to keep and bear arms for lawful self-defense against infringement by state and municipal actors.

230.    Plaintiff seeks declaratory and prospective injunctive relief against Defendant Commissioner, in her official capacity, to prevent future enforcement against Plaintiff under N.Y. Penal Law § 265.01(1) and New York City Administrative Code § 10-135.

b.    *Second Amendment Protection and "Common Use"*

231.    The Second Amendment, as incorporated and applicable to the states through the Fourteenth Amendment, protects the right of ordinary, law-abiding citizens to possess arms "typically possessed by law-abiding citizens for lawful purposes," including self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 624-25 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

232.    In *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Supreme Court unanimously vacated a state ban on SGs, confirming that the Second Amendment extends to arms that were not in existence at the founding. In concurrence, Justice Alito recognized that "hundreds of thousands of Tasers and stun guns" had been sold to private citizens, that such devices appeared lawful to possess in forty-five states, and that SGs were "widely owned and accepted as a legitimate means of self-defense across the country." *Id.* at 420 (Alito, J., concurring in the judgment).

233.    In *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411-12 (N.D.N.Y. 2019), the Northern District of New York addressed New York's civilian SG prohibition and relied on a stipulated factual record showing that, as of 2019, at least 300,000 Tasers and 4,478,330 SGs were owned by private citizens across the United States. Based on that record, the court held that Tasers and SGs, treated as "electric arms," were in common use and were typically possessed by law-abiding citizens for lawful purposes such as self-defense. *Id.* at 412.

234.    Courts outside New York have likewise recognized, as persuasive authority, substantial civilian possession and acceptance of electronic SGs and Tasers. In *People v. Yanna*, 297 Mich. App. 137, 145, 824 N.W.2d 241, 245 (2012), the court noted that "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens," that many more were

in use by law enforcement officers, and that such devices were legal in forty-three states. In *People v. Webb*, 2019 IL 122951, ¶¶ 13-14, 131 N.E.3d 93, 98, the Illinois Supreme Court relied on *Yanna* and *Caetano* in holding that SGs and Tasers are protected bearable arms and that a complete ban violated the Second Amendment. And in *O'Neil v. Neronha*, 594 F. Supp. 3d 463, 473 (D.R.I. 2022), the court cited sworn declarations from national SG distributors establishing that approximately 6.5 million SGs were sold to consumers in the United States between 2008 and 2020.

235.    Plaintiff alleges that the judicially recognized figures described above reflect substantial civilian ownership, commercial distribution, and lawful civilian acquisition of SGs. Based on those figures, widespread lawful possession across jurisdictions, ordinary commercial availability, self-defense marketing, law enforcement use, and the defensive character of SGs as non-lethal arms, Plaintiff alleges that SGs are bearable arms in common use by law-abiding citizens for lawful self-defense and therefore fall within the Second Amendment's protection.

236.    To the extent Defendants contest Plaintiff's common use allegations, Plaintiff reserves the right to seek additional ownership, sales, shipment, distribution, and acquisition data from manufacturers, distributors, retailers, and related commercial actors through discovery.

c.    *Bruen Framework and Calce*

237.    Under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022), once the Second Amendment's plain text covers an individual's conduct, the challenged restriction is presumptively unconstitutional, and the government bears the burden of demonstrating that the restriction is consistent with the Nation's historical tradition of firearm regulation.

238.   *Wolford v. Lopez*, 609 U.S. ___ (2026), further confirms that the plain text inquiry asks whether the challenged restriction applies to "the people," concerns "Arms," and restricts the keeping or bearing of arms. Under *Bruen* and *Wolford*, that inquiry is governed by the Second Amendment's text and historical tradition, not by interest balancing, generalized public-safety preferences, or jurisdiction-specific policy judgments. *Wolford* , 609 U.S. ___.

239.   Plaintiff alleges that she is a member of "the people"; SGs are bearable "Arms" under the Second Amendment; and N.Y. Penal Law § 265.01(1) and N.Y.C. Administrative Code § 10-135 restrict her ability to keep or bear SGs for lawful self-defense.

240.   Therefore, Plaintiff's conduct – possession of a SG for lawful self-protection – falls within the Second Amendment's plain text.

241.   As applied to Plaintiff under the specific circumstances alleged herein, Defendants' enforcement of the challenged restrictions cannot be justified by historical analogues consistent with *Bruen*. See *Bruen*, 597 U.S. at 24.

242.   New York City, therefore, may not avoid Second Amendment scrutiny by maintaining a local enforcement regime that imposes burdens on protected arms inconsistent with the historical tradition required by *Bruen* and *Wolford*.

243.   Plaintiff acknowledges the Second Circuit's recent decision in *Calce v. City of New York*, No. 25-861-cv, 2026 WL 980092, at *2–3 (2d Cir. Apr. 13, 2026) (summary order), which affirmed a summary judgment dismissal based on those specific plaintiffs' evidentiary failure to build a sufficient record reflecting that SGs were in common lawful civilian use.

244.   Plaintiff alleges that this case is distinguishable from *Calce* because: (a) it arises at the pleading stage, where Plaintiff's detailed factual allegations must be accepted as true; (b) it presents independent, robust, and materially different factual allegations concerning

nationwide civilian ownership, commercial distribution, and lawful acquisition; and (c) it features a distinct as-applied challenge predicated on Plaintiff's possession of a non-lethal arm under acute, state-documented safety threats.

245. This case is further distinguishable from *Calce* because Plaintiff does not merely challenge New York City's local administrative prohibition in the abstract. Plaintiff was arrested, charged, and subjected to criminal process under N.Y. Penal Law § 265.01(1), the state Penal Law provision that *Avitabile* had already held unconstitutional as applied to civilian possession of SGs for self-defense. See *Avitabile*, 368 F. Supp. 3d at 421-22. Unlike *Calce,* the present action therefore arises from the actual criminal enforcement of the Penal Law provision previously declared unconstitutional under the circumstances presented in *Avitabile*, including arrest, seizure, prosecution, and liberty restraints imposed against Plaintiff for possession of a non-lethal defensive arm.

### d.    *Prior Constitutional Notice and Enforcement*

246. By May 2025, Supreme Court precedent had recognized SGs as bearable arms within the Second Amendment's protection for nearly a decade, and *Avitabile* had held that enforcement of N.Y. Penal Law § 265.01(1) against civilian SG possession violated the Second Amendment under the circumstances presented there. See *Caetano*, 577 U.S. at 411–12; *Avitabile,* 368 F. Supp. 3d at 421–22.

247. As a published federal constitutional decision addressing the identical statewide Penal Law provision used against Plaintiff and the same category of civilian defensive device, *Avitabile* placed governmental actors on public notice that *automatic* enforcement of N.Y. Penal Law § 265.01(1) against civilian SG possession was constitutionally suspect.

248. Plaintiff alleges that Defendants enforced N.Y. Penal Law § 265.01(1) *automatically* and mechanically, without any constitutionally meaningful assessment of Plaintiff's lawful self-defense purpose, the non-lethal character of the SG, the defensive circumstances of possession, or the constitutional limits recognized by *Caetano*, *Avitabile*, and *Bruen*.

e.    *As-Applied Violation*

249. Plaintiff was a known protected victim with active court-issued POs arising from repeated threats, assaults, harassment, stalking, and ongoing safety concerns.

250. Plaintiff possessed the SG for lawful, non-lethal self-defense to fill the protective void left by the NYPD's repeated failures to enforce her active POs or provide meaningful intervention against an ongoing, documented threat to her safety.

251. Plaintiff did not possess the device for unlawful aggression, criminal activity, intimidation, or offensive use.

252. Plaintiff did not deploy the SG against TJ through physical contact or electrical discharge but activated only the device's audible alert function while attempting to create distance during an assault.

253. Despite these circumstances, Defendants, acting under color of state law, arrested Plaintiff, seized her property, and initiated criminal enforcement proceedings under N.Y. Penal Law § 265.01(1), thereby violating Plaintiff's rights secured by the Second and Fourteenth Amendments.

254. Defendants Kontorovich, Ausman, Quinones, Uddin, and Draughon directly participated in Plaintiff's arrest, seizure, detention, and enforcement arising from Plaintiff's possession of the SG.

255. Upon information and belief, supervisory approval or direction was sought and provided in connection with Plaintiff's detention, arrest, charging, or continued custody, including by supervisory personnel within the 28th Precinct command structure and by later-identified supervisory defendants.

### f. *Ongoing Chill and Prospective Relief*

256. Plaintiff remains subject to a credible threat of renewed enforcement under both N.Y. Penal Law § 265.01(1) and New York City Administrative Code § 10-135. Plaintiff would presently acquire, possess, and carry a SG for lawful non-lethal self-defense, but for Defendants' continuing enforcement posture and the credible threat of renewed arrest, seizure, prosecution, or other enforcement. Plaintiff therefore continues to suffer an ongoing chill in the exercise of her Second Amendment rights.

SECOND CAUSE OF ACTION
**False Arrest and False Imprisonment**
(42 U.S.C. § 1983; U.S. Const. amend. IV)

(*Against Defendants: City, under Monell; and Kontorovich, Ausman, Quinones, Uddin, Draughon, and any later-identified JD Defendants who personally participated in, directed, approved, prolonged, processed, supervised, or had a realistic opportunity to prevent or terminate Plaintiff's May 15, 2025 arrest, detention, confinement, or related seizure, in their individual capacities*)

### a. *Incorporation and Legal Basis*

257. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

258. This cause of action arises under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

259. A warrantless arrest without probable cause violates the Fourth Amendment. *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006).

260.   Probable cause exists only where officers possess knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in believing an offense has been committed. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

b.   *Unlawful Arrest*

261.   On May 15, 2025, Defendants Kontorovich, Quinones, Ausman, Uddin, Draughon, and other NYPD personnel, acting under color of state law, caused Plaintiff to be arrested without a warrant for alleged violation of N.Y. Penal Law § 265.01(1), Criminal Possession of a Weapon in the Fourth Degree.

262.   Plaintiff was conscious of the confinement, did not consent to it, and remained confined until she was released through criminal process. See *Weyant*, 101 F.3d at 853; *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

c.   *Absence of Probable Cause*

263.   Under the totality of the circumstances known to Defendants at the time of arrest, probable cause was lacking.

264.   Defendants relied on Plaintiff's civilian possession of a SG to arrest her under N.Y. Penal Law § 265.01(1). Although § 265.01(1) includes possession of an "electronic stun gun" within the text of the offense, Plaintiff alleges that probable cause and arguable probable cause were lacking because Plaintiff possessed the device for lawful self-defense, did not offensively deploy it, voluntarily surrendered it, cooperated with responding officers, and advised officers that federal constitutional authority had held New York's civilian SG prohibition unconstitutional.

265.   In particular, *Avitabile*, 368 F. Supp. 3d at 421-22, had held enforcement of N.Y. Penal Law § 265.01(1) against civilian possession of SGs unconstitutional under the circumstances

presented there. At a minimum, that public decision undermined any claim that Plaintiff's civilian possession of a SG, standing alone and without offensive deployment or other criminal conduct, *automatically* supplied probable cause or arguable probable cause under the circumstances alleged herein.

266. Defendants also knew facts materially inconsistent with criminal or menacing use: Plaintiff was the protected party under active court-issued POs; TJ initiated the confrontation, followed Plaintiff, verbally harassed Plaintiff, and physically assaulted Plaintiff; Plaintiff activated only the SG's audible alert function and did not physically deploy the device; TJ retreated after hearing the alert and had not stated she was "in fear"; and Plaintiff remained at the scene, cooperated, surrendered the SG, identified exculpatory recordings, and acted defensively rather than offensively.

267. Responding officers initially treated Plaintiff as the apparent complainant, but their posture changed after communication with supervisory personnel at the 28th Precinct, notwithstanding the absence of new facts establishing probable cause to arrest Plaintiff.

THIRD CAUSE OF ACTION
**Malicious Prosecution**
(42 U.S.C. § 1983; U.S. Const. amend. IV)

(*Against Defendants: City, under Monell; and Kontorovich, Ausman, Quinones, Uddin, Draughon, and any later-identified JD Defendants who personally initiated, procured, influenced, continued, or materially contributed to the criminal prosecution of Plaintiff, including by preparing, approving, transmitting, omitting, suppressing, or failing to correct material information bearing on probable cause, in their individual capacities*)

a. *Incorporation and Legal Basis*

268. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

269. This cause of action arises under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

270.    The Fourth Amendment protects individuals from unreasonable seizures effected through criminal legal process, including post-arraignment restraints on liberty unsupported by probable cause. See *Manuel v. City of Joliet*, 580 U.S. 357, 367-70 (2017)**;** *Manganiello v. City of New York*, 612 F.3d 149, 160-63 (2d Cir. 2010); *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215-16 (2d Cir. 2000).

b.    *Initiation and Continuation of Criminal Proceedings and Lack of Probable Cause*

271.    Defendants Kontorovich, Ausman, Quinones, Uddin, Draughon, and one or more later-identified NYPD officers or supervisors initiated, procured, influenced, continued, or materially contributed to the criminal proceedings against Plaintiff by preparing, approving, transmitting, or causing the transmission of arrest information, accusatory information, supporting facts, or materially incomplete information to prosecutorial authorities and criminal court personnel.

272.    The criminal proceedings against Plaintiff were initiated, escalated, and continued without probable cause. The initial SG possession charge was based on N.Y. Penal Law § 265.01(1), even though *Avitabile*, 368 F. Supp. 3d at 421-22, had already held that enforcement of that Penal Law provision against civilian possession of SGs violated the Second Amendment under the circumstances presented there.

273.    Defendants knew or had ready access to the fact that Plaintiff's arrest was based on civilian possession of a SG for lawful self-defense, not offensive weapon use, and Plaintiff expressly advised officers that federal constitutional authority had held New York's civilian SG prohibition unconstitutional. Defendants nevertheless caused or contributed to criminal process based on Plaintiff's possession of the SG.

274. Defendants also knew or had ready access to materially exculpatory facts undermining any reasonable basis for the subsequently added June 3 Menacing Charges, including Plaintiff's status as the protected party under active court-issued POs, the defensive circumstances surrounding Plaintiff's possession of the SG, TJ's role as the initiating aggressor, Plaintiff's cooperation, the absence of physical deployment of the SG, the absence of any statement by TJ that she was "in fear," and contemporaneous exculpatory recordings documenting the surrounding events.

275. Upon information and belief, Defendants omitted, minimized, suppressed, distorted, or failed to transmit those material facts to prosecutorial authorities and criminal court personnel, thereby contributing to the initiation, escalation, and continuation of criminal proceedings against Plaintiff.

276. Those omissions and distortions were material because a complete and accurate account would have revealed the absence of probable cause to initiate, add, maintain, or continue the SG possession charge, the June 3 Menacing Charges, or the June 3 PO against Plaintiff in favor of TJ.

c.    *Criminal Process Seizure*

277. Following initiation of criminal process, Plaintiff was subjected to liberty restraints, including mandatory court appearances, criminal process obligations, the June 3 PO entered against Plaintiff, and the addition and maintenance of the June 3 Menacing Charges.

d.    *Favorable Termination of the Criminal Proceedings*

278. On or about June 25, 2025, all criminal charges against Plaintiff were dismissed in the interest of justice, without any conviction, admission of guilt, guilty plea, adjournment in

contemplation of dismissal, or compromise disposition, and the June 3, 2025 PO entered against Plaintiff was vacated. See *Thompson v. Clark*, 596 U.S. 36, 49 (2022).

e.    *Malice*

279.    Malice may be inferred from the absence of probable cause and is independently supported by the retaliatory circumstances alleged herein, Defendants' omission or suppression of known exculpatory facts, and the addition or maintenance of the June 3 Menacing Charges despite known contrary facts. See *Manganiello*, 612 F.3d at 163.

FOURTH CAUSE OF ACTION
**Abuse of Process**
(42 U.S.C. § 1983; U.S. Const. amend. IV)

(*Against Defendants: City, under Monell; and Kontorovich, Ausman, Quinones, Uddin, Draughon, and any later-identified JD Defendants who personally used, maintained, procured, prolonged, approved, transmitted, or failed to correct criminal process against Plaintiff for collateral objectives outside the legitimate ends of criminal adjudication, in their individual capacities*)

a.    *Incorporation and Legal Basis*

280.    Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

281.    This cause of action arises under 42 U.S.C. § 1983 and challenges Defendants' post-issuance misuse of criminal process to impose liberty restraints and obtain collateral objectives unrelated to legitimate criminal adjudication.

282.    Under § 1983, abuse of process occurs where state actors employ regularly issued legal process with intent to do harm and use that process in a perverted manner to obtain collateral objectives outside the legitimate ends of criminal adjudication. See *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994); *Savino v. City of New York*, 331 F.3d 63, 76-77 (2d Cir. 2003).

283.    This claim does not rest merely on the arrest, the initiation or continuation of charges, or the absence of probable cause. It challenges Defendants' post-issuance use, maintenance,

transmission, and failure to correct criminal process for retaliatory, coercive, witness-impairing, PO-undermining, and other collateral objectives.

b.    *Misuse of Criminal Process*

284.    Defendants employed and thereafter used regularly issued criminal process against Plaintiff, including criminal accusatory instruments, court proceedings, formal criminal charges, mandatory appearance obligations, and the June 3, 2025 PO entered against Plaintiff.

285.    After that process issued, Defendants used, maintained, transmitted, or failed to correct it for purposes beyond ordinary criminal adjudication, including by allowing the June 3 Menacing Charges and June 3, 2025 PO to operate as leverage against Plaintiff while she remained a protected party, complainant, and witness in simultaneous criminal proceedings involving PS.

286.    Those collateral objectives included, *inter alia*:

a.    impairing Plaintiff's credibility, access to protection, and practical effectiveness in ongoing criminal proceedings involving PS;

b.    materially undermining Plaintiff's ability to seek enforcement of her own active POs and related governmental protection;

c.    reversing Plaintiff's functional status from protected complainant to criminal defendant in a manner that suppressed further advocacy and complaint activity;

d.    discouraging Plaintiff from making future complaints to law enforcement, prosecutors, oversight entities, and governmental officials;

e.    punishing Plaintiff for seeking governmental redress and enforcement assistance; and

f. retaliating against Plaintiff for protected complaints and public criticism concerning NYPD conduct.

287. As alleged herein, Defendants' misuse of criminal process occurred after Plaintiff engaged in protected complaints, public criticism, and escalating efforts to seek governmental intervention concerning NYPD conduct and failures to enforce Plaintiff's POs.

288. Defendants knew that the criminal proceedings against Plaintiff, including the June 3 Menacing Charges and June 3, 2025 PO, would materially alter Plaintiff's legal status, credibility, access to protection, and ability to function as a complainant, protected party, and witness in simultaneous criminal proceedings involving PS, and yet used, maintained, transmitted, or failed to correct that process despite those foreseeable collateral consequences.

289. Those collateral consequences were concrete and foreseeable. Plaintiff's prosecution and the June 3, 2025 PO created practical and legal barriers to direct communication with prosecutorial personnel, complicated Plaintiff's ability to attend or participate in related proceedings, and constrained Plaintiff's ability to seek enforcement assistance without risking further adverse treatment.

290. Defendants acted intentionally and without legitimate justification, knowing that the challenged use of criminal process would impose retaliatory, coercive, witness impairing, PO undermining, and other practical burdens extending beyond ordinary criminal adjudication.

FIFTH CAUSE OF ACTION
**First Amendment Retaliation**
(42 U.S.C. § 1983; U.S. Const. amends. I and XIV)

(*Against Defendants: City, under Monell; and Whitlock, Kontorovich, Hirsch, Ausman, Lugo, Mack, Douglas, Dzeviatka, Quinones, Uddin, Draughon, Castillo, Cavalieri, Pastwa,*

*Lobsang, Layes, Russo, Sotamba, Pitre, Ramos, JD No. 14, JD No. 16, and any later-identified JD Defendants who personally participated in, directed, approved, ratified, or had a realistic opportunity to prevent adverse actions taken against Plaintiff because of Plaintiff's protected speech, complaints, public criticism, or petitioning activity, in their individual capacities)*

#### a.    *Incorporation and Legal Basis*

291.    Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

292.    This cause of action arises under 42 U.S.C. § 1983 and the First Amendment to the United States Constitution, as incorporated and applicable to the states through the Fourteenth Amendment.

293.    The First Amendment protects the rights to speak freely, to criticize government officials, to petition for redress of grievances, and to be free from retaliation for exercising those rights. *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

#### b.    *Legal Elements of a First Amendment Retaliation Claim*

294.    A First Amendment retaliation claim under 42 U.S.C. § 1983 requires protected speech or petitioning activity, adverse action that would deter a person of ordinary firmness from continuing such activity, and a causal connection between the protected activity and the adverse action. See *Dorsett*, 732 F.3d at 160. In the retaliatory arrest context, the plaintiff must also plausibly allege that retaliatory animus was a but-for cause of the arrest and, absent an applicable exception, that the arrest lacked probable cause. See *Nieves v. Bartlett*, 587 U.S. 391, 398-402 (2019).

295.    Because Plaintiff plausibly alleges the absence of probable cause for her arrest and prosecution, the retaliatory enforcement alleged herein is not barred by *Nieves*. See *Nieves*, 587 U.S. at 399-402.

296. In the alternative, Plaintiff alleges objective evidence sufficient to invoke the *Nieves* exception, including materially disparate treatment, selective use of harsher criminal enforcement mechanisms, comparator evidence showing non-enforcement against similarly situated individuals, and direct and circumstantial evidence of retaliatory animus. See *Nieves*, 587 U.S. at 406-07.

c.    *Plaintiff's Protected Speech and Petitioning Activity*

297. Plaintiff engaged in protected First Amendment activity, including repeated complaints to NYPD supervisors; communications with the New York County District Attorney's Office; complaints to oversight bodies, including substantiated complaints to the CCRB; communications with elected officials; requests for governmental redress and enforcement assistance; and public criticism of NYPD conduct at community and public meetings, as alleged herein.

d.    *Adverse Actions Taken*

298. As alleged herein, Defendants took adverse actions against Plaintiff, including, *inter alia*:

a.    refusing, withholding, or withdrawing ordinary enforcement responses, protective intervention, or safety-related assistance after Plaintiff engaged in protected complaints and public criticism;

b.    canceling promised safety measures expressly "*because*" of Plaintiff's public criticism;

c.    arresting Plaintiff without probable cause on May 15, 2025;

d.    initiating, escalating, or materially contributing to criminal charges, including the June 3 Menacing Charges;

e.    procuring and leveraging the June 3 PO against Plaintiff; and

  f. subjecting Plaintiff to continued retaliatory and materially disparate enforcement treatment through criminal process.

299. These actions would deter a person of ordinary firmness from engaging in protected speech, petitioning activity, or requests for governmental redress.

e. <em>Causation and Retaliatory Motive</em>

300. Plaintiff's protected speech and petitioning activity were a "but-for" cause of Defendants' adverse actions. Evidence of this retaliatory motive includes:

  a. <u>Express Admissions</u>: Defendant Ramos expressly tied the cancellation of protections and services to Plaintiff's public criticism.

  b. <u>Temporal Proximity</u>: Defendants' adverse treatment intensified after Plaintiff escalated protected complaints, public criticism, oversight complaints, and demands for supervisory and governmental intervention in January and February 2025.

  c. <u>Command-Level Awareness</u>: NYPD supervisors, including Defendants Whitlock and Hirsch, were aware of Plaintiff's complaints, criticisms, and requests for intervention.

  d. <u>Pattern of Hostility and Unequal Treatment</u>: Defendants repeatedly failed to provide meaningful enforcement intervention despite Plaintiff's protected party status, active POs, available recordings, and repeated requests for protection, while later invoking criminal enforcement against Plaintiff.

  e. <u>Materially Disparate Treatment</u>: Defendants declined to take contemporaneous enforcement action against PS or TJ despite reported threats, assaults, active POs,

Page 57 of 93

available recordings, and Plaintiff's protected party status, but invoked criminal enforcement against Plaintiff after her protected complaints and public criticism.

    f.   <u>Selective Enforcement Mechanism</u>: Defendants invoked N.Y. Penal Law § 265.01(1), a statewide criminal weapons offense carrying materially more serious consequences than available local enforcement mechanisms, against Plaintiff under circumstances in which she was a protected complainant acting defensively and had not physically deployed the SG.

301.   By May 15, 2025, Plaintiff, PS, TJ, Apartment 4B, and the Building had been the subject of repeated 911 calls, NYPD responses, complaint reports, PO issues, criminal proceedings, and supervisory communications involving the 28th Precinct. Plaintiff repeatedly appeared at, contacted, and communicated with the 28th Precinct and its supervisory personnel seeking enforcement assistance, reporting threats and PO violations, providing recordings and documentation, and complaining about NYPD non-enforcement and misconduct. The volume, recurrence, and documented nature of these contacts support a plausible inference that Defendants knew, were aware of, or had ready access to information showing Plaintiff's protected activity, protected party status, history with PS and TJ, and repeated complaints concerning 28th Precinct non-enforcement.

302.   Taken together, the chronology, command-level awareness, express statements, disparate treatment, selective enforcement, and escalation alleged herein plausibly support the inference that Plaintiff's protected speech and petitioning activity were a but-for cause of the adverse actions taken against her.

f.    *Defendant-Specific Participation*

303.    Defendant Ramos expressly tied the withdrawal of previously discussed safety coordination, command-level engagement, welfare check coordination, and protective assistance to Plaintiff's protected speech and public criticism of NYPD conduct.

304.    Defendants Whitlock and Hirsch were aware of Plaintiff's protected complaints and public criticism before the May 15, 2025 arrest and subsequent criminal process. Defendant Hirsch communicated with Plaintiff regarding her complaints concerning the 28th Precinct and NYPD. Defendant Whitlock was present when Plaintiff publicly criticized the 28th Precinct, and was the central figure in the command-level meeting that Defendant Ramos later canceled, seemingly at the behest of Defendant Whitlock, "*because*" of Plaintiff's public criticism.

305.    Defendants Kontorovich, Ausman, Quinones, Uddin, Draughon, and other later-identified NYPD personnel participated in, approved, directed, processed, or materially contributed to Plaintiff's May 15, 2025 arrest, seizure, detention, charging, and subsequent criminal process after Plaintiff's protected complaints and public criticism had been escalated to supervisory and command-level attention.

306.    Defendants Lugo, Mack, Douglas, Dzeviatka, Castillo, Cavalieri, Lobsang, Pastwa, Layes, Russo, Sotamba, Pitre, JD No. 14, JD No. 16, and additional JD Defendants participated in the broader course of adverse treatment alleged herein, including materially deficient enforcement responses, inaccurate or misleading enforcement information, and refusals to take contemporaneous enforcement action despite Plaintiff's protected party status, repeated complaints, and requests for governmental protection. Plaintiff pleads those facts as part of the retaliatory chronology, pattern of materially disparate treatment, and evidence of

causation, and alleges individual First Amendment retaliation liability only to the extent each Defendant knew of Plaintiff's protected activity and personally participated in adverse action because of that protected activity.

SIXTH CAUSE OF ACTION<br>
<strong>Fabrication of Evidence and Materially Misleading Criminal Narratives Causing Deprivation of Liberty</strong><br>
(42 U.S.C. § 1983; U.S. Const. amends. IV and XIV)

(*Against Defendants: City, under Monell; and Kontorovich, Ausman, Quinones, Uddin, Draughon, and later-identified JD Defendants who personally prepared, approved, adopted, transmitted, or maintained materially false or materially misleading criminal narratives, in their individual capacities*)

a.    *Incorporation, Legal Basis, and Element Summary*

307. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

308. This cause of action arises under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution and challenges Defendants' fabrication of evidence, creation and maintenance of materially misleading criminal narratives, and transmission of false or materially misleading information that caused or prolonged Plaintiff's deprivation of liberty.

309. The Constitution prohibits state actors from knowingly creating, adopting, transmitting, or maintaining materially false or materially misleading information likely to influence criminal proceedings where such conduct causes or prolongs a deprivation of liberty, including through affirmative misstatements, deliberate half-truths, or material omissions that render transmitted accounts materially misleading. See *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279-80 (2d Cir. 2016). The Fourth Amendment also protects against unreasonable seizures effected through criminal legal process unsupported by probable cause. See *Manuel v. City of Joliet*, 580 U.S. 357, 367-70 (2017).

Page 60 of 93

b.    *Material Exculpatory Evidence and Facts Known to Defendants*

310.    Defendants knew of, possessed, controlled, generated, viewed, or had ready access to materially exculpatory evidence and facts bearing directly on probable cause, charging decisions, and the accuracy of any criminal narrative concerning Plaintiff. Those facts included Plaintiff's protected party status under active stay-away POs; TJ's initiating and assaultive conduct; Plaintiff's defensive posture, cooperation, and voluntary surrender of the SG; Plaintiff's statement that she possessed the SG for lawful self-defense; the absence of physical deployment of the SG; contemporaneous recordings and, upon information and belief, body-worn-camera footage; prior NYPD records documenting PS's threats and violence; 911 and dispatch materials containing materially inconsistent or misleading information; and information communicated to supervisory personnel that TJ had not stated she feared imminent physical injury.

311.    Plaintiff expressly identified and offered exculpatory recordings and information at the scene, and, upon information and belief, responding officers and supervisors viewed, captured, obtained, or had ready access to such recordings and documentation. The exculpatory significance of this evidence was apparent and material to any reasonable probable-cause determination, charging decision, or criminal-process obligation.

c.    *Fabrication, Material Omissions, and Misleading Narratives*

312.    Despite knowing of, possessing, or having ready access to materially exculpatory evidence, Defendants knowingly, intentionally, or with reckless disregard for the truth created, adopted, approved, transmitted, maintained, or failed to correct materially false or materially misleading criminal narratives concerning Plaintiff.

313. Upon information and belief, the materially false or misleading narratives included, *inter alia*, portraying Plaintiff as the aggressor or offender; omitting TJ's initiating assaultive conduct; omitting Plaintiff's protected party status; omitting that Plaintiff did not physically deploy the SG; omitting that TJ had not stated she was "in fear"; omitting the availability and content of contemporaneous recordings; and failing to communicate Plaintiff's defensive posture, cooperation, and voluntary surrender of the SG.

314. Upon information and belief, these misleading narratives were created or maintained through affirmative misstatements, deliberate half-truths, material omissions, and failures to transmit, summarize, incorporate, or otherwise account for exculpatory recordings, witness information, and contemporaneous facts necessary to render the transmitted accounts non-misleading.

d.   *Causation*

315. Defendants transmitted, caused to be transmitted, approved for transmission, or knowingly permitted such materially false or materially misleading narratives to be conveyed to prosecutors, charging authorities, official criminal records, and the criminal court process, resulting in the District Attorney's Office recharging Plaintiff, adding the June 3 Menacing Charges, and seeking or obtaining the June 3 PO.

316. As a direct and foreseeable result, Plaintiff was deprived of liberty through the initiation and continuation of criminal proceedings, arraignment, compelled court appearances, court-imposed restrictions, burdens associated with continued prosecution, restrictions associated with the June 3 PO, and other post-legal-process restraints on liberty.

317. Plaintiff's ability to communicate with prosecutors, provide evidence, receive victim-related information, and participate effectively as the complaining witness and protected party in the criminal proceedings against PS was also materially impaired.

318. Had Defendants accurately conveyed the known exculpatory facts and refrained from creating, adopting, transmitting, maintaining, or failing to correct materially false or materially misleading criminal narratives, there is a reasonable likelihood Plaintiff would not have been subjected to continued prosecution, escalated charges, post-legal-process liberty restraints, or other continuing deprivations of liberty.

<u>SEVENTH CAUSE OF ACTION</u>
**Selective Enforcement – Equal Protection Violation**
(42 U.S.C. § 1983; U.S. Const. amend. XIV)

(*Against Defendants: City, under Monell; and Whitlock, Kontorovich, Hirsch, Ausman, Lugo, Mack, Douglas, Dzeviatka, Quinones, Uddin, Draughon, Castillo, Cavalieri, Pastwa, Lobsang, Layes, Russo, Sotamba, Pitre, JD No. 14, JD No. 16, and Ramos to the extent she acted jointly with NYPD personnel in causing or furthering the materially disparate enforcement treatment; and any later-identified JD Defendants who personally participated in, directed, approved, ratified, supervised, or had a realistic opportunity to prevent materially disparate enforcement decisions affecting Plaintiff, in their individual capacities*)

a. *Incorporation and Legal Basis*

319. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

320. This claim arises under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment.

321. The Equal Protection Clause prohibits selective enforcement of facially neutral laws where a plaintiff is treated differently from similarly situated persons and such differential treatment is motivated by impermissible considerations, malicious or bad faith intent to injure, or intent to punish the exercise of constitutional rights. See *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886); *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980); *Bizzarro v. Miranda*, 394 F.3d 82, 87-88 (2d Cir. 2005).

b.    *Materially Disparate Enforcement Treatment*

322.    As alleged herein, Defendants exercised enforcement discretion in a materially disparate manner with respect to Plaintiff.

323.    Plaintiff was similarly situated, in all material respects relevant to enforcement discretion, to other protected complainants, crime victims, and persons involved in disputed cross-complaint incidents where officers had notice of active POs, victim or complainant status, available recordings or corroborating evidence, defensive conduct, and facts bearing on probable cause.

324.    Unlike similarly situated protected complainants and crime victims, Plaintiff was not treated primarily as a person seeking enforcement assistance, protection, or victim-directed intervention. Instead, despite repeated documented complaints, active court-issued "stay-away" POs, officer awareness of Plaintiff's protected status, and available corroborating evidence, Defendants repeatedly declined to take enforcement action in response to Plaintiff's reported victimization, and, later, aggressively exercised enforcement authority against Plaintiff herself.

325.    This materially disparate enforcement treatment included declining enforcement in response to Plaintiff's repeated reports of PO violations, threats, harassment, stalking-related conduct, and physical aggression despite active POs and corroborating evidence; failing to provide meaningful victim-directed intervention after Plaintiff's December 12, 2024 911 call concerning PS's unlawful presence in the Building; shifting enforcement posture against Plaintiff on May 15, 2025 despite Plaintiff's protected party status, TJ's initiating conduct, available recordings, Plaintiff's defensive conduct, and other exculpatory circumstances;

treating Plaintiff as the enforcement target while declining comparable enforcement against TJ; and withdrawing previously discussed protective assistance through Defendant Ramos.

326. Upon information and belief, Defendants did not ordinarily arrest, criminally charge, or convert protected complainants into enforcement targets under materially comparable circumstances involving active POs favoring the complainant, defensive conduct, disputed cross-complaint allegations, available exculpatory recordings, and facts undermining probable cause.

327. Plaintiff was treated differently from TJ in connection with the May 15, 2025 incident because, upon information and belief, NYPD did not arrest TJ for assault, harassment, menacing, false reporting, or related conduct despite Plaintiff's report, available recordings, TJ's initiating aggression, and facts showing that Plaintiff acted defensively.

328. Plaintiff was also treated differently from PS because, upon information and belief, NYPD repeatedly declined to arrest PS for reported PO violations, assaultive conduct, and threats, including on December 11, December 12, December 13, December 17, 2024, February 20, April 12, and May 6, 2025, despite recordings or other corroborating evidence.

c.    *Bad Faith/Impermissible Motive*

329. Defendants' materially disparate enforcement treatment was motivated by bad faith, malicious intent to injure, impermissible retaliation for Plaintiff's protected complaints and criticism, and other impermissible considerations affecting enforcement discretion.

330. That inference is supported by, *inter alia*, Defendant Ramos's express withdrawal of previously discussed assistance "*because*" of Plaintiff's public criticism; temporal proximity between Plaintiff's protected complaints and escalated enforcement against her; supervisory awareness of Plaintiff's complaints and disputes with the 28th Precinct; the abrupt shift from

treating Plaintiff as a complainant to treating her as an enforcement target despite materially exculpatory circumstances; and continued aggressive enforcement measures against Plaintiff notwithstanding contrary evidence.

d.    *Personal Involvement*

331.    The individual Defendants were personally involved in the materially disparate enforcement treatment alleged herein only to the extent each Defendant personally participated in, directed, approved, ratified, supervised, reinforced, transmitted, documented, failed to correct, or had a realistic opportunity to prevent materially unequal enforcement decisions affecting Plaintiff.

332.    Defendants Whitlock, Hirsch, Lugo, Mack, Douglas, Dzeviatka, Lobsang, Pastwa, Layes, Russo, Sotamba, Pitre, JD No. 14, JD No. 16, and, upon information and belief, other later-identified Defendants personally participated in, directed, approved, ratified, reinforced, documented, or failed to correct materially unequal enforcement responses to Plaintiff's reports of PO violations, threats, harassment, stalking-related conduct, assaultive conduct, and related safety concerns. Their conduct included, as alleged herein, declining enforcement, despite active POs and available corroborating evidence; misclassifying or incompletely documenting incidents; providing or failing to correct materially inaccurate enforcement information; minimizing Plaintiff's victimization; treating Plaintiff's requests for assistance or lawful protective guidance as suspect or potentially punishable; and denying or terminating victim-directed follow-up.

333.    Defendants Kontorovich, Ausman, Quinones, Uddin, Draughon, and, upon information and belief, other later-identified Defendants personally participated in, directed, approved, supervised, ratified, transmitted, processed, or failed to prevent the materially adverse

enforcement shift against Plaintiff on May 15, 2025. That shift included treating Plaintiff as the enforcement target, rather than as the complainant or protected party, despite known or readily available exculpatory information, including Plaintiff's protected party status, TJ's initiating conduct, available recordings, Plaintiff's defensive conduct, and the absence of physical deployment of the SG.

334. Defendant Ramos was personally involved to the extent she acted jointly with NYPD personnel or through precinct-linked safety channels in causing, furthering, or ratifying materially disparate enforcement treatment. Her conduct included withdrawing previously discussed protective assistance, canceling the contemplated safety intervention involving Defendant Whitlock, and expressly tying that withdrawal to Plaintiff's public criticism of the 28th Precinct, thereby materially reducing Plaintiff's access to protective resources while Plaintiff was later subjected to adverse enforcement treatment.

335. Taken together, the above Defendant-specific conduct supports a plausible inference that Plaintiff was treated differently from similarly situated protected complainants and crime victims subject to comparable enforcement discretion. Defendants repeatedly declined to enforce Plaintiff's active POs or act on Plaintiff's reports involving PS and TJ, while later invoking materially harsher criminal enforcement mechanisms against Plaintiff despite Plaintiff's protected party status, defensive conduct, available recordings, and facts undermining probable cause.

336. Plaintiff alleges individual liability against each Defendant only for that Defendant's own conduct and personal involvement in the materially disparate enforcement treatment alleged herein.

e.      *Distinct Equal Protection Injury*

337.    This Equal Protection claim is distinct from Plaintiff's First Amendment retaliation claim. It rests not solely on retaliatory motive, but on materially unequal enforcement treatment as compared to similarly situated persons subject to comparable enforcement discretion.

338.    Even assuming *arguendo* that Defendants contend probable cause existed for some aspect of the challenged enforcement, which Plaintiff denies, Plaintiff's selective enforcement claim remains actionable because Defendants treated Plaintiff differently from similarly situated persons based on bad faith, malicious intent to injure, impermissible retaliation, or other impermissible considerations.

EIGHTH CAUSE OF ACTION
**State Created Danger (Substantive Due Process)**
(42 U.S.C. § 1983; U.S. Const. amend. XIV)

*(Against Defendants: City, under Monell; Whitlock, Kontorovich, Ausman, Lugo, Mack, Douglas, Dzeviatka, Quinones, Uddin, Draughon, Castillo, Cavalieri, Pastwa, Lobsang, Ramos, Layes, Russo, Sotamba, Pitre, JD No. 14, JD No. 16, and any later-identified JD Defendants who affirmatively used governmental authority to create or increase Plaintiff's vulnerability to foreseeable private violence by PS or TJ, in their individual capacities)*

a.      *Incorporation and Legal Standard*

339.    Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

340.    This cause of action arises under 42 U.S.C. § 1983 and the substantive component of the Fourteenth Amendment's Due Process Clause, which, in limited circumstances, imposes liability where state actors affirmatively use governmental authority in a manner that creates or increases a specific individual's vulnerability to private violence.

341.    Although the Due Process Clause generally does not impose an affirmative duty to protect individuals from private violence, substantive due process liability may arise where state actors affirmatively use official authority in a manner that creates or increases danger to a

foreseeable, particularized plaintiff, and where the resulting harm is fairly direct and the official conduct is conscience-shocking or deliberately indifferent under the circumstances. See *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–200 (1989); *Pena v. DePrisco,* 432 F.3d 98, 108–10 (2d Cir. 2005); *Matican v. City of New York*, 524 F.3d 151, 157–59 (2d Cir. 2008); *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428–31 (2d Cir. 2009).

b.    *Plaintiff as a Foreseeable and Particularized Victim*

342.    Plaintiff was not a member of the general public, but a specifically identified and foreseeable victim known to Defendants through repeated documented interactions involving threats, assaults, stalking-related conduct, PO violations, emergency calls, complaint reports, and repeated requests for police intervention.

343.    Defendants had actual knowledge of Plaintiff's status as the protected party under multiple active POs, the documented history involving PS and TJ, repeated reported violations, prior violent incidents, and the escalating nature of the danger confronting Plaintiff.

c.    *Affirmative Conduct Increasing Plaintiff's Vulnerability*

344.    Plaintiff does not premise this claim on a generalized failure to protect from private violence or on a custodial "special relationship" theory rejected in *DeShaney.* Rather, Plaintiff alleges that Defendants affirmatively used governmental authority, official access, precinct linked safety channels, and criminal enforcement discretion in ways that materially worsened Plaintiff's position and increased her vulnerability to known private aggressors.

345.    Defendants used official authority in a manner that communicated tolerance, acquiescence, or encouragement of violations against Plaintiff. That affirmative pattern foreseeably emboldened PS and TJ, increased Plaintiff's vulnerability to further private aggression, and

left Plaintiff in a materially more dangerous position than she would have occupied absent Defendants' affirmative conduct.

346. Defendants' affirmative danger enhancing conduct included, without limitation, official representations and actions inducing Plaintiff's reliance on institutional safety mechanisms; withdrawal or abandonment of offered protective intervention; materially inaccurate enforcement information, reporting, classification, or documentation; repeated ratification or reinforcement of non-enforcement despite known threats and active POs; and the May 15, 2025 enforcement reversal that shifted criminal consequences toward Plaintiff rather than the known aggressors.

d. *Personal Involvement*

347. Each individual Defendant is alleged to have contributed to this state created danger only to the extent that, as specifically alleged herein, that Defendant personally participated in, directed, approved, ratified, transmitted, reinforced, or failed to correct affirmative official conduct that communicated tolerance of violations against Plaintiff, undermined Plaintiff's access to protective enforcement, withdrew or abandoned promised protective intervention, or shifted enforcement consequences toward Plaintiff despite known threats and active POs.

348. Defendants Castillo, Cavalieri, Lugo, Sotamba, Draughon, Pitre, Dzeviatka, Russo, Layes, Mack, Douglas, Lobsang, and Pastwa affirmatively contributed to Plaintiff's danger through repeated official responses to Plaintiff's reports of PS's threats, assaults, and PO violations that went beyond passive non-enforcement. As alleged herein, those Defendants responded to incidents involving active POs, visible or provided recordings, documented threats, Plaintiff's protected party status, and recurring safety risks, yet repeatedly declined enforcement, misclassified or incompletely documented incidents, provided materially

incorrect enforcement information, or failed to correct known misinformation concerning Plaintiff's POs. Those actions foreseeably communicated tolerance of PS's violations, impaired accurate risk assessment by later officers and supervisors, undermined Plaintiff's access to protective enforcement, and increased Plaintiff's vulnerability to continued threats, intimidation, and private violence.

349. Defendant Hirsch affirmatively contributed to Plaintiff's danger by refusing to formulate any individualized safety response, despite Plaintiff's protected party status, active full stay-away POs, and repeated reports of ongoing threats and violations; by characterizing Plaintiff's complaints as "Unsubstantiated"; by treating the December 12, 2024 matter as a trespass issue; by failing to address the December 11, 2024 incident; and by failing to identify or implement corrective intervention concerning Plaintiff's emergency reports relating to safety concerns and PO violations. Those actions ratified or reinforced inaccurate, incomplete, or danger-minimizing NYPD treatment of Plaintiff's reports and foreseeably increased Plaintiff's vulnerability to further private aggression.

350. Defendant Ramos affirmatively contributed to Plaintiff's danger by representing, through her precinct-linked role and relationship with NYPD leadership, that she could facilitate coordinated protective intervention, command-level engagement, welfare monitoring, and access to safety-related resources concerning Plaintiff's ongoing danger. Plaintiff reasonably relied on those representations. Defendant Ramos then withdrew the coordinated protective intervention, canceled Plaintiff's scheduled meeting with Defendant Whitlock, and expressly tied that withdrawal to Plaintiff's public criticism of the 28th Precinct. That withdrawal of offered and accepted safety intervention materially worsened Plaintiff's position by collapsing anticipated protective channels, undermining Plaintiff's reliance on institutional

safety mechanisms, and increasing Plaintiff's vulnerability to continued threats, proximity, and confrontation.

351. Defendants Quinones, Uddin, Draughon, Kontorovich, and Ausman affirmatively contributed to Plaintiff's danger through the May 15, 2025 enforcement reversal. Defendants Quinones, Uddin, and Draughon initially treated Plaintiff as the apparent complainant and discussed her eligibility for protective relief, but after communication with supervisory personnel, the response shifted from victim-oriented intervention to enforcement against Plaintiff, despite known or readily available facts showing Plaintiff's protected party status, TJ's initiating aggression, Plaintiff's defensive conduct, the absence of physical deployment of the SG, available recordings, Plaintiff's cooperation, and the absence of any statement by TJ that she was "in fear." Defendant Kontorovich then arrived, assumed supervisory control, approved, directed, or participated in the arrest decision, personally transported Plaintiff to the 28th Precinct, and stated in substance that "the victim is the City of New York." Defendant Ausman participated in, was consulted regarding, or approved Plaintiff's custodial processing, charging determinations, or related supervisory review despite prior notice from NYPD records identifying Plaintiff as a crime victim and complainant in incidents involving PS. By shifting enforcement consequences toward Plaintiff, rather than addressing the reported conduct of known aggressors, those Defendants materially impaired Plaintiff's practical ability to obtain police protection from PS and TJ and communicated that Plaintiff herself could become the enforcement target when seeking help.

352. Defendants JD No. 14 and JD No. 16 affirmatively contributed to Plaintiff's danger to the extent discovery confirms their identities and roles as alleged herein. Defendant JD No. 14 responded to Plaintiff's request for guidance concerning lawful protective options by stating

in substance that Plaintiff was "lucky" the officer's body camera was not on and indicating that Plaintiff could have been arrested had her remark been recorded, without identifying an offense or providing lawful safety guidance. Defendant JD No. 16 terminated Plaintiff's victim-directed follow-up concerning the May 15, 2025 incident after learning that Plaintiff had been arrested in connection with the same incident, and no further follow-up occurred. Those actions reinforced Plaintiff's reasonable belief that ordinary police channels were unreliable or punitive and impaired Plaintiff's access to victim-directed intervention.

353. Taken together, the above Defendant-specific conduct was not merely passive inaction. Defendants affirmatively used governmental authority, official access, reporting and classification mechanisms, supervisory authority, precinct-linked safety channels, and criminal enforcement discretion to communicate tolerance of violations against Plaintiff, undermine Plaintiff's access to protective enforcement, discourage lawful reliance on police protection, withdraw or abandon offered protective intervention, and shift enforcement consequences toward Plaintiff despite known threats, active POs, and readily available exculpatory information.

e. *Conscience-Shocking Conduct*

354. Defendants' conduct materially worsened Plaintiff's exposure to foreseeable violence and was sufficiently arbitrary, egregious, and conscience-shocking to violate substantive due process. See *Okin*, 577 F.3d at 430-31.

355. Defendants had repeated opportunities for deliberate decision making, possessed actual knowledge of Plaintiff's documented vulnerability and escalating risk, and acted with deliberate indifference to a known and particularized risk of serious harm.

356.   As a direct and foreseeable consequence of Defendants' affirmative danger-enhancing conduct, Plaintiff was left in a materially more vulnerable position than before Defendants affirmatively intervened, including through increased vulnerability to continued threats, intimidation, retaliatory aggression, and foreseeable private harm.

NINTH CAUSE OF ACTION
**Failure to Intervene**
(42 U.S.C. § 1983; U.S. Const. amends. IV and XIV)

(*Against Defendants: Kontorovich, Ausman, Quinones, Uddin, Draughon, and any later-identified JD Defendants who were present during, participated in, supervised, reviewed, approved, processed, or otherwise had a realistic opportunity to prevent or halt Plaintiff's unlawful arrest, detention, processing, or the transmission of materially false or misleading arrest-related information, in their individual capacities*)

a.   *Incorporation and Legal Basis*

357.   Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

358.   This cause of action arises under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

359.   This cause of action is pleaded in the alternative against individual Defendants who, to the extent they did not directly commit each underlying constitutional violation, knew or had reason to know that such violations were occurring and had a realistic opportunity to prevent or halt them, but failed to do so.

b.   *Legal Standard*

360.   Law enforcement officers have an affirmative duty to intervene to prevent constitutional violations committed by fellow officers where they observe or have reason to know that such violations are occurring and possess a realistic opportunity to intervene. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016).

c.    *Knowledge of Ongoing Violations*

361.    At the time of Plaintiff's arrest, detention, processing, supervisory review, and arrest-related decision making, one or more individual Defendants knew or had reason to know that Plaintiff was being subjected to constitutional violations, including unlawful seizure without probable cause, unlawful arrest, continued detention unsupported by probable cause, and the use, approval, or transmission of materially false or misleading arrest-related information.

362.    These Defendants were aware of materially exculpatory facts, including, *inter alia*:

   a.    Plaintiff's status as a complainant and protected party under active POs;

   b.    Plaintiff's contemporaneous statements identifying TJ as the aggressor;

   c.    Plaintiff's recordings documenting the surrounding events;

   d.    Plaintiff's explanation that the SG had been audibly activated but not deployed;

   e.    Plaintiff's voluntary surrender of the device; and

   f.    surrounding circumstances materially undermining probable cause.

363.    Defendants Ausman and Draughon had additional reason to know that Plaintiff's arrest, detention, processing, and related arrest narratives were constitutionally deficient because, as alleged herein, each had prior documented involvement with Plaintiff's recurring safety situation involving PS, TJ, active POs, and Plaintiff's status as a protected party or complainant. That prior involvement made the exculpatory significance of Plaintiff's protected party status, TJ's initiating conduct, Plaintiff's defensive conduct, and the available recordings especially apparent.

d.    *Realistic Opportunities to Intervene*

364.    Defendants had realistic opportunities to intervene before Plaintiff's arrest was completed, during custodial detention, during supervisory review, before finalization of arrest

processing, and before materially false or misleading arrest-related information was transmitted, finalized, or relied upon in connection with criminal process.

e.   *Failure to Act*

365.   Despite such knowledge and opportunity, Defendants consciously failed to intervene, thereby permitting Plaintiff's unlawful arrest, continued detention, the transmission or maintenance of materially false or misleading arrest-related information, and resulting deprivation of liberty.

TENTH CAUSE OF ACTION
**False Arrest / False Imprisonment**
(New York Common Law)

*(Against Defendants: City, under respondeat superior; and Kontorovich, Ausman, Quinones, Uddin, Draughon, and any later-identified JD Defendants who personally arrested, confined, transported, detained, processed, supervised, approved, or directly caused Plaintiff's May 15, 2025 arrest or confinement, in their individual capacities)*

a.   *Incorporation and Legal Standard*

366.   Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

367.   This cause of action seeks relief under New York common law, arising from the same unlawful arrest and confinement described herein.

368.   Under New York law, the elements of false arrest and false imprisonment are: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent; and (4) the confinement was not otherwise privileged. See *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975); *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 85 (2001); *Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. 1996).

369.   Probable cause, if it existed at the time of arrest, constitutes a complete defense to claims for false arrest and false imprisonment under New York law. See *Weyant*, 101 F.3d at 852; *Broughton*, 37 N.Y.2d at 458.

370.    Probable cause exists only where the arresting officers possessed knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in believing that Plaintiff committed an offense. See *Weyant*, 101 F.3d at 852.

b.    *Plaintiff's Arrest and Unlawful Confinement*

371.    As alleged *supra*, Defendants intentionally confined Plaintiff by arresting, handcuffing, transporting, detaining, and processing her on May 15, 2025.

372.    Plaintiff was conscious of the confinement and did not consent to it.

373.    At the time of arrest, Defendants knew, were told, were presented with, or had ready access to materially exculpatory information, including Plaintiff's status as a protected party under active criminal POs, the surrounding circumstances of the confrontation, Plaintiff's non-aggressor conduct, the fact that Plaintiff did not offensively deploy the SG, and Plaintiff's contemporaneous recordings and statements concerning the incident.

374.    The confinement was not privileged because Defendants lacked probable cause to arrest Plaintiff under the totality of the circumstances known at the time.

375.    Defendants nevertheless arrested and detained Plaintiff based substantially or entirely upon Plaintiff's civilian possession of a SG under N.Y. Penal Law § 265.01(1), notwithstanding the publicly available federal constitutional authority, including *Avitabile*, 368 F. Supp. 3d at 421-22, holding New York's civilian SG prohibition unconstitutional as applied to civilian possession of such devices for self-defense and placing law enforcement officials on notice of serious constitutional defects in categorical enforcement of that prohibition.

376.    No reasonably prudent law enforcement officer possessing the information available at the time would have concluded that probable cause existed to arrest Plaintiff.

c.    *Municipal Respondeat Superior Liability*

377.    Defendant City is liable for the foregoing conduct under the doctrine of *respondeat superior*, because the individual Defendants were acting within the scope of their employment and in the course of performing their duties as NYPD personnel.

ELEVENTH CAUSE OF ACTION
**Malicious Prosecution**
(New York Common Law)

(*Against Defendants: City, under respondeat superior; and Kontorovich, Ausman, Quinones, Uddin, Draughon, and any later-identified JD Defendants who personally initiated, procured, continued, or materially contributed to Plaintiff's prosecution, including by preparing, approving, transmitting, omitting, suppressing, or failing to correct material information bearing on probable cause, in their individual capacities*)

a.    *Incorporation and Legal Standard*

378.    Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

379.    This cause of action seeks relief under New York common law arising from the same prosecution described herein.

380.    Under New York law, a claim for malicious prosecution requires: (1) initiation or continuation of a criminal proceeding; (2) termination of that proceeding in plaintiff's favor; (3) lack of probable cause; and (4) actual malice. *Broughton v. State of New York*, 37 N.Y.2d 451, 457 (1975); *Cantalino v. Danner*, 96 N.Y.2d 391, 394 (2001); *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000).

b.    *Initiation and Continuation of Criminal Proceedings*

381.    Defendants affirmatively caused, procured, or materially contributed to the initiation and continuation of criminal proceedings against Plaintiff through the preparation or approval of arrest paperwork, sworn or otherwise materially influential allegations, communications with

prosecutorial authorities, and the omission, suppression, or failure to disclose materially exculpatory information.

382.    Defendants did not merely furnish information, but played an active and proximate role in causing, influencing, or maintaining Plaintiff's prosecution.

c.    *Favorable Termination of the Proceedings*

383.    On or about June 25, 2025, all criminal charges against Plaintiff were dismissed in the interest of justice, and the June 3 PO issued against her was dissolved.

384.    The termination was not the product of a compromise, plea, adjournment in contemplation of dismissal, admission of guilt, or misconduct by Plaintiff, and was not inconsistent with her innocence.

385.    Under New York law, a dismissal in the interest of justice constitutes a favorable termination where, as here, the circumstances of the dismissal are not inconsistent with innocence. See *Cantalino*, 96 N.Y.2d at 396-99.

d.    *Lack of Probable Cause*

386.    As alleged herein and in the Third Cause of Action, Defendants lacked probable cause to initiate or continue criminal proceedings against Plaintiff, and, therefore, lacked legal justification to commence or maintain the prosecution under New York law.

e.    *Actual Malice*

387.    Defendants acted with actual malice. Malice may be inferred from the absence of probable cause, and is further supported by Defendants' retaliatory motive, suppression or omission of materially exculpatory information, continuation of proceedings despite contrary known facts, and escalation of charges without adequate factual basis. See *Martin v. City of Albany*, 42 N.Y.2d 13, 17 (1977).

f.    *Municipal Respondeat Superior Liability*

388.    Defendant City is vicariously liable under New York law pursuant to *respondeat superior*, because the individual Defendants were acting within the scope of their employment and in the course of performing their duties as NYPD personnel in causing, influencing, or maintaining Plaintiff's prosecution. See *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979).

## TWELFTH CAUSE OF ACTION
**Abuse of Process**
(New York Common Law)

*(Against Defendants: City, under respondeat superior; and Kontorovich, Ausman, Quinones, Uddin, Draughon, and any later-identified JD Defendants who personally used, maintained, procured, prolonged, approved, transmitted, or failed to correct criminal process against Plaintiff for collateral objectives outside the legitimate ends of criminal adjudication, in their individual capacities)*

a.    *Incorporation*

389.    Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

390.    This cause of action seeks relief under New York common law arising from Defendants' post-issuance misuse of criminal process after regularly issued process had been employed against Plaintiff.

391.    This claim is distinct from Plaintiff's false arrest and malicious prosecution claims. It does not arise merely from Plaintiff's arrest, the initiation or continuation of criminal charges, or the absence of probable cause, but from Defendants' post-issuance misuse, maintenance, transmission, or failure to correct criminal process for collateral objectives outside the legitimate ends of criminal adjudication.

392.    Under New York law, abuse of process requires: 1) regularly issued process; 2) intent to do harm without excuse or justification; and 3) use of process in a perverted manner to obtain a

collateral objective. See *Curiano v. Suozzi*, 63 N.Y.2d 113, 116-17 (1984); *Bd. of Educ. v. Farmingdale Classroom Tchrs. Ass'n*, 38 N.Y.2d 397, 403-04 (1975).

b.    *Use of Regularly Issued Legal Process*

393.    Regularly issued criminal process was employed against Plaintiff, including criminal accusatory instruments, the June 3 PO, mandatory court appearances, and related judicial restraints imposed in the course of Plaintiff's criminal proceedings.

394.    After that process was issued, Defendants used, maintained, transmitted, approved, or failed to correct it, with intent to harm Plaintiff and without justification, despite knowing that the charges and PO materially altered Plaintiff's legal status, credibility, access to protection, and ability to participate effectively as a complainant, protected party, and witness in related criminal matters involving PS.

395.    Defendants used and maintained that process in a perverted manner to obtain collateral objectives outside the legitimate ends of criminal adjudication, including reversing Plaintiff's functional status from protected complainant to accused criminal defendant; impairing Plaintiff's ability to seek enforcement of existing POs; deterring further complaints, public criticism, and requests for governmental intervention; and imposing coercive judicial restraints for retaliatory and non-adjudicative purposes.

396.    The collateral effect was concrete and foreseeable. While Plaintiff remained the protected party under active POs involving PS (and related third parties) and continued to possess safety-related information relevant to PS's pending criminal proceedings, Plaintiff's own prosecution and the June 3, 2025 PO created practical and legal barriers to direct communication with prosecutorial personnel, complicated Plaintiff's ability to attend or

participate in related proceedings, and constrained Plaintiff's ability to seek enforcement assistance without risking further adverse treatment.

c.    *Perverted Use of Process to Achieve Collateral Objectives*

397.    These objectives were collateral to the lawful purpose of criminal process – namely, adjudicating criminal liability – and, therefore, constitute improper collateral objectives under New York law. See *Curiano*, 63 N.Y.2d at 116-17; *Farmingdale*, 38 N.Y.2d at 403-04.

d.    *Improper and Malicious Intent*

398.    Defendants' improper intent is evidenced by their post-issuance maintenance, transmission, approval, and failure to correct the criminal process, after they knew or should have known that it was being used: 1) to impair Plaintiff's role as a complainant, protected party, and witness; 2) to deter further complaints and public criticism; and 3) to impose collateral pressure unrelated to the adjudication of the charges against Plaintiff.

e.    *Municipal Respondeat Superior Liability*

399.    Defendant City is vicariously liable under New York law pursuant to *respondeat superior*, because the individual Defendants acted within the scope of their employment and in the course of performing their duties as NYPD personnel. See *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979).

THIRTEENTH CAUSE OF ACTION
**Negligent Performance of Assumed
Protective Duties Arising from a Special Relationship**
(New York Common Law)

(*Against Defendant City, under respondeat superior*)

a.    *Incorporation and Legal Framework Governing
Municipal Negligence and Special Duty*

400.    Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

401. This cause of action is pleaded in the alternative to Plaintiff's federal constitutional claims, and seeks relief under New York common law governing municipal liability arising from special duty, voluntary assumption of protective obligations, and negligent performance of undertaken duties.

402. As a general rule, municipalities owe duties to the public at large, rather than to particular individuals. However, municipal liability may arise where the municipality, through promises or actions: 1) assumes an affirmative duty to act on behalf of an injured party; 2) municipal agents know that inaction could lead to harm; 3) there is direct contact between municipal agents and the injured party; and 4) the injured party justifiably relies on the undertaking. See *Cuffy v. City of New York*, 69 N.Y.2d 255, 260 (1987); *Sorichetti v. City of New York*, 65 N.Y.2d 461, 469-70 (1985); *McLean v. City of New York*, 12 N.Y.3d 194, 199-201 (2009).

403. This claim is based on negligent performance of specific protective undertakings directed toward Plaintiff, including inaccurate guidance, abandonment of undertaken protective measures, and failure to carry out operational or ministerial steps necessary to implement those undertakings. It is not based solely on generalized non-enforcement, resource allocation, or discretionary governmental policy judgments owed to the public at large. See *McLean*, 12 N.Y.3d at 199-203; *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 425-31 (2013).

404. Through repeated direct interactions with Plaintiff concerning specific threats, assaults, PO violations, and ongoing safety risks, NYPD personnel undertook particularized protective obligations directed specifically to Plaintiff, not merely duties owed to the public generally.

405. The NYPD personnel whose acts and omissions support this claim include, among others, Whitlock, Hirsch, Lugo, Mack, Douglas, Dzeviatka, Lobsang, Pastwa, Draughon, Castillo, Cavalieri, Layes, Russo, Sotamba, Pitre, JD No. 14, JD No. 16, Ramos, and later-identified City employees who had direct contact with Plaintiff concerning enforcement follow up, safety planning, safety related communications, or protective intervention.

406. Those undertakings included express representations and affirmative conduct concerning PO enforcement, identified aggressors, reported violations, enforcement follow up, safety planning, and protective intervention concerning the threats reported by Plaintiff.

407. NYPD personnel knew Plaintiff faced escalating risk from identified individuals, knew repeated non-enforcement or inaccurate enforcement guidance could result in further harm, and maintained direct and repeated contact with Plaintiff regarding those dangers.

408. Plaintiff reasonably relied on these undertakings in structuring her conduct, reporting behavior, and safety decisions, including by continuing to report violations through NYPD channels, providing evidence and information in reliance on expected enforcement follow up, and continuing to seek NYPD intervention rather than immediately abandoning reliance on law enforcement protection.

b.    *Negligent Performance*

409. After undertaking these protective obligations, NYPD personnel negligently performed them.

410. Rather than merely failing to provide police protection to the public at large, NYPD personnel negligently performed specific undertakings directed toward Plaintiff by:

   a.    providing misleading or inaccurate guidance concerning the availability, scope, or operation of undertaken enforcement protections;

     b.     withdrawing, abandoning, or failing to perform previously undertaken protective measures;

     c.     communicating inconsistent, misleading, or materially inaccurate information concerning enforcement options, PO enforcement, safety planning, or follow-up; and

     d.     failing to perform ministerial or operational steps necessary to carry out specific protective undertakings directed toward Plaintiff.

411.    NYPD personnel's negligent performance of those undertakings worsened Plaintiff's position, reduced her practical protection, and increased her vulnerability to known harm.

### c.   *Causation and Harm*

412.    As a direct and foreseeable consequence of NYPD personnel's negligent performance of assumed protective duties, Plaintiff suffered diminished protection, increased exposure to known threats, emotional distress, practical impairment of her ability to protect herself, and other foreseeable resulting harm, all of which were foreseeable given NYPD personnel's knowledge of repeated PO violations, prior threats, escalating hostility, and Plaintiff's repeated requests for intervention.

### d.   *Municipal Respondeat Superior Liability*

413.    The negligent acts and omissions described herein were committed by City employees acting within the scope of their employment.

414.    The conduct alleged herein arose from specific protective undertakings directed toward Plaintiff, direct contact, known and foreseeable risk of harm, Plaintiff's justifiable reliance, and negligent performance of operational or ministerial acts, rather than solely from discretionary governmental policy judgments or duties owed to the public at large.

415.    Defendant City of New York is, therefore, liable under *respondeat superior* for those negligent acts and omissions.

FOURTEENTH CAUSE OF ACTION
**Violation of the New York City Human Rights Law**
(N.Y.C. Admin. Code §§ 8-107, 8-502(a))

(*Against Defendants: City; Whitlock, Kontorovich, Hirsch, Ausman, Lugo, Mack, Douglas, Dzeviatka, Quinones, Uddin, Draughon, Castillo, Cavalieri, Pastwa, Lobsang, Layes, Russo, Sotamba, Pitre, JD No. 14, JD No. 16, Ramos, and later-identified NYPD or City personnel who personally participated in, aided, abetted, incited, compelled, or coerced the discriminatory or retaliatory denial of municipal services alleged herein, in their individual capacities*)

a.    *Incorporation, Statutory Basis, and Independent Construction of the NYCHRL*

416.    Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

417.    This claim is brought pursuant to N.Y.C. Admin. Code § 8-502(a). Under N.Y.C. Admin. Code § 8-130, the New York City Human Rights Law ("NYCHRL") must be construed independently from federal and state law and liberally in favor of discrimination plaintiffs to accomplish its uniquely broad and remedial purposes. See N.Y.C. Admin. Code § 8-130(a); *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 66-69 (1st Dep't 2009); *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109-10 (2d Cir. 2013).

418.    The NYCHRL prohibits discrimination in the full and equal enjoyment of covered public accommodations, services, facilities, privileges, advantages, and accommodations, and prohibits retaliation and aiding or abetting such discrimination or retaliation. Plaintiff alleges that the municipal services at issue here include police protection, enforcement of court-issued POs, victim notification, and victim-related safety services made available to members of the public. See N.Y.C. Admin. Code §§ 8-107(4) (Public accommodations), 8-107(6) (Aiding and abetting) and 8-107(7) (Retaliation).

419.    This cause of action concerns Defendants' discriminatory and retaliatory denial, withdrawal, obstruction, or unequal provision of those municipal services.

420.    Plaintiff's documented status as a victim of stalking-related conduct and a protected party under court issued POs made her eligible for police, enforcement, notification, and victim-related safety services that Defendants denied, withheld, withdrew, or provided on unequal and retaliatory terms.

b.    *Discrimination in the Provision of Municipal Services*

421.    At all relevant times, Plaintiff was protected under the NYCHRL on the basis of gender, gender identity, and gender expression. Defendants' conduct, as alleged herein, reflected and/or acquiesced in gender-based and gender-identity-based stereotypes concerning Plaintiff's credibility, victimhood, personal safety, and entitlement to equal police protection, including in connection with complaints involving stalking, harassment, interpersonal violence, anti-trans slurs, misgendering, and PO violations.

422.    Defendants, acting under color of law and in the course of providing municipal services, treated Plaintiff less well than similarly situated individuals in connection with the provision of police protection and enforcement services.

423.    Plaintiff engaged in protected activity by opposing and complaining about discriminatory, retaliatory, and unequal treatment in the provision of police, enforcement, notification, and victim-related municipal services, including treatment Plaintiff reasonably understood to be based at least in part on gender, gender identity, gender expression, and related stereotypes concerning credibility, victimhood, personal safety, and complaints involving stalking, harassment, interpersonal violence, anti-trans hostility, misgendering, and PO violations, including, *inter alia*:

a.  refused to enforce valid court-issued POs protecting Plaintiff;

b.  failed to provide standard victim protections and notifications;

c.  reversed victim/offender roles by arresting Plaintiff rather than known aggressors; and

d.  denied Plaintiff equal access to police services routinely afforded to similarly situated complainants.

424.  Upon information and belief, similarly situated complainants reporting comparable threats, stalking-related conduct, or violations of court-issued POs are ordinarily provided enforcement assistance, victim services, notifications, and police protection under comparable circumstances.

425.  Defendants' conduct resulted in Plaintiff being treated less well than similarly situated complainants in the provision of municipal services, at least in part because of gender, gender identity, gender expression, and gender-based or gender-identity-based stereotypes concerning credibility, victimhood, personal safety, enforcement priorities, and the handling of complaints involving stalking, harassment, interpersonal violence, anti-trans hostility, misgendering, and PO violations.

c.  *Protected Activity Under the NYCHRL*

426.  The NYCHRL prohibits retaliation against any person because she has opposed practices forbidden under the statute or otherwise exercised rights protected thereunder. See N.Y.C. Admin. Code § 8-107(7).

427.  Plaintiff engaged in protected activity by opposing and complaining about discriminatory, retaliatory, and unequal treatment in the provision of police, enforcement, notification, and victim-related municipal services, including treatment Plaintiff reasonably understood to be

based at least in part on gender-based stereotypes concerning credibility, victimhood, personal safety, and complaints involving stalking, harassment, and interpersonal violence, including, *inter alia*:

    a.    reporting that NYPD officers failed to provide equal enforcement of court-issued POs afforded to similarly situated complainants, including those not sharing Plaintiff's protected characteristics;

    b.    filing complaints with the Civilian Complaint Review Board and other oversight bodies concerning misconduct, unequal treatment, retaliation, and denial of police services;

    c.    publicly criticizing the 28th Precinct and its leadership for discriminatory and retaliatory practices; and

    d.    repeatedly requesting equal access to police protection, enforcement, and victim services.

428. Plaintiff's complaints constituted opposition to practices prohibited by the NYCHRL, including discriminatory and unequal denial of municipal services and retaliatory treatment in response to such opposition.

### d. *Retaliatory Conduct*

429. Following Plaintiff's protected activity, Defendants engaged in conduct reasonably likely to deter a person from engaging in such activity, including: 1) escalating enforcement against Plaintiff; 2) initiating and maintaining criminal charges against her; 3) refusing to enforce POs in her favor; and 4) denying her access to standard victim protections and services.

430. The causal connection is supported by temporal proximity, Defendants' statements, Defendants' knowledge of Plaintiff's complaints, and the escalation of adverse treatment following Plaintiff's complaints and public criticism.

e. *Independent and Liberal Construction*

431. This claim is independent of Plaintiff's federal constitutional claims and must be analyzed separately under the broader, more plaintiff-protective standards of the NYCHRL. Under the NYCHRL, Plaintiff need only show that she was treated less well, at least in part, because of a protected characteristic, and that Defendants engaged in conduct reasonably likely to deter protected activity. See *Williams,* 61 A.D.3d at 78-80; *Mihalik*, 715 F.3d at 110-13.

f. *Liability*

432. The individual Defendants are liable under N.Y.C. Admin. Code § 8-107(6) to the extent they personally participated in, aided, abetted, incited, compelled, or coerced the discriminatory or retaliatory denial, withdrawal, obstruction, or unequal provision of municipal services alleged herein.

433. Defendant Ramos is liable to the extent she acted as a City-affiliated, City-coordinated, or precinct-linked community safety liaison, facilitator, intermediary, or service-access participant in connection with Plaintiff's efforts to obtain protective intervention, enforcement assistance, and safety-related municipal services. As alleged herein, Defendant Ramos communicated with Plaintiff concerning safety measures, coordinated or contemplated protective intervention involving NYPD personnel, including Defendant Whitlock, and functioned as an access point through whom Plaintiff was directed or encouraged to seek municipal safety assistance. After Plaintiff criticized NYPD conduct and sought further governmental intervention, Defendant Ramos withdrew, canceled, or

obstructed previously promised and scheduled safety measures, including the anticipated Whitlock-related intervention and related welfare or safety checks. By doing so, Defendant Ramos participated in, aided, abetted, or facilitated the discriminatory or retaliatory denial, withdrawal, or obstruction of municipal safety services in a manner reasonably likely to deter Plaintiff from further complaints, public criticism, and requests for equal access to police protection and enforcement services.

434.    Defendant City is liable for the discriminatory and retaliatory denial, withdrawal, obstruction, or unequal provision of municipal services by its employees and agents in the course of providing police protection, PO enforcement, victim notification, and related safety services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against all Defendants, jointly and severally where permitted by law, and award the following relief:

1.    Declaratory Relief: A declaration pursuant to 28 U.S.C. §§ 2201–2202 that:

    a.    Defendants' arrest, detention, and prosecution of Plaintiff violated her rights under the First, Second, Fourth, and Fourteenth Amendments to the United States Constitution;

    b.    A declaration that, at the time of Plaintiff's arrest, enforcement of N.Y. Penal Law § 265.01(1) and N.Y.C. Administrative Code § 10-135 against Plaintiff's civilian possession of a SG for lawful self-defense was unconstitutional as applied to Plaintiff under the Second and Fourteenth Amendments, including in light of then-

existing federal constitutional authority concerning civilian SG possession, including *Avitabile v. Beach*, 368 F. Supp. 3d 404, 421-22 (N.D.N.Y. 2019);

c. Defendants' conduct violated Plaintiff's constitutional and statutory rights as alleged in this Complaint;

d. To the extent Plaintiff has pleaded claims under the New York Constitution and no adequate alternative remedy exists, Defendants' conduct violated Article I, §§ 6, 8, 11, and 12 of the New York Constitution.

2. <u>Injunctive Relief</u>: Appropriate prospective injunctive relief, including:

a. Enjoining Defendants from enforcing N.Y. Penal Law § 265.01(1) against Plaintiff in a manner that violates the Second and Fourteenth Amendments;

b. Enjoining Defendants from retaliating against Plaintiff for protected speech or petitioning activity;

c. Requiring appropriate prospective corrective measures necessary to prevent recurrence of the constitutional violations found by the Court, including measures concerning enforcement against Plaintiff, preservation or correction of records, and non-retaliation, as permitted by law; and

d. Such further equitable relief as the Court deems necessary to prevent ongoing or future violations of law.

3. <u>Compensatory Damages</u>: Compensatory damages against all Defendants to the fullest extent permitted by law for:

a. Loss of liberty, emotional distress, reputational injury, and other personal harms;

b. Financial losses, including lost income and out-of-pocket expenses; and

    c.      All damages recoverable under 42 U.S.C. §§ 1983 and 1988, the NYCHRL, and New York law.

4.    <u>Punitive Damages</u>: Punitive damages against all individual Defendants (but not against the City), for their intentional, reckless, retaliatory, and malicious conduct.

5.    <u>Attorneys' Fees and Costs</u>: Reasonable attorneys' fees, expert fees where permitted, costs, and expenses pursuant to 42 U.S.C. § 1988; N.Y.C. Admin. Code § 8-502(g); 28 U.S.C. § 1920; and any other applicable authority.

6.    <u>Nominal Damages</u>: Nominal damages for the violation of Plaintiff's constitutional rights.

7.    <u>Interest</u>: Prejudgment and post-judgment interest as permitted by law.

8.    <u>Jury Trial</u>: Plaintiff demands a trial by jury on all issues so triable.

9.    <u>Further Relief</u>: Such other and further relief as the Court deems just and proper.


Date:   <u>July 9, 2026</u>
       New York, NY


Respectfully submitted,


<u>/s/  Jennifer L. Harrington</u>
Jennifer L. Harrington, Esq.
*Plaintiff, Pro Se*
2214 Frederick Douglass Blvd, Ste. 243
New York, NY 10026
Tel: (917) 488-8414
harringtonlegalnyc@gmail.com